UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2004 JUL -9  A 11: 06

U.S. DISTRICT COURT
HARTFORD, CT

Barbara R. Burns,

    Plaintiff

v.

David S. King,

    Defendant

CIVIL ACTION

NO. 302-CV-897 (RNC)

---

**LOCAL RULE 56 (c) (2) STATEMENT OF BARBARA R. BURNS**

As specified by the May 24, 2004 order of United States District Court Judge Robert N. Chatigny, Plaintiff herein submits Plaintiff's Response to Defendant's Local Rule 9 (c) Statement, appended hereto as Exhibit A.

**I. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**

1. Plaintiff Barbara R. Burns has brought this action for defamation, common-law contract, detrimental reliance, and violations of the federal Family Educations Rights and Privacy Act (FERPA) and the Connecticut Unfair Trade Practices Act. (Plaintiff's Complaint, P. 1. Plaintiff DENIES Defendant's Statement #1 that Plaintiff sued in tort for defamation only.

2. Plaintiff asserts that by written and oral publication on or about May 24, 2000 and on other occasions, Defendant spoke and wrote false and per se defamatory words, which were actuated by malice, which were unprivileged, and which were published to third parties, including, but not limited to Dean E. Thomas Sullivan, and employees of the University of Minnesota Law School and other persons and

1

institutions, the substance and purpose of which was to thwart, undermine and sabotage the law school transfer applications that Quinnipiac Dean Neil H. Cogan, on January 4, 2000 and on subsequent occasions, pledged that Quinnipiac University School of Law would support and facilitate, including, but not limited to, an unauthorized statement that Plaintiff was not in good standing and not eligible for transfer status, when Dean Cogan, a higher-ranking University official and Defendant's supervisor, certified that Plaintiff was in good standing, eligible for transfer status and that the Office of the Dean, Quinnipiac School of Law, would facilitate Plaintiff's transfer to an ABA-approved law school of Plaintiff's choice. Plaintiff DENIES Defendant's Statement #2 that Defendant's conduct was limited to one isolated occasion and was limited only to a statement that Plaintiff was not in good standing as of May 24, 2000.

3. Plaintiff asserts that on May 24, 2000 and on other occasions, Defendant King spoke, wrote and otherwise communicated defamatory words to Quinnipiac employee Mary Ellen Durso and other employees of Quinnipiac University, the substance of which was that Plaintiff was not in good standing at Quinnipiac University School of Law; not eligible for transfer; and that Durso and other persons within the Registrar's office should withhold Letters of Good Standing that Dean Cogan ordered to be provided to Plaintiff and to transferee schools of Plaintiff's designation; and that Durso confirmed this to Plaintiff verbally and in writing on May 24, 2000 and subsequently. Plaintiff DENIES Defendant's Statement #3 that Defendant's conduct was limited to oral statements and was

limited in substance to statements that Plaintiff was not in good standing as of May 24, 2000.

4. In making his representations as to Plaintiff's standing with Quinnipiac University, Defendant King could not possibly have relied upon the fact that Plaintiff had an outstanding balance with the school in the amount of $11, 810, because (1) Defendant claimed in deposition to have no knowledge as to the University Accounts Receivable Department and stated in deposition that Defendant did not become involved in the accounting or collection function; (2) between January 1999 and November 1999, Quinnipiac University rejected a tender of approximately $5000 in "cross-over" financial aid funds and approximately $6700 in federal Stafford loans for Plaintiff' that would have paid Plaintiff's tuition in full, thus obviating Plaintiff's contractual obligation to pay this same amount out a second time out of Plaintiff's own funds; and (3) on January 4, 2000 and on subsequent occasions, the last of which was May 25, 2000, Dean Cogan, a higher-ranking University official, designated in written correspondence to Plaintiff by Quinnipiac University President John Leahy and Quinnipiac University Provost William Bennett as the deciding official, formally overruled Defendant's unauthorized and pretextual policy interpretation that good standing was in any way tied to, or contingent upon, financial factors. Plaintiff DENIES Defendant's Statement #4 that Defendant could have relied, or did rely, upon Defendant's own subjective and unauthorized "financial good standing" rationale, previously discredited and overruled by Dean Cogan.

5. Plaintiff seeks damages in excess of $75,000, in an amount to be proven at trial. Plaintiff ADMITS Defendant's Statement #5.

6. The total amount of actual damages claimed by Plaintiff is cumulative and exceeds $75,000, the specific amount to be proven at trial. Plaintiff DENIES Defendant's Statement #7 that Plaintiff's actual damages totals $37,000 to $39,000.

7. Of this amount, Plaintiff attributes no portion of the *ad damnum* to events occurring prior to May 24, 2000, excepting the $5,000 in "cross-over" financial aid and the $6,700 Stafford proceeds mishandled by the office of Anne Traverso, Quinnipiac Financial Aid office, which Plaintiff claims as offset, and for which Plaintiff does not demand otherwise demand a separate award of cash damages. Plaintiff DENIES Defendant's Statement #8.

8. Of the amount claimed in *ad damnum*, Plaintiff attributes approximately $10,000 to actual damages arising from Defendant's material and willful breach of the educational contract; and the remainder to lost opportunity earnings with regard to law school matriculation and law firm positions for which Plaintiff was recruited, in an amount to be proven at trial, in addition to actual, special, consequential and punitive damages sustained by and payable to Plaintiff, based upon legal theories of breach of contract, defamation, negligence, intentional and negligent infliction of emotional distress, damage to reputation, and invasion of privacy. Plaintiff DENIES Defendant's Statement #9.

## II. GENUINE DISPUTED ISSUES OF MATERIAL FACT

1. Whether, at various times between August 1999 and May 2000 and subsequently, Defendant, an associate dean, had the authority to create, devise, promulgate, disseminate, publish and enforce Quinnipiac institutional policy; and whether Defendant's unilateral and unauthorized policy statements were sufficient to terminate Dean Neil Cogan's actual and apparent authority to overrule Defendant as to matters of policy, including, but not limited to, Dean Cogan's acts, between November 1999 and July 1, 2000, of certifying Plaintiff's Good Standing Status over Defendant's objections.

   BRIEF ANSWER: No. (Defendant says Yes)

   Defendant testified under oath in deposition that Dean Cogan's policy-making and implementation authority throughout Plaintiff's enrollment at Quinnipiac was both plenary and preemptive; and that Defendant, an associate dean and Cogan's direct report, was bound by Dean Cogan's policy determinations, including, but not limited to, the Good Standing Certifications issued by Dean Cogan to Plaintiff on January 4, 2000 and May 25, 2000 over Defendant's objections. See, King Deposition, February 7, 2003, Filed in Case No. 3-02-CV897 (RNC).

2. Whether Defendant acted with malice.

   BRIEF ANSWER: Yes. (Defendant says No)

   Defendant, an associate dean, at all relevant times subject to the policy making determinations of Quinnipiac Dean Neil Cogan, repeatedly contravened and disregarded, and encouraged his staff to disregard and obstruct, numerous policy rulings by Cogan in Plaintiff's favor, including transcript issuance and Good

5

Standing Certifications between the dates of August, 1999 and May, 2000. The record available to this court and to a jury at trial—including, but not limited to, Defendant's deposition transcript and Quinnipiac University records created in the ordinary course of business between the dates of January 1999 and May 24, 2002—is unequivocal that, whenever Defendant had a choice and even when Defendant did not have a choice, i.e., when Defendant was expressly ordered to take certain actions by Dean Cogan and other Quinnipiac executives, Defendant always opted for the action, authorized or not, that would be most harmful and damaging to Plaintiff.

3. Whether Quinnipiac University, during Plaintiff's enrollment, ever adopted, published, and/or enforced, an institutional policy conditioning "Good Standing" status for transfer purpose upon financial obligations; and, if so, whether such an institutional policy ever mandates revocation of "Good Standing" status—as opposed to mere transcript hold not published to third parties—upon financial obligation; or whether Defendant, without authority, simply conveniently fabricated such a policy to sabotage Plaintiff's transfer application.

BRIEF ANSWER: No and Yes. (Defendant says Yes and No)

At deposition and throughout discovery, Defendant consistently admitted that he was unable to cite any authorizing institutional policy that conditioned law school good standing status upon "financial good standing"[1] ; and that, in fact, Defendant was repeatedly overruled by the deciding official, Dean Cogan, whenever he tried

---

[1] The court may take judicial notice of the fact that the Handbook materials—which, under Minnesota law, rise to the level of an express contract term—distributed and acknowledged by Plaintiff and her class as a condition precedent to matriculation at Quinnipiac School of Law do not give credence to, or even mention, "financial good standing" as a concept; and that Defendant, in more than two years of litigation, has never established that the concept of "financial good standing" exists anywhere other than in his own mind.

to unilaterally enforce his own contrived and self-serving "financial good standing" policy upon Plaintiff.

Defendant further admitted in deposition that Defendant himself did not observe such a policy whereby "good standing" for transfer certification purposes was contingent upon financial obligation with any degree of consistency; and that Defendant himself on at least two occasions between the dates of April 1999 and August 1999, had certified, over his own signature, Good Standing status with respect to Plaintiff and other students, similarly situated, without regard for an outstanding account balance. King Deposition, February 7, 2003.

Based upon the record, including Defendant's own testimony, under oath, at deposition, a reasonable juror could, and very likely would, conclude that (1) there is no such concept as "financial good standing" at Quinnipiac University School of Law or any other ABA law school; (2) that, in accordance with established ABA law school custom and practice, University of Minneosta Law School Dean Sullivan could not reasonably be expected to interpret Defendant's statement, which purported to revoke Plaintiff's good standing status, as meaning anything other than poor academic performance, failed attendance, or misconduct; and (3) that Defendant devised his "financial good standing" rationale for no purpose other than to thwart Plaintiff's otherwise excellent opportunity to transfer from Quinnipiac to a higher-rated ABA law school, with a higher market value; and to insulate himself from liability in any lawsuit brought by Plaintiff.

4. Whether Plaintiff was, in fact, delinquent with respect to any financial obligation within the meaning of any applicable Quinnipiac institutional policy; whether

7

Plaintiff was properly notified of the policy and the allegedly delinquent obligation; and whether Defendant committed an actionable invasion of privacy by publishing private facts.

BRIEF ANSWER: No and Yes. (Defendant says Yes and No)

The record available to the court demonstrates unprofessional, error-prone, and even feckless Quinnipiac administrative controls, of and with which Defendant, by his own deposition testimony, had limited knowledge and no involvement. Among other documented actions, in approximately mid-September, 1999, the Quinnipiac University Bursar, Valerie Carbone, "late billed" 1999 Summer, 1999 tuition, that, by Carbone's own admission, was the result of "a mistake." This resulted in a large, sudden, and unforeseen Fall, 1999 balance of some $5500 for which otherwise applicable financial aid could not be recaptured and that, in fact, Plaintiff paid in full immediately upon notification in November 1999.

At approximately this same time and at various times throughout 1999, Ann Traverso, Quinnipiac Financial Aid Office, unreasonably and in breach of the educational contract, unilaterally refused to process "cross-over" financial aid for which Plaintiff was eligible and for which Plaintiff applied. Traverso also unilaterally and without Plaintiff's consent or authorization, returned (and, technically, converted) $6700 in Stafford funds disbursed in November, 1999, that could and should have been applied to Quinnipiac tuition payable and which, if applied, would have resulted in a **credit** balance as of January 4, 2000, the date that Cogan overruled King and certified Plaintiff in good standing. Plaintiff duly and formally disputed Plaintiff's spring tuition bill on these and other grounds in April 1999.

Given that Plaintiff started the Spring Semester in good standing, having been certified so by Cogan, and that spring tuition was not billed until April (and was promptly and validly disputed and the legitimate dispute active and pending in May, 2000) Plaintiff could not possibly have been "delinquent" less than thirty days later, as of May 24, 2000. (This assumes, *arguendo*, that Quinnipiac institutional policy permitted Defendant to condition Good Standing upon financial obligation, which, by Dean Cogan's determinations overruling Defendant as to this point, it did not).

Plaintiff further notes that, even if Plaintiff were delinquent, which has not been established and even if Quinnipiac University correctly imposed a "transcript hold", which also has not been established, this would authorize the University to simply withhold transcript records and to deny the student's request for transcript issuance until all legitimate charges were paid. It would not justify a gratuitous and damaging publication of a blanket revocation of a student's good standing status, which are private facts, to third parties.

5. Whether Plaintiff was, in fact, in good standing as Cogan, the deciding official, defined it.

   BRIEF ANSWER: Yes (Defendant says No)

   The record before the court confirms that Plaintiff successfully completed all first-year law school coursework; that Plaintiff's academic performance, including Visiting Student coursework at top-tier law schools, placed Plaintiff in the upper half of her class; and that Plaintiff performed creditably, earning all attempted transfer credits, as a Visiting Student, at top-tier institutions, including the University of Minnesota Law School, the University of Connecticut School of

Law, and Georgetown University School of Law. By the determination of Cogan, Plaintiff had advanced to 2-L status as of January 2000.

Plaintiff, by all accounts, was also popular, respected and well-liked by Quinnipiac students and faculty and was, in fact, the only member of her first-year class to be chosen for two externships, in corporate law and appellate advocacy. Records produced by Defendant as Defendant's Initial Disclosures confirm that two Quinnipiac professors, Marilyn Ward Ford and Leonard Long, recommended Plaintiff for transfer to the University of Minnesota Law School and the University of Connecticut School of Law, respectively, both higher-ranked ABA schools than Quinnipiac, as did law Professors John Bedosky and Joseph Mitchell, attorneys and adjunct faculty, who recommended Plaintiff to the L.LM Tax Program at NYU, the top-rated tax program in the nation.

During this same time period, Plaintiff completed, *summa cum laude*, a regionally-accredited Executive MBA program in Risk Management and Insurance with a 3.9 GPA. Plaintiff also passed the California First Year Law Students Examination, aka "the baby bar"; in addition to the Multi-State Professional Responsibility Examination and the Uniform CPA Examination. Plaintiff's Business Law grade—a 94—placed Plaintiff in the top 5% of all CPA candidates, nationwide, who took that particular test battery.

There can be no question from the perspective of a reasonable juror that, but for Defendant's malicious, unauthorized, and vindictive conduct, Plaintiff would by now have passed the California Bar Examination and, accordingly, that Plaintiff's income would be commensurate with that credential. There further can be no

question that there exists ample empirical data and other credible and objective evidence that a law degree conferred by the top tier schools, where Plaintiff performed creditably and to which Dean Cogan promised that Quinnipiac would facilitate Plaintiff's transfer, has a higher market value, in terms of career opportunities and salary, than a Quinnipiac degree.

6. Whether Plaintiff was damaged and to what degree by Defendant's willful, unlawful, negligent, and unauthorized acts.

BRIEF ANSWER: Yes (Defendant says No). Plaintiff notes that Plaintiff has satisfied reasonable inquiry by obtaining expert review with respect to Plaintiff's Damage Analysis, as set forth, *infra*:

*Damage Analysis*

Three types of damages are available and potentially recoverable with respect to an action for defamation. In some, but not all, situations, the requirement of actual proof of damages is affected by the type of defamation that is involved.

***Pecuniary Damages*** are quantifiable monetary losses suffered by Plaintiff due to the injury to her reputation. Examples include loss of customers, loss of a job, or other diminishment of economic advantage. Plaintiff must present evidence of specific, actual monetary losses in order to recover pecuniary damages.

Here, Plaintiff incurred a total of $18000 in law school tuition and related costs—$6000 of which Plaintiff paid in cash, and approximately $12000 of which were payable by financial aid funds, including Federal Stafford funds, for which Plaintiff applied and was eligible and which, in breach of the education contract,

11

Defendant caused to be negligently forfeit—which Defendant's conduct rendered valueless.

Additionally, Plaintiff could not pursue a summer associate position for which Plaintiff was recruited and for which Plaintiff would have earned a minimum of $1800 per week for a minimum of 12 weeks, or $21,600.

Plaintiff also incurred approximately $2000 in attorneys' fees as a direct and proximate result of Defendant's admitted, knowing, and willful violation of the federal Family Educational Rights and Privacy Act (FERPA), whereby Defendant unreasonably and unlawfully withheld and/or directly caused to be withheld, disputed academic records for more than two **years**, in flagrant violation of the FERPA requirement that an institution is required to produce said records within 45 **days** of a student's request; and to mail said records to any student residing outside commuting distance of the institution. (FERPA office guidelines define "commuting distance" as 50 miles).

***Presumed* (*General*) *Damages*** are available in certain situations whereby a jury is permitted to presume that a plaintiff suffered general, or non-specific, damages as a result of the defendant's defamatory statement. These include non-pecuniary aspects of the injury to reputation, such as humiliation, loss of socialization, etc. The jury is instructed to estimate the amount of presumed damages based upon the extent of injury to Plaintiff's reputation.

Presumed damages are available and it is presumed that Plaintiff suffered general damages (and thus no proof of actual damages need be offered) when the form of defamation is slander per se or ordinary libel.

In this case, Defendant's defamatory written statement disparaged Plaintiff as both a law student and a lawyer by wrongfully impugning Plaintiff's honesty and personal integrity, of which others in the legal profession, including, but not limited to, two Quinnipiac faculty members, spoke in glowing terms.

Defendant's statement was defamatory and libelous per se (and not susceptible of anything other than a negative meaning) because it was readily apparent from the face of the message, i.e., "not in good standing", that it would injure Plaintiff's reputation and that of any other law student applying for transfer admission. Because the message on its face seems, and clearly is, injurious to Plaintiff's reputation, the doctrine of substantial truth, argued by the Defendant, cannot apply; and Plaintiff need not plead extrinsic facts which renders the message defamatory and Plaintiff need not explain how the message, with the extrinsic facts, damages her reputation.

***Punitive Damages*** are damages that are assessed against a defendant to punish and deter future wrongful conduct. To maintain a claim for punitive or exemplary damages, Plaintiff must make some additional evidentiary showing of vexatious or evil intent (i.e., common-law malice) to recover punitive damages.

Here, Plaintiff has demonstrated that Defendant willfully and in contravention of institutional policy set forth by the Dean of Quinnipiac University School of Law to whom Defendant reported, repeatedly withheld academic records and misrepresented relevant events having bearing upon Plaintiff's status, fitness, and personal integrity for no purpose other than harm Plaintiff, and to undermine

Plaintiff's transfer application to a higher-ranked ABA law school; and that Defendant did so in reckless disregard of Plaintiff's legal rights.

Plaintiff has further demonstrated that Defendant has advanced a frivolous legal position, i.e., "financial good standing" that, in fact, is not supported or articulated by any published or official University policy, and which was expressly overruled by his superior, Dean Neil Cogan, at least twice with respect to this Plaintiff. Plaintiff has demonstrated that Defendant cannot possibly hold a good faith belief that his position is meritorious.

Defendant has also committed documented discovery abuses, including, by all appearances, destruction of evidence, resulting in acute prejudice, including additional expense [2] to Plaintiff, who has conscientiously and diligently complied with court rules and requirements to the best of her ability throughout the two years of this litigation.

Under both the Federal Rules and Minnesota law governing punitive damages, Plaintiff may petition the court for an award of Rule 37 sanctions and/or treble damages to punish Defendant's conduct and to deter future wrongful conduct. For texture, Plaintiff notes that Defendant has admitted under oath in deposition that he has been sued several times under similar circumstances arising from his performance as an associate dean of Quinnipiac University. The court may infer from these admissions that persons other than Plaintiff have been damaged by Defendant's wrongful conduct and reckless disregard for the legal rights of others.

---

[2] Defendant's apparent destruction of, and stated inability to produce archived computer records, including records of email between Plaintiff and Cogan and Defendant and Cogan, to which Defendant testified in deposition, necessitates the live deposition of Cogan, in California, at substantial cost.

14

In consideration of the foregoing, it is Plaintiff's good-faith belief that, based upon Defendant's deliberate and intentional acts and the absence of any mitigating factors, a reasonable jury should and will find that Defendant published a false and unprivileged statement that, on its face, was injurious to Plaintiff's reputation, character, and fitness to complete her law school education and practice the law and, thus, was per se defamatory; and that Defendant's conduct was actuated by malice and, in context, was particularly egregious and knowing; and that, based upon this finding, should and will return a judgment in excess of $200,000, including punitive damages, against the Defendant.

DATED: June 12, 2004                         BY: _____
                                                  Barbara R. Burns

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Barbara R. Burns | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | NO: 302CV |
| 00897(RNC) | | |
| V. | : | |
| | : | |
| David S. King | : | May 19, 2003 |
| Defendant | : | |

## LOCAL RULE 9(c)(1) STATEMENT OF DAVID KING

The defendant, David King, by and through its attorneys, Conway & Stougton, LLP, herein submits the following Statement of Undisputed Material Facts in accordance with Local Rule 9(c)(1) of the United States District Court for the District of Connecticut:

1. Plaintiff Barbara Burns has brought this action for defamation against Defendant King, as an individual. (Plaintiff's complaint ¶2).

2. Plaintiff alleges that Defendant King, by letter dated May 24, 2000, wrote false and defamatory words which were published to other institutions the substance of which was that she was not in good standing as of May 25, 2000. (Plaintiff's complaint ¶4).

3. Plaintiff alleges that Defendant King, in the presence of Quinnipiac University employee Mary Ellen Durso and other persons unknown to plaintiff, spoke false and defamatory words, the substance of which was that she was not in good standing as of May 25, 2000. (Plaintiff's complaint ¶4).

## CERTIFICATION

This is to hereby certify that a copy of the foregoing has been mailed, postage prepaid, on this 19th day of May to all counsel of record, namely:

Barbara R. Burns
980 Main Street
Hackensack, NJ 07601

Matthew G. Conway

4. In making his representations as to Plaintiff's standing with Quinnipiac University, King relied upon the fact that had an outstanding balance with the school in the amount of $11,810. (King deposition ¶233).

5. The statements made by Defendant King as to Plaintiff's standing with the University were therefore truthful.

6. Plaintiff seeks damages in the excess of $75,000. (Plaintiff's complaint ¶7).

7. The total amount of actual damages claimed by Plaintiff totals approximately $37,000 to $39,000. (Burns deposition ¶142-160).

8. Of this amount, Plaintiff attributes at least $10,000 to damages suffered by her prior May 24, 2000. (Burns deposition ¶143-5). ¶

9. Also of this total amount, Plaintiff attributes $12,000-16,000 to loss opportunity earnings from a position that Plaintiff never submitted an application for. (Burns deposition ¶152-5).

DEFENDANT,
DAVID S. KING,

By: /s/ Matthew G. Conway
Matthew G. Conway
Fed. No. ct09612
Conway & Stoughton, LLP
201 Ann Street
Hartford, CT 06103
(860) 525-5529
fax (860) 525-1191

Affidavit of Service by Mail

Renée DeFina, upon oath, deposes & says that on June 12, 2004 & on July 6, 2004, I placed in an envelope, U.S. Postage prepaid, and addressed to the parties named below, Plaintiff's Motion in opposition to Defendants' Motion to Summary Judgment, affidavit of Barbara R. Burns and Local Rule 56(c)(2) Statement of Barbara R. Burns, and that the same were by me deposited in a U.S. Postal Box in New Milford, NJ.

Parties Served:
Conway & Houghton
201 Ann St
Hartford Ct 06103

Kevin Rowe / Clerk
U S Dist Court
450 Main St
Hartford Ct 06103

Renée DeFina
RENÉE DEFINA

Sworn to and subscribed before me this 6th day of July 2004.

DOROTHEA TURRIGIANO
Notary Public of New Jersey
MY COMMISSION EXPIRES MARCH 5, 2007