West Reporter Image (PDF)

**FOR EDUCATIONAL USE ONLY**
389 N.W.2d 876, 62 A.L.R.4th 581, 105 Lab.Cas. P 55,625, 1 IER Cases 1269
Supreme Court of Minnesota.
Carole LEWIS, et al., Respondents,
v.
The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, petitioner,
Appellant.
No. C8-84-1065.
July 3, 1986.

Employees brought action against former employer for alleged breach of employment contracts and for alleged defamation. The District Court, Ramsey County, entered judgment on verdict awarding employees compensatory and punitive damages, and employer appealed. The Court of Appeals, 361 N.W.2d 875, affirmed award, but remanded on issue of contract damages for future harm, and employer appealed. The Supreme Court, Amdahl, C.J., held that: (1) employee handbook provisions on dismissal were definite enough to constitute an offer and, when accepted, to form a binding unilateral contract; (2) instruction to effect that covenant of good faith could be implied in contract, though fundamentally erroneous, was not prejudicial when it was not linked to alleged breach of contract; (3) publication requirement for defamation could be satisfied by facts showing that employees were compelled to publish defamation to prospective employers and that it was foreseeable by employer; (4) issue of employer's entitlement to a qualified privilege should have been determined by court, instead of submitted to jury, but error was not prejudicial when jury found that employer's statements were actuated by actual malice; and (5) compensatory damages were properly awarded for future harm to employees' earning capacity, but punitive damages on defamation claim based on compelled self-publication were not available.
Affirmed in part and reversed in part.
Simonett, J., dissented in part and concurred in part and filed opinion in which Coyne, J., joined.
Kelley, J., dissented and filed opinion.

West Headnotes

[1] KeyCite Notes 

↪ 231H Labor and Employment
  ↪ 231HI In General
    ↪ 231Hk49 Manuals, Handbooks, and Policy Statements
      ↪ 231Hk50 k. In General. Most Cited Cases
      (Formerly 255k3(2) Master and Servant)

Personnel handbook provisions, if they meet requirements for formation of a unilateral contract, may become enforceable as part of employment contract.

[2] KeyCite Notes 

↪ 231H Labor and Employment
  ↪ 231HI In General
    ↪ 231Hk31 Contracts
      ↪ 231Hk34 Formation; Requisites and Validity
        ↪ 231Hk34(1) k. In General. Most Cited Cases
        (Formerly 255k3(1) Master and Servant)

A promise of employment on particular terms of unspecified duration, if presented in form of an offer and accepted by employee, will create a binding unilateral contract.

[3] KeyCite Notes 

⇐231H Labor and Employment
　⇐231HI In General
　　⇐231Hk31 Contracts
　　　⇐231Hk34 Formation; Requisites and Validity
　　　　⇐231Hk34(1) k. In General. Most Cited Cases
　　　　　(Formerly 255k3(1) Master and Servant)

Issue whether a proposal constitutes an offer for a unilateral contract of employment must be determined by outward manifestations of parties, not by their subjective intentions.

[4] KeyCite Notes 

⇐231H Labor and Employment
　⇐231HI In General
　　⇐231Hk49 Manuals, Handbooks, and Policy Statements
　　　⇐231Hk51 k. Particular Cases. Most Cited Cases
　　　　(Formerly 255k3(2) Master and Servant)

Employee handbook provisions which, though containing general statements of policy to effect that employer would ensure job security of all salaried employees, also contained specific language that except for misconduct serious enough to warrant immediate dismissal, no employee would be discharged without previous warning and a period in which to bring performance up to a satisfactory level was definite enough to constitute an offer which ripened into a binding unilateral contract upon acceptance.

[5] KeyCite Notes

⇐231H Labor and Employment
　⇐231HI In General
　　⇐231Hk31 Contracts
　　　⇐231Hk34 Formation; Requisites and Validity
　　　　⇐231Hk34(2) k. Particular Cases. Most Cited Cases
　　　　　(Formerly 255k3(2) Master and Servant)

Continued employment until discharge constituted acceptance of employer's unilateral offer of employment and provides necessary consideration for offer to ripen into a binding contract.

[6] KeyCite Notes

⇐231H Labor and Employment
　⇐231HI In General
　　⇐231Hk49 Manuals, Handbooks, and Policy Statements
　　　⇐231Hk51 k. Particular Cases. Most Cited Cases
　　　　(Formerly 255k3(2) Master and Servant)

Sentence in employment handbook to effect that dismissals usually came about because of an

individual's indifference to work quality or attendance standards, when combined with other language referring directly to company's policy on serious misconduct, was properly taken as an informative statement of fact rather than an explicit statement that dismissals were limited to attendance or performance.

[7] KeyCite Notes

⇐231H Labor and Employment
    ⇐231HI In General
        ⇐231Hk37 Term, Duration, and Termination
            ⇐231Hk40 Definite or Indefinite Term; Employment At-Will
                ⇐231Hk40(3) k. Particular Cases. Most Cited Cases
                    (Formerly 255k30(1.5) Master and Servant)

Dismissal provisions in employment contract which, in addition to a warning, provided for a period in which to bring performance up to a satisfactory level could have provided basis for conclusion that company's employees would be dismissed only for failing to adequately improve their performance or, in other words, for cause.

[8] KeyCite Notes

⇐231H Labor and Employment
    ⇐231HVIII Adverse Employment Action
        ⇐231HVIII(B) Actions
            ⇐231Hk873 k. Questions of Law or Fact. Most Cited Cases
                (Formerly 255k43 Master and Servant)

Question whether employer breached employment contracts by failing to comply with dismissal provisions of handbook by providing employees with a period in which to bring their performance up to a satisfactory level was question for jury.

[9] KeyCite Notes

⇐231H Labor and Employment
    ⇐231HVIII Adverse Employment Action
        ⇐231HVIII(B) Actions
            ⇐231Hk874 k. Instructions. Most Cited Cases
                (Formerly 255k44 Master and Servant)

Instruction to effect that handbook provisions could become part of employment contract only if company "intended to give up its right to terminate the employment of its employees at will," though not a model of clarity, were neither clearly erroneous nor prejudicial as misleading jury and compelling it to find that if a contract was proven the company had forfeited its right to freely terminate employees.

[10] KeyCite Notes

⇐30 Appeal and Error
    ⇐30V Presentation and Reservation in Lower Court of Grounds of Review
        ⇐30V(D) Motions for New Trial
            ⇐30k302 Sufficiency and Scope of Statement of Grounds

⇐30k302(4) k. Instructions, and Failure or Refusal to Give  Instructions. <u>Most Cited Cases</u>

Fundamental errors of law, in jury instructions are reviewable on appeal so long as they have been assigned as errors in motion for new trial.

[11] KeyCite Notes 

⇐<u>30</u> Appeal and Error
  ⇐<u>30XVI</u> Review
    ⇐<u>30XVI(J)</u> Harmless Error
      ⇐<u>30XVI(J)18</u> Instructions
        ⇐<u>30k1064</u> Prejudicial Effect
          ⇐<u>30k1064.1</u> In General
            ⇐<u>30k1064.1(1)</u> k. In General. <u>Most Cited Cases</u>

Jury instructions being reviewed for fundamental error on appeal are not a basis for obtaining reversal unless error is shown to be inherently prejudicial.

[12] KeyCite Notes 

⇐<u>231H</u> Labor and Employment
  ⇐<u>231HVIII</u> Adverse Employment Action
    ⇐<u>231HVIII(B)</u> Actions
      ⇐<u>231Hk874</u> k. Instructions. <u>Most Cited Cases</u>
        (Formerly 255k44 Master and Servant)

Instruction that employer had a duty to exercise good faith and fair dealing in all relations with its employees was not fundamentally erroneous when not linked to main breach of contract issue and when damage instructions warned against duplicative awards and essentially instructed jury that damages for breach were to be limited to out-of-pocket losses suffered by employees.

[13] KeyCite Notes

⇐<u>237</u> Libel and Slander
  ⇐<u>237I</u> Words and Acts Actionable, and Liability Therefor
    ⇐<u>237k1</u> k. Nature and Elements of Defamation in General. <u>Most Cited Cases</u>

A statement is not considered defamatory unless it is communicated to someone other than plaintiff, is false, intends to harm plaintiff's reputation and to lower him in estimation of community.

[14] KeyCite Notes

⇐<u>237</u> Libel and Slander
  ⇐<u>237I</u> Words and Acts Actionable, and Liability Therefor
    ⇐<u>237k23</u> Publication
      ⇐<u>237k23.1</u> k. In General. <u>Most Cited Cases</u>
        (Formerly 237k23)

Publication requirement for defamation may be satisfied by facts showing plaintiff was compelled to publish defamatory statement to a third person if it was foreseeable to defendant that plaintiff would be so compelled.

[15] KeyCite Notes 

←237 Libel and Slander
    ←237II Privileged Communications, and Malice Therein
        ←237k40 Qualified Privilege
            ←237k44 Discharge of Duty to Others
                ←237k44(3) k. As to Character of Employee. Most Cited Cases

Fact that defamation occurred in context of an employment discharge should not defeat recovery if employees can otherwise establish a cause of action for defamation against employer.

[16] KeyCite Notes 

←115 Damages
    ←115III Grounds and Subjects of Compensatory Damages
        ←115III(B) Aggravation, Mitigation, and Reduction of Loss
            ←115k62 Duty of Person Injured to Prevent or Reduce Damage
                ←115k62(2) k. Personal Injuries. Most Cited Cases

Duty to mitigate damages in connection with a compelled self-publication of a defamation can be protected by requiring plaintiffs when they encounter a situation in which they are compelled to repeat a defamatory statement to take all reasonable steps to attempt to explain true nature of situation and to contradict defamatory statement.

[17] KeyCite Notes 

←237 Libel and Slander
    ←237I Words and Acts Actionable, and Liability Therefor
        ←237k23 Publication
            ←237k23.1 k. In General. Most Cited Cases
            (Formerly 237k23)

Concept of compelled self-publication does no more than hold originator of defamatory statement liable for damages caused by statement where originator knows, or should know, of circumstances whereby defamed person has no reasonable means of avoiding publication of statement or avoiding resulting damages.

[18] KeyCite Notes

←237 Libel and Slander
    ←237I Words and Acts Actionable, and Liability Therefor
        ←237k23 Publication
            ←237k23.1 k. In General. Most Cited Cases
            (Formerly 237k23)

Allegedly defamatory statements which were communicated directly to employees upon their discharge and which employees were then forced to communicate themselves when prospective employers inquired as to why they left their previous employment were properly made a basis for a cause of action on ground that employer knew employees would be compelled to repeat allegedly defamatory statements to prospective employers.

An employer's communication to an employee of reason for discharge may present a proper occasion upon which to recognize a qualified privilege.

[24] KeyCite Notes

⇐237 Libel and Slander
   ⇐237IV Actions
      ⇐237IV(E) Trial, Judgment, and Review
         ⇐237k123 Questions for Jury
            ⇐237k123(8) k. Privilege. Most Cited Cases

Initial determination of whether an allegedly defamatory communication is privileged is a question of law for court to decide, while subsequent determination whether privilege was abused is a question of fact for jury to decide.

[25] KeyCite Notes

⇐237 Libel and Slander
   ⇐237II Privileged Communications, and Malice Therein
      ⇐237k51 Existence and Effect of Malice
         ⇐237k51(1) k. In General. Most Cited Cases

A qualified privilege is abused and therefore lost if plaintiff demonstrates that defendant acted with actual malice.

[26] KeyCite Notes

⇐30 Appeal and Error
   ⇐30XVI Review
      ⇐30XVI(J) Harmless Error
         ⇐30XVI(J)17 Submission of Issues or Questions to Jury
            ⇐30k1062.3 k. Withdrawal of Questions from Jury. Most Cited Cases

⇐237 Libel and Slander KeyCite Notes
   ⇐237IV Actions
      ⇐237IV(E) Trial, Judgment, and Review
         ⇐237k123 Questions for Jury
            ⇐237k123(8) k. Privilege. Most Cited Cases

Issue of employer's entitlement to a qualified privilege against alleged defamation of employees was a question for trial court to decide, so that summation of issue to jury was error, but since jury found that employer's statements were actuated by actual malice, and instructions correctly placed burden of demonstrating malice on employees, error was not prejudicial.

[27] KeyCite Notes

⇐237 Libel and Slander
   ⇐237IV Actions
      ⇐237IV(E) Trial, Judgment, and Review

⟸237k124 Instructions
⟸237k124(6) k. Privilege. <u>Most Cited Cases</u>

Instruction wherein jurors were informed that if they found that employer was entitled to a qualified privilege, employees had to prove that alleged defamation was made with actual malice correctly set forth common-law definition and, hence, was not erroneous as incorrectly stating standard of malice employees were required to prove as against a qualified privilege.

[28] <u>KeyCite Notes</u>

⟸<u>237</u> Libel and Slander
  ⟸<u>237IV</u> Actions
    ⟸<u>237IV(D)</u> Damages
      ⟸<u>237k115</u> Elements of Compensation
        ⟸<u>237k116</u> k. In General. <u>Most Cited Cases</u>

There was no error in including damages for future harm in employees' compensatory awards against employer for alleged defamation where neither expungement of employer's records nor vindication at trial could eliminate all future harm to employees' earning capacity with prospective employers.

[29] <u>KeyCite Notes</u>

⟸<u>115</u> Damages
  ⟸<u>115V</u> Exemplary Damages
    ⟸<u>115k87</u> Nature and Theory of Damages Additional to Compensation
      ⟸<u>115k87(1)</u> k. In General. <u>Most Cited Cases</u>

Statute governing punitive damage awards should not be read to extend availability of punitive damages to newly recognized causes of action. <u>M.S.A. § 549.20.</u>

[30] <u>KeyCite Notes</u>

⟸<u>237</u> Libel and Slander
  ⟸<u>237IV</u> Actions
    ⟸<u>237IV(D)</u> Damages
      ⟸<u>237k120</u> Exemplary
        ⟸<u>237k120(1)</u> k. In General. <u>Most Cited Cases</u>

Punitive damages in defamation actions involving compelled self-publication are not available. <u>M.S.A. § 549.20.</u>

*879 Syllabus by the Court
1. Dismissal provisions in employer's personnel handbook meet the requirements for formation of a unilateral contract and are therefore part of plaintiffs' employment contracts.
2. The trial court's instruction to the jury that a covenant of good faith was implied in plaintiffs' employment agreements was erroneous but not prejudicial.
3. In an action for defamation, the publication requirement may be satisfied by facts showing plaintiff was compelled to publish the defamatory statement to a third person if it was foreseeable to defendant that plaintiff would be so compelled.
4. In an action for defamation, an employer's communication to an employee of the reasons for employee's discharge *880 presents a proper occasion upon which to recognize a qualified privilege.
5. Punitive damages are not available in a defamation action based upon compelled self-publication.
John R. Kenefick, Kevin A. Berg, St. Paul, Robert M. Wattson, Scott M. Jefferson, Andrew W.

Horstman, Minneapolis, for appellant.
James W. Kenney, Timothy R. Murphy, St. Paul, for respondents.

Heard, considered, and decided by the court en banc.


AMDAHL, Chief Justice.
Plaintiffs, Carole Lewis, Mary Smith, Michelle Rafferty, and Suzanne Loizeaux, former employees of defendant, the Equitable Life Assurance Society of the United States (company), all hired for indefinite, at-will terms, were discharged for the stated reason of "gross insubordination." They claim that they were discharged in breach of their employment contracts, as determined by an employee handbook, and that they were defamed because the company knew that they would have to repeat the reason for their discharges to prospective employers. A Ramsey county jury awarded plaintiffs compensatory and punitive damages. The Minnesota Court of Appeals affirmed the award but remanded on the issue of contract damages for future harm. We affirm in full the award of compensatory damages but reverse the award of punitive damages.
In spring 1980, the company hired plaintiffs as dental claim approvers in its St. Paul office. During the application process, a manager or supervisor of the company interviewed plaintiffs and assured them that if hired, their employment would continue as long as their production remained at a satisfactory level. Plaintiffs did not execute written contracts of employment. They were employed for an indefinite time pursuant to oral agreements, and each received a copy of the company's employee handbook. Among other topics, the handbook discussed policies regarding job security, dismissals, and severance pay. [FN1]


    FN1. With respect to dismissals, the handbook provided:


    Dismissals usually come about because of an individual's indifference to work quality or attendance standards. Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level. When a dismissal is necessary and the employee has been with [the company] for six months or longer, severance pay may be granted, depending on the reason for the dismissal.


In fall 1980, the company's Pittsburgh office requested assistance from its St. Paul office. Claim approvers from St. Paul were sent to Pittsburgh beginning in September. In October, plaintiffs, who had never traveled on company business before, were among two groups of employees sent to assist the Pittsburgh office for 2-week periods.
At the time plaintiffs departed for Pittsburgh, the company had written policies concerning travel expenses. Guidelines were set forth on the back of company expense report forms and in management manuals, and the company's St. Paul office manager was responsible for instructing prospective travelers regarding the company's policies. Because he was out of the office at the time the first group departed, the office manager delegated the responsibility to his secretary. A supervisor in the St. Paul office was given responsibility for advising the second group. Neither the secretary nor the supervisor had performed such duties prior to instructing plaintiffs. As a result, they did not review available written guidelines, they did not give plaintiffs any written instructions, and they did not tell plaintiffs that expense reports would have to be filed. Plaintiffs were **881** only orally given information on the company's daily allowances for meals and maid tips and they were told to keep receipts for hotel bills and airfare. In addition, each received a $1,400 travel advance which, having no instruction to the contrary, they spent in full.
When plaintiffs returned to St. Paul, each received a personal letter from management commending them on their job performance while in Pittsburgh. Upon their return, and after they had spent their travel advances, they were also informed for the first time that they would have to submit expense reports detailing their daily expenditures while in Pittsburgh. Plaintiffs complied with the company's request and prepared expense reports in which they attempted to reconstruct their expenses. Upon

submission, however, they were asked to change the reports with respect to maid tips because the initial instructions had been erroneous. Plaintiffs complied with this second request. However, plaintiffs were yet again told to change their reports to reflect lower overall totals. Apparently, the company sought to recoup from each plaintiff approximately $200. [FN2]

> FN2. Just prior to the expense report controversy it was discovered that another employee in the office had embezzled $10,000 from the company. Although that incident was a criminal act involving more than ten times as much money as was at stake in all plaintiffs' expense reports combined, the company chose not to prosecute the case.

Not until late November 1980 did plaintiffs receive written guidelines for completing the expense reports. The guidelines differed from the instructions given prior to their departures. At this point, the company asked plaintiffs to make additional changes in their expense reports. Plaintiffs this time refused to make further changes, maintaining that the expenses shown on their original reports had been honestly and reasonably incurred and were submitted based upon the instructions they had received prior to leaving for Pittsburgh. The company did not dispute the claims that these expenses were honestly incurred.

Nevertheless, in January 1981, plaintiffs each received a letter from the office manager requesting again that they revise their expense reports. The letter set out still another, different set of guidelines to be followed. Additionally, three plaintiffs met individually with a manager from the company's Chicago office. At the meetings they were once again asked to change their expense reports to conform to company policies. They refused and were told that they were being put on probation. They were also warned, for the first time, that termination might be considered. At trial, company managers testified that the "probation" imposed on the three plaintiffs was not given in reference to the company's dismissal policies, but was primarily for the benefit of company management, to provide time to decide whether to terminate plaintiffs.

A week later, the office manager received orders from Chicago to obtain from two of the plaintiffs monies they had agreed to refund to the company and then to fire all four. The office manager called the two to his office and had them refund the money, saying nothing of the fact that they were to be terminated later that day. Late in the afternoon, he called each plaintiff to his office individually and again asked them to change their reports. When they stated that they were standing by their reports, he terminated them for "gross insubordination." [FN3] Another employee *882 involved in the expense-account dispute was not terminated because she agreed to change her report and to refund $200 to the company.

> FN3. Plaintiffs were terminated pursuant to the company's human
>
> resources manual, which provides in relevant part:
>
> Gross misconduct is a serious violation of accepted standards of behavior. Examples are: assaulting another employee, involvement in drug traffic, theft or destruction of Equitable's or another employee's property, or misusing an I.D. card. Gross misconduct also includes gross insubordination and falsification of any Equitable records including employment papers.

Because they were fired for "gross insubordination," plaintiffs received no severance pay. Had they been fired for other reasons they would have been entitled to as much as one month's severance pay.

The company admitted that the production and performance of plaintiffs was at all times satisfactory and even commendable. Company managers acknowledged that plaintiffs should have been given more thorough instructions and that the company's written guidelines should have been reviewed

prior to their departures for Pittsburgh. Management also admitted that the problems could have been avoided had plaintiffs been given proper guidelines prior to their departures.

In seeking new employment, plaintiffs were requested by prospective employers to disclose their reasons for leaving the company, and each indicated that she had been "terminated." When plaintiffs received interviews, they were asked to explain their terminations. Each stated that she had been terminated for "gross insubordination" and attempted to explain the situation. The company neither published nor stated to any prospective employer that plaintiffs had been terminated for gross insubordination. Its policy was to give only the dates of employment and the final job title of a former employee unless specifically authorized in writing to release additional information.

Only one plaintiff found employment while being completely forthright with a prospective employer about her termination by the company. A second plaintiff obtained employment after she misrepresented on the application form her reason for leaving the company. She did, however, explain the true reason in her interview. A third plaintiff obtained employment only when she left blank the question on the application form requesting her reason for leaving her last employment; the issue never arose in her interview. The fourth plaintiff has been unable to find full-time employment. All plaintiffs testified to suffering emotional and financial hardship as a result of being discharged by the company.

Breach of Contract Claim

On appeal, the company argues the following concerning plaintiffs' claims for breach of contract: (1) that the employee handbook did not affect the company's contractual relationship with plaintiffs; (2) that even if the handbook were found to contain provisions enforceable in contract, the company did not commit a breach; and (3) that the trial court prejudicially erred in its jury instructions.

1. *Did employee handbook become part of plaintiffs' employment contracts?*

[1]   It is undisputed that plaintiffs were hired for indefinite terms, had no written employment contracts, and could have left their employment with the company at any time. We have held that, as a general rule, such employment relationships may be terminated by the employer at any time without cause. *Thomsen v. Independent School District No. 91*, 309 Minn. 391, 244 N.W.2d 282 (1976); *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 117 N.W.2d 213 (1962); *Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 266 N.W. 872 (1936). We have, however, followed the modern trend in recognizing exceptions to employment at will. *See, e.g., Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114 (Minn.1981); *Bussard v. College of St. Thomas, Inc.*, 294 Minn. 215, 200 N.W.2d 155 (1972). Specifically, we have determined that, under certain circumstances, employee handbook provisions may create **\*883** contractual obligations enforceable against an employer. *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983).

[2]   In *Pine River*, we held that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the employment contract. 333 N.W.2d at 626-27. To create a binding unilateral contract, a promise of employment on particular terms of unspecified duration must be presented in the form of an offer and must be accepted by the employee. *Id*. at 626. The offer must be definite in form and must be communicated to the employee. *Id*. Here, definiteness is the only issue, because the company acknowledges that the handbook was distributed and therefore communicated to each plaintiff at or near the time of her employment.

[3]   Whether a proposal constitutes an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions. *Cederstrand, 263 Minn. at 532, 117 N.W.2d at 221*. The employee handbook sets forth the company's human resources policies. Among its provisions are sections on "Job Security" and "Dismissals." The section on job security appears to be no more than a general statement of policy: "Equitable seeks to ensure the job security of all salaried employees." General statements of policy do not meet the contractual requirements for an offer. *Pine River, 333 N.W.2d at 626*. The language on dismissals, however, is definite: "Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level."

[4]    The company argues that the language in its handbook is not definite enough to constitute an offer. We disagree. The language used clearly limits the right to freely dismiss employees and plainly states that in certain circumstances all employees are entitled to a warning and to a probationary period prior to dismissal. Further, the handbook states that only "serious misconduct" can constitute a ground for immediate dismissal. While the handbook does not contemplate every possible question regarding procedures for employee dismissals, the language is definite enough to permit a jury to conclude that plaintiffs received certain contractual rights. The precise nature of those rights is unclear, but where the terms of a contract are unclear, it is for a jury to determine the intent of the parties. See _Diesel Truck Drivers Training School, Inc. v. Erickson_, 256 N.W.2d 642, 645 (Minn.1977). A jury verdict will not be overturned on appeal unless it is manifestly and palpably contrary to the evidence, _Stuempges v. Parke, Davis & Co._, 297 N.W.2d 252, 256 (Minn.1980); and is such that no reasonable mind could find as did the jury. _Belden Porter Co. v. Kimball Co._, 303 Minn. 98, 99, 226 N.W.2d 310, 310 (1975). There is ample evidence here to support the jury's decision.

[5]    Because plaintiffs received handbooks at the time they began employment, their continued employment until discharged constituted acceptance of the offer of a unilateral contract and provided the necessary consideration for the offer. _Pine River_, 333 N.W.2d at 627. We therefore conclude that the handbook's dismissal provisions were part of plaintiffs' employment contracts.
2. _Was there a breach?_
We next consider whether the company breached its employment contracts with plaintiffs. In so doing we need only assess whether the evidence as a whole reasonably supports the jury's verdict. _Lesmeister v. Dilly_, 330 N.W.2d 95, 100 (Minn.1983). The jury concluded that the company's actions breached its contractual obligations.

**\*884** [6]    The company offers three arguments in support of its position that a breach did not occur. First, it argues that the handbook's section on dismissals does not apply in plaintiffs' cases. The company relies on the first sentence of the section: "Dismissals usually come about because of an individual's indifference to work quality or attendance standards." It argues that this language limits application to _attendance_ or _performance_ problems, neither of which are issues here. There is, however, no explicit statement in the handbook that the section is limited to attendance or performance. The jury could reasonably conclude that the first sentence is an informative statement of fact rather than a limitation on the dismissal policy. This conclusion is supported by other language referring directly to the company's policy on "serious misconduct," which indicates that the scope of the section includes more than just problems of attendance or productivity.
Contractual terms are ambiguous if they are reasonably susceptible to more than one construction. _Telex Corp. v. Data Products Corp._, 271 Minn. 288, 291, 135 N.W.2d 681 685 (1965). Where ambiguity exists, and construction depends upon extrinsic evidence, the proper construction is a question of fact for the jury. _Turner v. Alpha Phi Sorority House_, 276 N.W.2d 63, 66 (Minn.1979). The issue whether the handbook provisions created a binding employment contract was fully litigated. The jury finding that the dismissal section applied to plaintiffs is supported by the evidence.

[7]    The company argues, secondly, that even if the dismissal section did apply to plaintiffs, it did not prohibit the company from terminating plaintiffs without cause but only required that the company provide warnings to plaintiffs. The jury could have reasonably concluded that, read as a whole, the dismissal provisions limited the company's rights to terminate at-will employees. In addition to a warning, the section provides for "a period in which to bring performance up to a satisfactory level." According to the provisions, no employee can be discharged without such a probationary period, except in cases of serious misconduct. Because the purpose of this period is to give the employee an opportunity to change his or her performance, the jury could have reasonably drawn the conclusion that the company's employees would be dismissed only for failing to adequately improve their performance or, in other words, for cause.

[8]    Finally, the company argues that even if the dismissal provisions fully apply, it committed

no breach because it complied with the requirements of the provisions. It contends that the meetings held by management with each plaintiff from November 1980 through January 1981 served as warnings. It further argues that the fact plaintiffs were placed on probation a week prior to their terminations and were warned that discharge would be considered indicates full compliance with the handbook. The record, however, reveals clearly that the purpose of the meetings between management and plaintiffs was not to warn them about their "insubordination." The purpose of the meetings was to discuss the types of changes the company wanted made in the expense reports. The reason that there were numerous meetings over a 2- to 3-month period was because the company continually changed its position about what it wanted included in the expense reports. Also, prior to actually being placed on probation, plaintiffs were never told that they might be discharged. Finally, the record reveals that the "probations" given to plaintiffs prior to their dismissals were for the benefit of company management, to provide time to decide whether to terminate plaintiffs. On these facts, the jury could have found noncompliance with the dismissal provisions and breach of plaintiffs' employment agreements.

3. *Jury Instructions*

[9]    Regarding the breach of contract claim, the company lastly asserts that the **\*885** jury's verdict was prejudicially affected by erroneous instructions from the trial court. The company argues that the instructions misled the jury and compelled it to find that if a contract was proven the company had forfeited its right to freely terminate employees. The jury was instructed that the handbook provisions could become part of the employment contract only if the company "intended to give up its right to terminate the employment of its employees at will." The instructions are not a model of clarity. However, they must be reviewed as a whole, not as isolated statements taken out of context. *Peterson v. Sorlien,* 299 N.W.2d 123, 130 (Minn.1980). When considered as a whole, the instructions were not clearly erroneous or prejudicial. The cited instructions were given in the context of numerous other instructions that adequately and correctly dealt with nonperformance and breach of contract. The jurors were not compelled to find either that a contract had been formed or that the company had given up its right to terminate its employees at will.

The company asserts that the trial court misstated in its instructions the law with respect to covenants of good faith and fair dealing in employment contracts. The instructions stated: "In considering the terms of plaintiffs' employment agreements with [the company], you are also instructed that in all employment agreements the employer has a duty to exercise good faith and fair dealing in all relations with the employee." We have never decided whether such a condition of good faith is read into employment contracts. *Wild v. Rarig,* 302 Minn. 419, 441, 234 N.W.2d 775, 790 (1975).

[10]    The court of appeals refused to address this error in the jury instructions because no objection was made during trial. *Lewis v. Equitable Life Assurance Society of the United States,* 361 N.W.2d 875, 880 (Minn.App.1985). Objection, however, was made in the company's motion for a new trial. The court of appeals relied on our holding in *Colby v. Gibbons,* 276 N.W.2d 170, 178 (Minn.1979), that objections to jury instructions not made prior to jury sequestration could not be heard on review. *Colby,* however, involved objections to the wording of instructions. The objection that the company raises here involves a potentially fundamental error of law. Fundamental errors of law in jury instructions are reviewable on appeal so long as they have been assigned as errors in the motion for new trial. Minn.R.Civ.P. 51; *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727, 738-39 (Minn.1980). The company has met this requirement.

[11]    [12]    Although the error the company assigns to the jury instructions is reviewable on appeal, reversal is not required unless the error in the instructions was prejudicial to the company. See *McDonough v. Brite Lite Electric Co.,* 304 N.W.2d 28, 29 (Minn.1981). We conclude that the error in the instructions was not prejudicial. The erroneous instruction did not change the result against the company. We have already concluded that there was ample evidence to support the jury's findings that the handbook's dismissal provisions became part of plaintiffs' employment contracts and that those contracts were breached. The jury instructions concerning breach of contract did not link the determination of breach to the instruction of the duty to exercise good faith. [FN4] Moreover, the instructions on awarding damages for breach of contract warned against **\*886** duplicative awards and essentially instructed the jury that the damages for breach were to be the

"out-of-pocket losses" suffered by plaintiffs, including lost wages. There is nothing in the record or in the jury's award of damages on the breach of contract claim that suggests that additional damages were awarded for breach of a duty of good faith. In sum, the instruction on the duty in employment contracts to exercise good faith was erroneous and should not have been given; however, since there was substantial evidence of breach of the employment agreements independent of any breach of a duty of good faith, and since there were no additional damages awarded for the latter type of breach, we can find no prejudice to the company.

FN4. The jury instructions on breach of contract stated:

A breach of contract is simply a nonperformance of any contractual duty of immediate performance. A breach may take place by failure to perform acts promised, by prevention or hindrance, or by repudiation.

A failure without justification to perform all or any part of what is promised in the contract is a breach of that contract, and if there is such

a breach, the measure of damages which one party may recover from another for that breach is the amount which will reasonably and fairly compensate the plaintiffs or any of them for the damages which naturally and proximately resulted from the breach.

In order for each of the plaintiffs to recover in this lawsuit on a breach of contract theory, each of them must establish by a fair preponderance of the evidence, first, that there was a contract between her and the defendant; second, that there was a failure on the part of the defendant to perform all or some part of what was promised in the contract--in other words, that the contract was breached--and, third, each must prove the amount and extent of her damage.

Defamation Claim

With regard to plaintiffs' defamation claims, the company argues that the trial court's conclusion of liability on the part of the company was erroneous because: (1) the only publications of the allegedly defamatory statement were made by plaintiffs; (2) the statement in question was true; and (3) the company was qualifiedly privileged to make the statement.

1. *Publication*

[13]   [14]    In order for a statement to be considered defamatory, it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him or her in the estimation of the community. *Stuempges, 297 N.W.2d at 255.* Generally, there is no publication where a defendant communicates a statement directly to a plaintiff, who then communicates it to a third person. Restatement (Second) of Torts § 577, comment m (1977). Company management told plaintiffs that they had engaged in gross insubordination, for which they were being discharged. This allegedly defamatory statement was communicated to prospective employers of each plaintiff. The company, however, never communicated the statement. Plaintiffs themselves informed prospective employers that they had been terminated for gross insubordination. They did so because prospective employers inquired why they had left their previous employment. The question raised is whether a defendant can ever be held liable for defamation when the statement in question was published to a third person only by the plaintiff.

We have not previously been presented with the question of defamation by means of "self-publication." Courts that have considered the question, however, have recognized a narrow exception to the general rule that communication of a defamatory statement to a third person by the

person defamed is not actionable. *See, e.g., McKinney v. County of Santa Clara,* 110 Cal.App.3d 787, 168 Cal.Rptr. 89 (1980); *Colonial Stores, Inc. v. Barrett,* 73 Ga.App. 839, 38 S.E.2d 306 (1946); *Belcher v. Little,* 315 N.W.2d 734 (Iowa 1982); *Grist v. Upjohn Co.,* 16 Mich.App. 452, 168 N.W.2d 389 (1969); *Bretz v. Mayer,* 1 Ohio Misc. 59, 203 N.E.2d 665 (1963); *First State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696 (Tex.Civ.App.1980). These courts have recognized that if a defamed person was in some way compelled to communicate the defamatory statement to a third person, and if it was foreseeable to the defendant that the defamed person would be so compelled, then the defendant could be held liable for the defamation.

Several courts have specifically recognized this exception for compelled self-publication **887** in the context of employment discharges. In an early Georgia case an appellate court was presented with an employee discharged for alleged improper conduct toward fellow employees. *Colonial Stores, Inc. v. Barrett, supra.* At that time, the War Manpower Commission required persons seeking employment to present a certificate of availability to prospective employers. The defendant employer who discharged the employee had written the reason for discharge on the employee's certificate of availability. The employee brought suit for defamation. The court, in affirming the trial court verdict in favor of the plaintiff, held that there "may be a publication when the sender intends or has reason to suppose that the communication will reach third persons, which happens, or which result naturally flows from the sending." 73 Ga.App. at 840, 38 S.E.2d at 307 (quoting 36 Corpus Juris § 172).

In a Michigan case, the plaintiff employee was discharged and subsequently brought a slander action against her former employer. *Grist v. Upjohn Co., supra.* She alleged that the defendant had given her false and defamatory reasons for her discharge and that she was forced to repeat the reasons to prospective employers in detailing her previous employment. The trial court instructed the jury that they could find a slanderous statement even though the statements by the defendant were made only to the plaintiff. Affirming the trial court's jury instruction, the Michigan appellate court held: "Where the conditions are such that the utterer of the defamatory matter intends or has reason to suppose that in the ordinary course of events the matter will come to the knowledge of some third person, a publication may be effected." 16 Mich.App. at 485, 168 N.W.2d at 406.

Most recently, a California court considered the question of compelled self-publication in the employment discharge context. *McKinney v. County of Santa Clara, supra.* A discharged deputy sheriff brought a claim of defamation against his former employer. The California appellate court recognized that liability for defamation may arise "where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person *after* he has read it or been informed of its contents." 110 Cal.App.3d at 796, 168 Cal.Rptr. at 93-94 (emphasis in original). The court's rationale for imposing liability on a defendant for the foreseeable republication by a plaintiff of a defamatory statement was based upon the "strong causal link" between the defendant's actions and the damage caused by the republication. The court reasoned:

This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed.

*Id.* at 798-99, 168 Cal.Rptr. at 94.

[15]     The company presents two arguments against recognition of the doctrine of compelled self-publication. It argues that such recognition amounts to creating tort liability for wrongful discharge which, it asserts, has been rejected by this court. In *Wild v. Rarig,* 302 Minn. at 442, 234 N.W.2d at 790, we held that bad-faith termination of contract is not an independent tort of the kind that will permit a tort recovery. The company, however, misreads our holding regarding tort liability for wrongful discharge. We did not hold that the harm resulting from a bad-faith termination of a contract could never give rise to a tort recovery. Indeed, we recognized such a possibility by stating that a plaintiff is limited to contract damages "except in exceptional cases where the defendant's breach of contract constitutes or is **888** accompanied by an independent tort." *Id.* at 440, 234 N.W.2d at 789. If plaintiffs here can establish a cause of action for defamation, the fact that the defamation occurred in the context of employment discharge should not defeat recovery.

[16]     The company also argues that recognition of the doctrine of self-publication would discourage plaintiffs from mitigating damages. This concern does not appear to be a problem,