however, if liability for self-publication of defamatory statements is imposed *only* where the plaintiff was in some significant way compelled to repeat the defamatory statement and such compulsion was, or should have been, foreseeable to the defendant. Also, the duty to mitigate can be further protected by requiring plaintiffs when they encounter a situation in which they are compelled to repeat a defamatory statement to take all reasonable steps to attempt to explain the true nature of the situation and to contradict the defamatory statement. In such circumstances, there would be no voluntary act on the part of a plaintiff that would constitute a failure to mitigate. This point is clearly illustrated by the present action. The company points to no reasonable course of conduct that plaintiffs could have taken to mitigate their damages.

[17] The trend of modern authority persuades us that Minnesota law should recognize the doctrine of compelled self-publication. We acknowledge that recognition of this doctrine provides a significant new basis for maintaining a cause of action for defamation and, as such, it should be cautiously applied. However, when properly applied, it need not substantially broaden the scope of liability for defamation. The concept of compelled self-publication does no more than hold the originator of the defamatory statement liable for damages caused by the statement where the originator knows, or should know, of circumstances whereby the defamed person has no reasonable means of avoiding publication of the statement or avoiding the resulting damages; in other words, in cases where the defamed person was compelled to publish the statement. In such circumstances, the damages are fairly viewed as the direct result of the originator's actions.

Properly applied, the doctrine of compelled self-publication does not unduly burden the free communication of views or unreasonably broaden the scope of defamation liability. Accordingly, we hold that in an action for defamation, the publication requirement may be satisfied where the plaintiff was compelled to publish a defamatory statement to a third person if it was foreseeable to the defendant that the plaintiff would be so compelled.

[18] In the present action, the record indicates that plaintiffs were compelled to repeat the allegedly defamatory statement to prospective employers and that the company knew plaintiffs would be so compelled. The St. Paul office manager admitted that it was foreseeable that plaintiffs would be asked by prospective employers to identify the reason that they were discharged. Their only choice would be to tell them "gross insubordination" or to lie. Fabrication, however, is an unacceptable alternative.

2. *Issue of Truth*

[19] Finding that there was a publication, we next turn to the issue of truth. True statements, however disparaging, are not actionable. Stuempges, 297 N.W.2d at 255. Since it is true that plaintiffs were fired for gross insubordination, the company argues, they cannot maintain an action for defamation. The company contends the relevant statement to consider when analyzing the defense of truth is the one that plaintiffs made to their prospective employers, that is, that they had been fired for gross insubordination. Plaintiffs counter that it is the truth or falsity of the underlying statement--that plaintiffs engaged in gross insubordination--that is relevant.

*889 [20] The company relies for its authority solely upon language of this court in Johnson v. Dirkswager, 315 N.W.2d 215, 218-19 (Minn.1982), where we raised the question whether truth as a defense goes to the verbal accuracy of the statement or to the underlying implication of the statement. In *Dirkswager*, however, it was unnecessary to resolve the question. Moreover, that case is distinguishable from the present case because there the underlying statements were presented merely as "allegations of misconduct." Id. at 219 n. 4. Here, the company's charges against plaintiffs went beyond accusations and were conclusory statements that plaintiffs had engaged in gross insubordination.

[21] Requiring that truth as a defense go to the underlying implication of the statement, at least where the statement involves more than a simple allegation, appears to be the better view. See Restatement (Second) of Torts § 581A, comment e (1977). Moreover, the truth or falsity of a statement is inherently within the province of the jury. This court will not overturn a jury finding on the issue of falsity unless the finding is manifestly and palpably contrary to the evidence. Thus, we

find no error on this point because the record amply supports the jury verdict that the charge of gross insubordination was false.

3. *Qualified Privilege*

[22] Even though an untrue defamatory statement has been published, the originator of the statement will not be held liable if the statement is published under circumstances that make it conditionally privileged and if privilege is not abused. Restatement (Second) of Torts § 593 (1977). The law in Minnesota is:

[A] communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

Stuempges, 297 N.W.2d at 256-57 (quoting *Hebner v. Great Northern Railway*, 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899)).

The doctrine of privileged communication rests upon public policy considerations. As other jurisdictions recognize, the existence of a privilege results from the court's determination that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory. See *Calero v. Del Chemical Corp.*, 68 Wis.2d 487, 498, 228 N.W.2d 737, 744 (1975). Whether an occasion is a proper one upon which to recognize a privilege is a question of law for the court to determine. *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976); *Fisher v. Myers*, 339 Mo. 1196, 100 S.W.2d 551 (1936); *Cash v. Empire Gas Corp.*, 547 S.W.2d 830, 833 (Mo.Ct.App.1976). In the context of employment recommendations, the law generally recognizes a qualified privilege between former and prospective employers as long as the statements are made in good faith and for a legitimate purpose. Stuempges, 297 N.W.2d at 257.

[23] Plaintiffs argue that a self-publication case does not properly fit within the qualified privilege doctrine. Two of the cases which plaintiffs cite in support of the self-publication doctrine, however, appear to agree that the employer's qualified privilege does apply. See *Colonial Stores, Inc. v. Barrett*, 73 Ga.App. 839, 38 S.E.2d 306; *Grist v. Upjohn Co.*, 16 Mich.App. 452, 168 N.W.2d 389. Also, the logic of imposing liability upon a former employer in a self-publication case appears to compel recognition of a qualified privilege. A former employer in a compelled self-publication case may be held liable as if it had actually published the defamatory statement directly to prospective employers. Where an employer ***890** would be entitled to a privilege if it had actually published the statement, it makes little sense to deny the privilege where the identical communication is made to identical third parties with the only difference being the mode of publication. Finally, recognition of a qualified privilege seems to be the only effective means of addressing the concern that every time an employer states the reason for discharging an employee it will subject itself to potential liability for defamation. Stuempges, 297 N.W.2d at 257. It is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers, and we are concerned that, unless a significant privilege is recognized by the courts, employers will decline to inform employees of reasons for discharges. *Id.* We conclude that an employer's communication to an employee of the reason for discharge may present a proper occasion upon which to recognize a qualified privilege.

[24] [25] This conclusion does not necessarily determine that the company's statements were privileged. A qualified privilege may be lost if it is abused. The burden is on the plaintiff to show that the privilege has been abused. *Id.* While the initial determination of whether a communication is privileged is a question of law for the court to decide, the question of whether the privilege was abused is a jury question. Restatement (Second) of Torts, § 619 (1977). The company argues that the trial court in its instructions improperly submitted *both* questions to the jury and misconstrued the nature of the qualified privilege. The challenged instruction stated:

The burden of establishing that it was entitled to such a qualified privilege, of course, is on the defendant [company]. In determining whether [the company] was entitled to the qualified privilege, you should ask yourselves whether agents of [the company] had reasonable grounds to believe that the various plaintiffs had displayed gross insubordination in light of all the circumstances known to the agents of [the company] at the time and whether the agent or agents believed that the

statements were made in good faith.

The court should not have submitted the issue of the company's entitlement to the qualified privilege to the jury. Absent abuse, the company was entitled to the privilege.

[26] This error, however, was not prejudicial because the jury found that the company's statements were "actuated by actual malice." A qualified privilege is abused and therefore lost if the plaintiff demonstrates that the defendant acted with actual malice. *Stuempges, 297 N.W.2d at 257*. The jury instructions correctly placed the burden of demonstrating malice on the plaintiff. Most importantly, the jury's special verdict finding on actual malice did not depend upon a finding that there was a qualified privilege. [FN5] Even though the jury was not properly instructed on the qualified privilege, it nevertheless found the actual malice which negates the company's entitlement to the privilege. Thus, the company was not prejudiced.

> FN5. The special verdict form submitted to the jury stated in relevant part:
>
> ```
> 17) Did (the company) have a qualified privilege
>     to have the words "gross insubordination"
>     communicated to prospective employers of the
>     plaintiffs? (Yes or No)                              NO
>                                                          ----
> 18) Was the use of the words "gross insubordination"
>     actuated by the actual malice? (Yes or
>     No)                                                  YES
>                                                          ----
> ```

[27] The company also argues that the court's instructions incorrectly stated the standard of malice which plaintiffs must prove if the existence of a qualified privilege is demonstrated. The law recognizes essentially two definitions of malice in defamation cases: the "actual malice" definition as set forth in *891 *New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)*, and the common-law definition. See *Stuempges, 297 N.W.2d at 257*. The common-law definition is more appropriate in the employer-employee situation because it focuses on the employer's attitude toward the plaintiff. See *id. at 258.* Under the common-law definition, malice exists where the defendant " 'made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.' " *Id. at 257* (quoting *McKenzie v. William J. Burns International Detective Agency, Inc.,* 149 Minn. 311, 312, 183 N.W. 516, 517 (1921)). In its instructions, the court informed the jurors that if they found that the company was entitled to a qualified privilege, plaintiff had to prove that the statement was made "with actual malice." In defining malice for the jury, the court correctly set forth the common-law definition. We therefore find no error in the jury instructions.

Damages

1. *Compensatory Damages*

After finding the company liable on the breach of contract and defamation claims, the jury awarded plaintiffs compensatory and punitive damages. The trial court instructed the jury that in determining compensatory damages on the breach of contract claim, the jury could consider harm to the "future earning capacity" of each plaintiff. After trial, the court suggested and approved dismissal of claims plaintiffs had pleaded for expungement of the defamatory words from the company's records. The court observed that the verdict itself vindicated plaintiffs so that injunctive relief was unnecessary. The court, however, did not modify the award to eliminate damages for future harm.

[28] The court of appeals remanded the issue of compensatory damages to the trial court to eliminate any awards for future harm, concluding that the awards must "exclude losses which are avoided by publication of the verdict, or can be avoided by expungement of defamatory statements * * *." *Lewis v. Equitable Life Assurance Society, 361 N.W.2d at 883*. A jury award will not be set

aside unless it is manifestly and palpably contrary to the evidence. _Levienn v. Metropolitan Transit Commission, 297 N.W.2d 272, 273 (Minn.1980); Miller v. Hughes, 259 Minn. 53, 56, 105 N.W.2d 693, 696 (1960)._ We determine in this case that it is not necessary to remand the award of compensatory damages. Neither expungement of the company's records nor vindication at trial eliminate all future harm to the plaintiffs' earning capacity. The fact that plaintiffs brought suit against the company may itself have future detrimental effects. A person who brings suit against a former employer is likely to be a less attractive employment candidate to prospective employers. No amount of vindication with respect to the gross insubordination charge can eliminate this impact on plaintiffs' future work lives. We conclude that there was no error in including damages for future harm in plaintiffs' awards. The trial court awards of compensatory damages are supported by the evidence, and we therefore reverse the court of appeals directive remanding the issue of compensatory damages.

2. _Punitive Damages_

[29]   We also reverse the award of punitive damages on the defamation claim. Although Minnesota law recognizes that punitive damages may be imposed in certain actions, _see_ Minn.Stat. § 549.20 (1984), the instant suit is not an appropriate action in which to do so. The concern of the legislature in enacting the punitive damages statute, section 549.20, was to limit the frequency and amounts of punitive damage awards. _Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Association, 294 N.W.2d 297, 311 (Minn.1980)._ The intent was essentially to codify the existing case law on punitive damages. ***892** Thus, section 549.20 should not be read to extend the availability of punitive damages to newly recognized causes of actions, such as an action based upon compelled self-publication.

The availability of punitive damages in these causes of actions depends upon the evaluation of a variety of policy considerations, including " 'the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent.' " _Scott v. Plante, 641 F.2d 117, 135 (3d Cir.1981)_ (quoting _Fisher v. Volz, 496 F.2d 333, 347 (3d Cir.1974))._ Punitive damages are not generally favored by the law. _Sellers v. O'Connell, 701 F.2d 575, 579 (6th Cir.1983); Scott, 641 F.2d at 135; Cochetti v. Desmond, 572 F.2d 102, 105 (3d Cir.1978); Simpson v. Weeks, 570 F.2d 240, 243 (8th Cir.1978); Knippen v. Ford Motor Co., 546 F.2d 993, 1002 (D.C.Cir.1976); Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (5th Cir.1970)._ They are only to be allowed with caution and within narrow limits. _Fountila v. Carter, 571 F.2d 487, 491 (9th Cir.1978); Simpson, 570 F.2d at 243; Southern Home Sites, 429 F.2d at 294._ " '[T]he very power of the remedy demands that judges exercise close control over the imposition and assessment of punitive damages.' " _Eisert v. Greenberg Roofing & Sheet Metal Co., 314 N.W.2d 226, 229 (Minn.1982)_ (quoting Mallor & Roberts, _Punitive Damages: Toward a Principled Approach,_ 31 Hastings L.J. 639, 670 (1980)); _see also Lundgren v. Eustermann, 370 N.W.2d 877, 882 (Minn.1985)._

[30]   Applying these principles, we deny the imposition of punitive damages in defamation actions involving compelled self-publication. We are concerned that the availability of punitive damages may tend to encourage publication of defamatory statements in actions where the plaintiff, rather than the defendant, does the actual publication. More importantly, in the context of an employee discharge, the availability of punitive damages in such an action may significantly deter employer communication of the reason for discharge. "When punitive damages are injected into a case, the defendant's reputation as well as its money become involved, and the litigation can assume a different dimension." _Lundgren, 370 N.W.2d at 882._ When an employer's reputation and its liability for potentially large money damages are at stake, the employer may be unwilling to trust its fate to a jury. Even with the qualified privilege, the risk of punitive damages may prove too great. As a result, the employer may refuse to state a reason when discharging an employee. As indicated above, such a result would not serve the interests of the public.

In determining the availability of punitive damages, we must consider the interests of society as well as those of the plaintiff. We find that punitive damages in a compelled self-publication case are not advisable as a deterrent. Accordingly, we hold that punitive damages are not available in defamation actions based upon compelled self-publication, and therefore the award of punitive damages to plaintiffs is reversed.

Affirmed in part; reversed in part.

SIMONETT, Justice (dissenting in part and concurring in part).

In its handbook, Equitable reserved its right as an at-will employer to dismiss an employee for serious misconduct, but it agreed it would not dismiss for other misconduct or poor performance without a prior warning and an opportunity afforded to the employee to bring his or her performance up to a satisfactory level.

In this case we have an unusual situation. This was not a case where the employee could be warned about her performance and told not to do it again. The situation was unlikely to re-occur. If plaintiffs were asked to travel again with adequate instructions about use of their expense advances, they would presumably *893 have abided by their instructions. The problem here was the past mistake made by plaintiffs' supervisor and the supervisor's secretary in not giving adequate instructions for the Pittsburgh trip. Plaintiffs insisted the employer should be bound by this mistake and that Equitable, not they, should bear the cost of the mistake. Human nature being what it is, the problem escalated into something more serious, a confrontation in which neither side would yield.

At this point, Equitable discharged the plaintiffs for gross insubordination, *i.e.*, for flagrant unwillingness to submit to authority. Unfortunately for Equitable, the jury found there was no gross insubordination. It does not follow, however, that Equitable breached any contract by discharging plaintiffs on an unproven charge of insubordination. It is undisputed plaintiffs were employees at will except as the employee handbook may have modified this arrangement. Nothing in the handbook says or can be construed to say Equitable had agreed the employees could only be discharged for cause. See _Hunt v. IBM Mid America Employees Federal Credit Union_, 384 N.W.2d 853 (Minn.1986). If plaintiffs have a remedy, it must lie in tort, not contract, unless we are willing to do away with at will employment.

We have no idea how the jury construed the handbook, although, to me, it seems likely the jury was influenced by the trial court's erroneous instruction on "fair dealing," especially on the meaning of the handbook phrase "misconduct serious enough to warrant immediate dismissal." But as Justice Kelley points out in his dissent, the interpretation of the handbook, since it involved no extrinsic evidence, was a question of law for the court to decide. See _Turner v. Alpha Phi Sorority House_, 276 N.W.2d 63, 66 (Minn.1979) ("That the jury resolved the issue does not transform it into a question of fact"). In my view, the handbook provision was intended by the parties to be part of their employment relationship to the extent stated in the first paragraph of my dissent, but this provision, so understood, was irrelevant to the dispute between the parties and, therefore, there was no contract breach. The handbook provision here is not to be construed as if it were the entire agreement on matters of employee discipline and dismissal (it is not), but as a modification of the parties' at-will contract to the extent expressed. [FN1]

> FN1. Apparently the jury, in order to find a contract breach, chose to read the handbook to be the entire agreement on dismissal and, therefore, to say in effect: "No employee will be discharged except as follows: 1) for serious misconduct, immediately; 2) for other conduct, only after a warning and a probationary period." But this is not how the handbook reads.

What we are left with is a common-law defamation action, such as we recognized in _Stuempges v. Park, Davis & Co._, 297 N.W.2d 252, 255 (Minn.1980), except that here we allow the publication to be satisfied, subject to certain strict safeguards, by "self publication." On this issue, as well as the punitive damages issue, I agree with the majority.

COYNE, Justice (dissenting in part and concurring in part).
I join in Justice Simonett's opinion dissenting in part and concurring in part.

KELLEY, Justice (dissenting):
Even though I concede that it is not difficult to conclude that the terminations of these four employees was done in a shoddy, callous, and perhaps even deceiving manner, I feel constrained to dissent with today's court opinion.

Unless the employee handbook delivered to these four employees modified the relationship between the parties, the employment of the respondents by Equitable was an at-will relationship. In *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983), we specifically held that in order to change an at-will employment contract into a unilateral employment contract ***894** terminable only for cause, the words used by the employer in an employee handbook must set out in "definite language" an offer for a unilateral contract for procedures to be followed in job discipline and dismissals. *Id.* at 630. However, in *Pine River,* we also noted that general statements of policy do not meet the contractual requirements sufficient to constitute an offer. *Id.* at 626. See also *Degen v. Investors Diversified Services, Inc.,* 260 Minn. 424, 110 N.W.2d 863 (1961).

A comparison of the discipline and dismissal provisions in the *Pine River* employment manual with those contained in Equitable's employment handbook demonstrates that the vague language in the Equitable manual fails to approach the definiteness requirement set forth in *Pine River.* The discipline and dismissal provisions in *Pine River* provided for a definite, explicit, and detailed four-step procedure.

If an employee has violated a company policy, the following procedure will apply:

1. An oral reprimand by the immediate supervisor for the first offense, with a written notice sent to the Executive Vice President.
2. A written reprimand for the second offense.
3. A written reprimand and a meeting with the Executive Vice President and possible suspension from work without pay for five days.
4. Discharge from employment for an employee whose conduct does not improve as a result of the previous action taken.

In no instance will a person be discharged from employment without a review of the facts by the Executive Officer.

333 N.W.2d at 626, n. 3.

In contrast to this precisely delineated termination procedure, the Equitable Employee Manual vaguely asserts: "Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level." In my opinion, the language in the Equitable handbook amounts to nothing more than a general statement of policy which, as indicated in the majority opinion, is legally insufficient to change an at-will employment relationship to one where discharge may be only for cause. I cannot conclude that the nebulous language in the Equitable Employee Manual "clearly limits the right to freely dismiss employees."

While the majority concedes the company's handbook "does not contemplate every possible question regarding dismissal procedures," the language is "definite enough to permit a jury to conclude that plaintiffs received certain contractual rights." Although admitting the precise "nature of those rights is unclear," the majority opines that it is for the jury to determine the intent of the parties, or, as I understand it, to determine whether the language is sufficiently definite. [FN1]

> FN1. When employees are relying exclusively on language contained in a manual furnished by an employer in attempting to establish a contract providing for disciplinary or termination procedures, as they are here, whether language used in the manual is sufficiently definite to constitute a contractual offer is for the court. *Hunt v. IBM Mid America Employees Federal Credit Union,* 384 N.W.2d 853, 856 (Minn.1986).

In *Pine River* there was no question that the termination and disciplinary proceedings were sufficiently definite so as to constitute an offer. The jury only needed to decide whether the bank intended the handbook to be binding on it, *id.* at 630, n. 6, and, if so, whether it was breached. I suggest that whether the Equitable handbook dismissal language is sufficiently definite to constitute an offer is a question of law for the court, not for the jury which has the duty to decide issues of acceptance, consideration, breach, and, if appropriate, damages. *See, e.g., Hunt v. IBM Mid America Employees Federal Credit Union,* 384 N.W.2d 853, 856 (Minn.1986).

In holding that the jury could have concluded that the discipline and dismissal provisions "***895** read

as a whole" limited the company's rights to terminate at-will employees, the majority permits the jury to find that dismissal may be only for cause. The employees handbook issued by Equitable is completely devoid of any reference, directly or indirectly, to "dismissal for cause."

An oft repeated aphorism in the law is that "hard cases make bad law." This is such a case. The conduct of the superiors, arguably prompted in some degree, at least, by the obduracy of the employees in refusing to comply with company expense account reporting policies, was, on the whole, despicable. Fortunately, such egregious conduct by superiors towards employees in these days is rare, but when present it is understandable why juries and judges sometimes are tempted to extend judicial rules to afford those victims vindication and compensation. As much as these results are appealing to one's sense of justice in this case, I fear the consequences of today's decision will allow future juries and courts, after the fact, to strain amorphous, vague language expressing general policy into a definite contract in which the employer is subject to liability unless the employer can prove just cause. I would not go beyond *Pine River.* I would hold that before a unilateral contract can arise providing for due process type discipline and dismissal procedures, the language in the alleged offer, whether contained in an employee manual or other type of communication to the employee, must be sufficiently definite to meet the standard set out in *Pine River* as a matter of law. Further, whether the language is so definite should be a question of law for the court to decide. Otherwise juries and courts will be creating contracts, long after the inception of the employment, containing termination and discipline procedures never objectively contemplated by either party at the time of the institution of the relationship.

I likewise disagree with the majority opinion as it addresses the defamation claims of the respondents. At the time of their discharge, respondents were told by the company that the reason for the discharge was "gross insubordination." Notwithstanding the crudeness with which the supervisory employees handled the situation, still the fact remains that, over the course of three months, respondents intentionally, adamantly, and repeatedly refused to obey numerous company requests to submit revised travel expense reports that complied with previously established company policies for such accounts. Thus, from the standpoint of the company supervisor, that conduct is appropriately categorized as "gross insubordination." Nevertheless, the only communication of that was to the respondents themselves. There was no publication of the reason for the discharge to others by Equitable. Indeed, it was Equitable's policy to not release any information on former employees, other than the dates of employment and the last job title, unless the former employee authorized, in writing, the release of additional information. Moreover, the company did not challenge any of the applications of any of these respondents when they made unemployment compensation claims.

The company neither published nor communicated its reason for termination to any person other than the employees themselves. It is clear that there was publication; but the publication was made by the employees themselves in communications to prospective employers. Generally, such publication amounts to insufficient publication to sustain a defamation claim. See Restatement (Second) of Torts § 577(1) (1977). The majority opinion holds that the "self publication" in this case comes under a narrow exception to the general rule that communication of a defamatory statement to a third person by the person defamed is not actionable. Very few courts of this nation have recognized this exception. Those few courts who have recognized it have held that for a defamatory statement to be actionable, the claimant must show more than that the alleged defamer "knew *896 or should have known" that the utterances and their publication would come to the attention of a third person. See *Belcher v. Little,* 315 N.W.2d 734 (Iowa 1982). In addition, there must exist a strong compulsion upon the defamed person to disclose the defamatory statement to third parties. Likewise, there must be showing that such compulsion was reasonably foreseeable by the wrongdoer at the time the statement was published. *Id.* at 738. What constitutes compulsion must be decided by the finder of fact. *Id.*

In this case, the trial court's instruction on when and under what circumstances the narrow exception of "self publication" applies, even if technically correct, was, at best, confusing. For example, on two separate occasions in the instructions, the trial court generally discussed "self publication" and "compulsion." On both occasions, the instruction was either incomplete or erroneous. In a third instance, in point of time considerably removed from the other two, the court instructed the jury that if it found the defamatory language was "communicated to someone other than the plaintiffs by Equitable Life *or by the plaintiffs, themselves* * * * compensatory damages are presumed." (Emphasis added.) Thus, on that occasion, the jury was reminded neither of "compulsion" nor of the requirement that Equitable should have realized that disclosure would be

compelled to third parties.

Recognition of the so-called "doctrine" of "self publication" under circumstances similar to this case discourages plaintiffs from mitigating damages, as pointed out by the dissenter in the court of appeals. *Lewis v. Equitable Life Assurance Society of the United States,* 361 N.W.2d 875, 884 (Minn.Ct.App.1985) (Forsberg, J., dissenting). For example, respondents here originally sought to have "gross insubordination" expunged from their records as part of declaratory relief. Obviously, such an expungement would work against their self interest because, if granted, would mitigate, if not eliminate, the basis of recovery of future damages. Predictably, therefore, respondents chose to dismiss this claim for declaratory relief because expungement would lower, if not eliminate, recovery of future defamation damages.

In my view, the majority opinion gives insufficient attention to the ramifications of the mitigation problem. The opinion asserts the nonexistence of such a problem "if liability * * * is imposed *only* where the plaintiff was in some significant way compelled to repeat the defamatory statement and such compulsion was, or should have been, foreseeable to the defendant." In claims brought by ex-employees against employers for defamation when the employment was terminated for "incompetence," "dishonesty," "insubordination" or for any other reason carrying a connotation of immorality, ineptness, or improbity, "compulsion" will almost automatically be found in connection with future job applications by the discharged employee. Such "compulsion" would, with certainty, be foreseeable by the ex-employer. Moreover, I cannot agree with the assertion in the opinion that: "Properly applied, the doctrine of compelled self-publication does not unduly burden the free communication of views or unreasonably broaden the scope of defamation liability." To the contrary, I suggest that today's ruling substantially expands the scope of the defamation action. Now, the only way an employer can avoid litigation and the possible liability for substantial damages, is to cease communicating the reason it felt justified the termination, not only to third persons, but even to the employee himself or herself.

For these reasons, I would reverse.

Minn.,1986.

Lewis v. Equitable Life Assur. Soc. of the U.S.

389 N.W.2d 876, 62 A.L.R.4th 581, 105 Lab.Cas. P 55,625, 1 IER Cases 1269

END OF DOCUMENT

West Reporter Image (PDF)

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works


Westlaw.

| | | |
|---|---|---|
| 105 S.Ct. 2939 | FOR EDUCATIONAL USE ONLY | Page 1 |
| 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593, 53 USLW 4866, 11 Media L. Rep. 2417 | | |
| **(Cite as: 472 U.S. 749, 105 S.Ct. 2939)** | | |

▷
Briefs and Other Related Documents

DUN & BRADSTREET, INC., Petitioner
v.
GREENMOSS BUILDERS, INC.

## •Case Summary: Synopsis

Construction contractor brought defamation action against credit reporting agency which issued false credit report to contractor's creditors. The Washington Superior Court granted defendant's motion for a new trial after jury returned verdict in plaintiff's favor, and the Vermont Supreme Court reversed at 143 Vt. 66, 461 A.2d 414. On certiorari, the Supreme Court, Justice Powell, held that the false statements in the credit report did not involve matters of public concern which would require showing of actual malice for recovery of presumed and punitive damages.

Affirmed.

Chief Justice Burger and Justice White concurred in judgment and filed opinions.

Justice Brennan filed dissenting opinion in which Justices Marshall, Blackmun, and Stevens joined.

## •Points of Law: West Headnotes

[1] Libel and Slander ⬌124(8)

237k124(8) Most Cited Cases

Taken as a whole, instructions in defamation action against credit reporting agency permitted jury to award presumed and punitive damages on lesser showing than "actual malice." (Per Justice Powell with two Justices joining and the Chief Justice and a Justice concurring in judgment).

[2] Constitutional Law ⬌90.1(5)
92k90.1(5) Most Cited Cases

[2] Libel and Slander ⬌120(1)
237k120(1) Most Cited Cases

Permitting recovery of presumed and punitive damages in defamation cases absent showing of "actual malice" does not violate the First Amendment when the defamatory statements do not involve matters of public concern.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

105 S.Ct. 2939  FOR EDUCATIONAL USE ONLY  Page 2
472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593, 53 USLW 4866, 11 Media L. Rep. 2417
**(Cite as: 472 U.S. 749, 105 S.Ct. 2939)**

Westlaw.

AUTHORIZED FOR EDUCATIONAL USE ONLY

U.S.C.A. Const.Amend. 1. (Per Justice Powell with two Justices joining and the Chief Justice and a Justice concurring in judgment).

[3] Libel and Slander 120(2)
237k120(2) Most Cited Cases

False credit report which was issued to construction contractor's creditors and which was clearly damaging to contractor's business reputation did not involve matters of public concern which would require showing of "actual malice" to permit recovery of presumed and punitive damages in defamation action. (Per Justice Powell with two Justices joining and the Chief Justice and a Justice concurring in judgment).

**\*\*2940 *Syllabus* [FN\*]**

> FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499.

Petitioner credit reporting agency sent a report to five subscribers indicating that respondent construction contractor had filed a voluntary petition for bankruptcy. The report was false and grossly misrepresented respondent's assets and liabilities. Thereafter, petitioner issued a corrective notice, but respondent was dissatisfied with this notice and brought a defamation action in Vermont state court, alleging that the false report had injured its reputation and seeking damages. After trial, the jury returned a verdict in respondent's favor and awarded both compensatory or presumed damages and punitive damages. But the trial court believed that *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, controlled, and granted petitioner's motion for a new trial on the ground that the instructions to the jury permitted it to award damages on a lesser showing than "actual malice." The Vermont Supreme Court reversed, holding that *Gertz* was inapplicable to nonmedia defamation actions.

*Held:* The judgment is affirmed.

143 Vt. 66, 461 A.2d 414, affirmed.

Justice POWELL, joined by Justice REHNQUIST and Justice O'CONNOR, concluded that:

1. The fact that the jury instructions in question referred to "malice," "lack of good faith," and "actual malice," did not require the jury to find "actual malice," as respondent contends, where the instructions failed to define any of these terms. Consequently, the trial court correctly concluded that the instructions did not satisfy *Gertz.* Pp. 2942-2943.

2. Permitting recovery of presumed and punitive damages in defamation cases absent a showing of "actual malice" does not violate the First Amendment when the defamatory statements do not involve matters of public concern. Pp. 2943- 2947.

(a) In light of the reduced constitutional value of speech on matters of purely private concern, as opposed to speech on matters of public concern, the state interest in compensating private individuals for injury to their

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

105 S.Ct. 2939                         FOR EDUCATIONAL USE ONLY                                Page 1
472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593, 53 USLW 4866, 11 Media L. Rep. 2417
**(Cite as: 472 U.S. 749, 105 S.Ct. 2939)**

Westlaw.

AUTHORIZED FOR EDUCATIONAL USE ONLY

reputation adequately supports awards of presumed and punitive damages--even absent a showing of "actual malice." Cf. *Gertz.* Pp. 2943-2946.

(b) *Gertz, supra,* does not apply to this case. Petitioner's credit report concerned no public issue but was speech solely in the individual *750 interest of the speaker and its specific business audience. This particular interest warranted no special protection when it was wholly false and damaging to the victim's business reputation. Moreover, since the credit report was made available to only five subscribers, who, under the subscription agreement, could not disseminate it further, it cannot be said that the report involved any strong interest in the free flow of commercial information. And the speech here, like advertising, being solely motivated by a desire for profit, is hardy and unlikely to be deterred by incidental state regulation. In any event, the market provides a powerful incentive to a credit reporting agency to be accurate, since false reporting is of no use to creditors. P. 2947.

THE CHIEF JUSTICE concluded that *Gertz* is inapplicable to this case, because the allegedly defamatory expression involved did not relate to a matter of public concern, and that no other reason was needed to dispose of the case. P. 2948.

JUSTICE WHITE concluded that *Gertz* should not be applied to this case either **2941 because *Gertz* should be overruled or because the defamatory publication in question did not deal with a matter of public importance. Pp. 2953-2954.

472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593, 53 USLW 4866, 11 Media L. Rep. 2417

Briefs and Other Related Documents (Back to top)

• 1984 WL 565535 (Appellate Brief) Reply Brief of Petitioner on Reargument (Sep. 14, 1984)

• 1984 WL 565528 (Appellate Brief) Supplemental Brief of Respondent on Reargument (Aug. 24, 1984)

• 1984 WL 565533 (Appellate Brief) Brief Amicus Curiae in Support of Respondent Greenmoss Builders, Inc. (Aug. 24, 1984)

• 1984 WL 565525 (Appellate Brief) Supplemental Brief of Petitioner on Reargument (Jul. 30, 1984)

• 1984 WL 565529 (Appellate Brief) Brief of Dow Jones & Company, Inc. as Amicus Curiae, in Support of Petitioner (Jul. 30, 1984)

• 1984 WL 565531 (Appellate Brief) Brief of Information Industry Association, Amicus Curiae, in Support of Reversal (Jul. 30, 1984)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

AUTHORIZED FOR EDUCATIONAL USE ONLY

# •Case History: KeyCite History

**History**
**Direct History**

▶ 1  Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc., 143 Vt. 66, 461 A.2d 414, 9 Media L. Rep. 1902 (Vt. Apr 15, 1983) (NO. 173-81)
   *Certiorari Granted by*
H 2  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 464 U.S. 959, 104 S.Ct. 389, 78 L.Ed.2d 334 (U.S.Vt. Nov 07, 1983) (NO. 83-18)
   *AND Judgment Affirmed by*
=> 3  **Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.**, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593, 53 USLW 4866, 11 Media L. Rep. 2417 (U.S.Vt. Jun 26, 1985) (NO. 83-18)

**Negative Indirect History (U.S.A.)**
*Not Followed on State Law Grounds*
C 4  Newberry v. Allied Stores, Inc., 108 N.M. 424, 773 P.2d 1231, 4 IER Cases 562 (N.M. May 01, 1989) (NO. 17,712) ★★★ **HN: 1,2,3 (S.Ct.)**
▷ 5  Demopolis v. Peoples Nat. Bank of Washington, 59 Wash.App. 105, 796 P.2d 426 (Wash.App. Div. 1 Sep 04, 1990) (NO. 25739-1-I) ★★★ **HN: 2,3 (S.Ct.)**
*Disagreement Recognized by*
▷ 6  Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783, 54 USLW 4373, 12 Media L. Rep. 1977 (U.S.Pa. Apr 21, 1986) (NO. 84-1491) ★★★★ **HN: 1,2,3 (S.Ct.)**
*Declined to Extend by*
▷ 7  Dworkin v. Hustler Magazine Inc., 867 F.2d 1188, 16 Media L. Rep. 1113 (9th Cir.(Cal.) Jan 24, 1989) (NO. 87-6393) ★★★★ **HN: 1,2,3 (S.Ct.)**
H 8  U.D. Registry, Inc. v. State of California, 34 Cal.App.4th 107, 40 Cal.Rptr.2d 228, 63 USLW 2673 (Cal.App. 2 Dist. Apr 21, 1995) (NO. B077282, B077283), review denied (Aug 17, 1995) ★★ **HN: 2,3 (S.Ct.)**
H 9  Nizam-Aldine v. City of Oakland, 47 Cal.App.4th 364, 54 Cal.Rptr.2d 781, 96 Cal. Daily Op. Serv. 5250, 96 Daily Journal D.A.R. 8503 (Cal.App. 1 Dist. Jul 15, 1996) (NO. A065678), review denied (Nov 13, 1996) ★★★★ **HN: 1,2,3 (S.Ct.)**
▶ 10  Washington Legal Foundation v. Friedman, 13 F.Supp.2d 51 (D.D.C. Jul 30, 1998) (NO. CIV. A. 94-1306(RCL)) ★★ **HN: 2 (S.Ct.)**
*Distinguished by*
H 11  Straw v. Chase Revel, Inc., 813 F.2d 356, 55 USLW 2599, 13 Media L. Rep. 2269 (11th Cir.(Ga.) Mar 27, 1987) (NO. 86-8524) ★★ **HN: 1,2,3 (S.Ct.)**
C 12  Towers Financial Corp. v. Dun & Bradstreet, Inc., 803 F.Supp. 820 (S.D.N.Y. Sep 16, 1992) (NO. 92 CIV 629 (KTD)) ★★★ **HN: 1,2,3 (S.Ct.)**
H 13  In re County of Orange, 245 B.R. 138 (C.D.Cal. Mar 18, 1997) (NO. SACV 96-0765-GLT, SA 94-22272-JR, SA 96-1624 JR) ★★★ **HN: 1,2,3 (S.Ct.)**

**Related References (U.S.A.)**
H 14  Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc., 149 Vt. 365, 543 A.2d 1320 (Vt. Feb 26, 1988) (NO. 86-047)

**Court Documents**
**Appellate Court Documents (U.S.A.)**

**U.S. Appellate Brief**

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

AUTHORIZED FOR EDUCATIONAL USE ONLY

15 DUN & BRADSTREET, INC., Petitioner, v. GREENMOSS BUILDERS, INC., Respondent., 1984 WL 565525 (Appellate Brief) (U.S. Jul. 30, 1984) **Supplemental Brief of Petitioner on Reargument** (NO. 83-18)

16 DUN & BRADSTREET, INC., Petitioner, v. GREENMOSS BUILDERS, INC., Respondent., 1984 WL 565529 (Appellate Brief) (U.S. Jul. 30, 1984) **Brief of Dow Jones & Company, Inc. as Amicus Curiae, in Support of Petitioner** (NO. 83-18)

17 DUN & BRADSTREET, INC., Petitioner, v. GREENMOSS BUILDERS, INC., Respondent., 1984 WL 565531 (Appellate Brief) (U.S. Jul. 30, 1984) **Brief of Information Industry Association, Amicus Curiae, in Support of Reversal** (NO. 83-18)

18 DUN & BRADSTREET, INC., Petitioner, v. GREENMOSS BUILDERS, INC., Respondent., 1984 WL 565528 (Appellate Brief) (U.S. Aug. 24, 1984) **Supplemental Brief of Respondent on Reargument** (NO. 83-18)

19 DUN & BRADSTREET, INC., Petitioner, v. GREENMOSS BUILDERS, INC., Respondent., 1984 WL 565533 (Appellate Brief) (U.S. Aug. 24, 1984) **Brief Amicus Curiae in Support of Respondent Greenmoss Builders, Inc.** (NO. 83-18)

20 DUN & BRADSTREET, INC., Petitioner, v. GREENMOSS BUILDERS, INC., Respondent., 1984 WL 565535 (Appellate Brief) (U.S. Sep. 14, 1984) **Reply Brief of Petitioner on Reargument** (NO. 83-18)

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.