UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Barbara R. Burns,

      Plaintiff             CIVIL ACTION

v.

David S. King,

      Defendant        CASE NO. 02 CV 000897 (RNC)

PLAINTIFF'S FIRST MOTION IN LIMINE



---

   Plaintiff Barbara R. Burns hereby moves the court for an order in limine with respect to Defendant's eleventh-hour attempt to introduce hearsay writings that, inter alia, purport to set forth the merits and procedural history of unrelated litigation involving Plaintiff and/or other parties, including a case that was commenced, upon three Affidavits of Expert Review [1], in October, 2003, more than one year after filing of the case at bar, and more than three years after the events that give rise to this litigation; and which further relates to Defendant's belated attempts to introduce other unreliable and inadmissible evidence, including character evidence, regarding events, testimony and other evidence that is irrelevant to this case. Plaintiff further moves the court for an order in limine with respect to Defendant's simultaneous attempt to introduce double-hearsay and triple-hearsay statements, wherein one of the writings submitted by Defendant purports to quote statements that were allegedly made by Kevin S. Burke and others not available for cross examination in unauthorized proceedings convened in contravention of Rule 63.03 of the Minnesota Rules of Civil Procedure or otherwise contrary to law.[2]

---

[1] It is a matter of record that three Minnesota attorneys with expertise in Minnesota real estate law certified the referenced action "wholly meritorious" and averred by affidavit that, under existing Minnesota law, Plaintiff and the two co-parties should and would prevail on the merits. The action is presently pending.

[2] Burke was removed on a peremptory challenge on December 14, 1994 and thereafter convened unauthorized proceedings on December 19, 1994 and January 5, 1995. Danial Mabley was removed for cause on March 25, 1997, and thereafter convened an unauthorized proceeding on April 2, 1997 in which Mabley acknowledged and acceded to the removal and then violated the disqualification rule by making

1

## DISCUSSION

The Federal Rules of Evidence and other evidentiary rules, which regulate admission of proof in the trial of a lawsuit, exist for the purpose of preventing unfair prejudice. A trial court has broad discretion to exclude evidence even in cases where the proffered evidence is highly probative, which is not the case here, when any probative value is outweighed by unfair prejudice.

In this case, the suggested "evidence" proffered by Defendant, on the eve of trial, in addition to being unreliable hearsay, is irrelevant, has potential to confuse the jury, has no probative value, and is highly prejudicial. On December 9, 2004, the trial judge expressly authorized both parties to submit Motions in Limine on or before December 20, 2004, at the same time stating that the hearsay exclusion would be applied even-handedly to both parties. Plaintiff will address the issues of relevance and unfair prejudice, including, but not limited to, hearsay and unfair surprise, in turn, infra.

*Relevance*

Under the Federal Rules of Civil Procedure, only **relevant** evidence is admissible at trial. FRCP 401. In the instant case, the hearsay writing cited by Defendant for the first time in November, 2004 refers, inter alia, to an unauthorized default proceeding in an unrelated case, filed three years after the events giving rise to this litigation, in which the litigation position of Plaintiff and two other parties was certified meritorious by not one but three Minnesota attorneys of reputation. The same writing purported to recount other, unrelated litigation that, in some cases, occurred as long as ten to twelve years ago.

Given these facts, neither the default proceeding, presently being litigated in a different forum, nor the writer's substantially false and incomplete account of that litigation and other facts did, or could have, influenced any of the parties to this litigation and/or interested third parties. Interested third parties include, but are not limited to, University of Minnesota and Quinnipiac Law faculty who, as the record before this court recites, consistently gave Plaintiff high marks as both a law student and an MBA student

---

substantive findings. A three-judge panel of the Minnesota appellate court reviewed de novo Plaintiff's application of the disqualification rule and upheld it.

throughout the relevant period. Among those law professors with firsthand knowledge of, and who have favorably commented upon, Plaintiff's character and law school performance are John Bedosky, a respected Minnesota attorney, who recommended Plaintiff without reservation and with enthusiasm to the top-rated New York University L.LM program, and Marilyn Ward Ford, a respected Connecticut attorney who recommended Plaintiff to the University of Connecticut. Exhibits A and B.

The record further confirms that, in July 2004, a Minnesota trial court formally considered and rejected the same hearsay writing cited by Defendant. The court granted judgment to Plaintiff for the full amount of Plaintiff's claim, in addition to court fees and costs, by order filed July 22, 2004.

*Unfair Prejudice*

It must further be expressly noted that, even if the suggested "evidence" were relevant, probative, and competent, which is not the case, exclusion is still appropriate on ground of unfair prejudice, confusion of the issues, misleading of the jury, unfair surprise, and on the basis that the suggested evidence is inadmissible as unreliable hearsay and character evidence for which no available exception is applicable.

Specifically, the Defendant, literally on the eve of trial, offers for its truth a purported "news article"[3] that dates to January 2004 and which has been considered and rejected by the July 2004 order of a St. Paul, MN court on hearsay[4] grounds, as well as on the ground that the statements cited by the article are unauthorized under Minnesota law and court rules, which control, and cannot be used or cited as precedent. It also constitutes unfair surprise, and since Defendant waited until November 2004 to cite it, Plaintiff had no opportunity to know that Defendant intended to rely upon the suggested evidence, nor to test its validity and/or discredit it via cross-examination of the writer and/or the person whose statements were quoted.[5]

---

[3] The publisher of the writing proffered by Defendant is not a "reporter of news" and, consequently, the referenced publication is not accurately classified as a "news article." Rather it is a privately-owned and operated trade journal, with a limited and specific circulation, concentrated almost exclusively in southern Minnesota, and marketed by paid private subscription.

[4] The Second Federal Circuit has taken a similar position. See, e.g., Dibella v. Hopkins, 2002 WL 31427362 (S.D.N.Y.), stating that, upon parties' motion in limine, news article was required to be excluded as hearsay unless the writer of the article was available to testify; and expert "ethics" witness was barred from testifying.

[5] Cross-examination would substantially weaken the evidentiary impact of the writing that Defendant apparently expects the jury to accept at face value. As an offer of proof, there are many articles that have

Furthermore, Defendant—who must be bound by his pleadings and deposition testimony—has testified [6] that his "good standing" comment was premised upon financial factors only and did not in any way involve any disparagement of Plaintiff's character or fitness to practice the law. Accordingly, Plaintiff's character is not in issue and character evidence, including reputation evidence and specific acts, otherwise available to Defendant in a defamation action, is not, or should not be, available to Defendant in this litigation. DiBella v.Hopkins, supra, 2002 WL 31427362. See also FRE 702.

In these circumstances, to allow Defendant to introduce "evidence" consisting of hearsay writings that attest to events having no bearing upon the issues, as the parties have defined them over a three-year period, would clearly and unfairly exceed the parameters of this case and would also unfairly prejudice Plaintiff. Specifically, Defendant has consistently stated for more than two years that his statements were premised only upon Defendant's unsupported contention that Plaintiff owed money to the

---

been published by the Minneapolis Star Tribune, which has the largest circulation of any newspaper in the Twin Cities, which conclusively establish that the decorum and litigation conduct—and thereby the credibility—of the subject of the "article", Kevin Burke, is highly objectionable and unprofessional by any standard; and that Burke cannot claim to be a model of propriety. As just one illustration, Burke is on record as admitting in an article published by the Minneapolis Star Tribune that he signed a letter to United States District Court Judge Ann Day Montgomery which began, "Dear Bitch". Exhibit A. On another occasion, as the Star Tribune also recounted, Burke publicly attacked his African-American colleague, Judge La June Thomas Lange, and was subsequently denounced--also in print, published in the Star-Tribune--by the Rev. Jesse Overton, director of the NAACP, as "mean-spirited." Exhibit B. (In this context, Plaintiff must disagree with those who have described Burke as chauvinistic. By Plaintiff's observation and that of others who know him and who have characterized him, verbally and in print, as "vindictive", "controlling", and "mean-spirited", Burke is capable of behaving equally abusively to men). A subsequent prosecution instigated by Burke against Lange was dismissed by the Minnesota Supreme Court in 1996, in part based upon Plaintiff's affidavit recounting the statements of one Teresa Graham, who stated to Plaintiff and three other persons, one of whom was a clergyman, that Burke harassed Graham. For texture, Plaintiff notes that, notwithstanding Burke's negative characterizations of Lange's judicial performance, Lange, who is still on the bench, recently was the recipient of an award in recognition for her exemplary performance as a state court judge. Last, but certainly not least, Burke, who has carefully cultivated the press over a period of years and, as demonstrated, routinely uses local newspapers as a media outlet to express his views regarding pending cases, was quoted in the Star Tribune less than two weeks ago as speaking out in defense of two attorneys, Julius and Laura Nolan, husband and wife prosecutors, who had been the "victims" of a cocaine raid the previous weekend. Exhibit C. The apparent purpose of Burke's pre-arraignment statement to the Star Tribune was to influence the Scott County judge assigned to the Nolans' criminal prosecution to avoid an actual or potential conflict of interest and to ensure that the court would treat the Nolans, whom Burke described as friendly colleagues, leniently. The court may properly conclude that, totally apart from the fact that Burke is in no position to criticize or even comment upon the decorum and professional demeanor of others, the unfair surprise of Defendant's eleventh-hour reference to Burke affords Plaintiff no opportunity to develop these and other facts having direct bearing upon factors such as bias and credibility that should and would be of great interest to a jury, charged with evaluating his demeanor and credibility as a witness for the Defendant.

[6] Defendant's deposition transcript, in its entirety, has been filed with the court.

Law School and were **not** based upon Plaintiff's academic performance, character, or conduct. Given these admissions by Defendant, there can be no legitimate interest on the part of the parties or the court in litigating claims that have been, and are being, resolved in Plaintiff's favor in other proceedings. [7]

## CONCLUSION

In sum, there is no evidence, and Defendant has made no showing, that statements attributed to Kevin Burke and Daniel Mabley in January 2004 are in any way relevant to the case at bar. Indeed, Defendant has asserted an affirmative defense of "substantial truth", stating that Defendant did **not** disparage and had no basis to disparage Plaintiff's character, of which two Quinnipiac professors and other attorney-professors spoke in the most glowing terms. Accordingly, all testimony and evidence relating to any conduct by either party that is not probative of the validity of Defendant's "financial good standing" defense to Plaintiff's defamation and emotional distress claims is irrelevant and inadmissible at trial, and properly excluded on Plaintiff's First Motion in Limine.

The court should therefore properly conclude that any testimony or other evidence relating to these statements is wholly irrelevant and barred by applicable evidentiary Rules, enacted for the protection of parties and counsel, and would only serve as tools of prejudice and harassment of the Plaintiff. Furthermore, the interests of judicial economy dictate that Defendant should not be permitted to unduly prolong this trial and confuse the issues by questioning Plaintiffs and other witnesses about matters that had and have no bearing upon Plaintiff's tenure at Quinnipiac School of Law and/or Plaintiff's good standing as a second-year Quinnipiac law student in May 2000. By Defendant's own admission, these matters are irrelevant and under the hearsay rule upheld by the court, otherwise inadmissible.

In consideration of the foregoing facts, the court should grant Plaintiff's First Motion in Limine.

DATED: /2-09-04                    BY: *Barbara R Burns*

                                   Barbara R. Burns

---

[7] See Footnote 1.

## LOWRY HILL

May 31, 2001

John R. Bedosky
Principal

90 South Seventh Street, Suite 5300
Minneapolis, Minnesota 55402
Direct: (612) 667-1758
Toll Free: (888) 648-8157
Facsimile: (612) 667-7839
johnb@lowryhill.com

Re:    Recommendation of Barbara R. Burns

Dear Sir or Madam:

Barbara Burns was a student in my Fiduciary Income Tax Class in the Masters in Business Taxation Program at the University of Minnesota's Carlson School of Management in Winter of 2001. She demonstrated academic excellence and an in depth understanding of both the practical and theoretical principles of the federal income taxation of estates, trusts and their beneficiaries.

The course requires: (1) meticulous attention to detail; (2) an ability to think logically and apply concepts within an arbitrary framework dictated by tax law; (3) an appreciation for the practical human aspects of this discipline and the ability to apply these concepts to sophisticated planning problems involving real people; and (4) the ability to communicate effectively in writing. Barbara's work demonstrated high performance in each of these areas.

This is a conceptually difficult course and the grades this year tended to be lower than in previous years. Barbara's raw score was near the top of the class. Therefore, I recommend her for admission to the JD/LLM program.

Sincerely,

# Transcript Report
## Student Information

*Name:*    Barbara Burns
*Former Last Name:*

*Birthday:*           *Stud ID*  1918862
*Sex:*      F          *Ethnic:*  White      *Ssn*  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

## Home Information

*Addr1:*  13684 Harmony Way                          *Phone*  612    327-1133
*Addr2:*                                             *Email*  barbaraburns002@hotmail.c
*City*  Apple Valley        *State*  MN    *Zip*  55124    *Foreign Country*

## Work Information

*Company Name:*                          *Title:*                *Phone*  201    390-2134
*Work Addr2:*
*Work Addr3:*                            *Country*
*Work City:*            *Work State:*      *Work Zip*

## School Information

## Course Information

ACCT-5353        001      Taxation of Fiduciaries        A Spring      2001      A



## QUINNIPIAC COLLEGE
## SCHOOL OF LAW



May 1, 2000

Office of Admissions
University of Connecticut
  School of Law
65 Elizabeth Street
Hartford, Connecticut 06105

To Whom It May Concern:

   Ms. Barbara R. Burns, a student enrolled at Quinnipiac College School of Law (the "Law School") has advised me of her desire to transfer to the University of Connecticut School of Law. Ms. Burns has expressed an interest in the Tax and Insurance Law Program offered at the University of Connecticut. I write this letter in support of Ms. Burns and her application for admission as a transfer student.

   Since January of this year, Ms. Burns has been a student in my Business Organizations course. I have had ample opportunity to observe and interact with Ms. Burns both inside and outside of the classroom. We have had extensive conversations about her educational and professional goals and the best way to prepare herself to achieve them.

   It has been a pleasure to have Ms. Burns in class because she is always extremely well prepared and always makes a valuable contribution to class discussion. She is an intelligent, articulate, and analytical individual who has been recognized as a Dean's Scholar as a result of her academic achievement at the Law School. Based on her level of preparation and superior classroom performance, I anticipate that Ms. Burns will receive one of the highest grades in my course.

   Prior to attending the Law School, Ms. Burns received a B.A. in Business Administration and Marketing, an MBA in Accounting and Finance, and completed some course work in the Carlson School Master of Business Taxation program. Her work experience includes service in administrative and managerial positions with various corporations. In addition to her role as a law student, Ms. Burns, an assiduous individual with a high energy level, is currently employed full-time. On a more personal level, she is a pleasant person who exhibits leadership qualities while also demonstrating her ability to be a team player. She also has integrity.

   I am confident that if admitted as a transfer student, Ms. Burns will be an asset to the University of Connecticut School of Law. I recommend Ms. Burns without any hesitation whatsoever. If you desire additional information or would like to discuss this matter further, please feel free to call me at (203) 287-3258.

                    Sincerely yours,

                    Marilyn Ward Ford
                    Neil H. Cogan Public Service Professor of Law

*Exhibit 65*

Copy

TO:    Academic Dean (of Host Law School)
FR:    Professor Leonard J. Long, Quinnipiac College School of Law
DA:    August 27, 1999

### RE: Ms. Barbara Burns

Ms Burns asked me to write a letter of reference to you in support of her being a visiting student this Fall 1999 term.

She was a student in my first-year Torts class last Spring. This course, of forty-four students, was the core substantive course taken by students admitted. I found Ms. Burns to be a solid student. Always in attendance, always prepared, and always asking the right kinds of questions.

Ms. Burns received a 'B' grade in my class. I am not a generous grader, I still grade on the same harsh curve used at the University of Southern California, and it is not uncommon for me to not award a single 'A' range class in even the largest class. Consequently, for me Ms. Burns 'B' reflects my judgment that she is a solidly above average students at this law school.

I think you will find her a good student at any law school.

Respectfully submitted,

Leonard J. Long
Professor of Law
Tel. 203.287.3257
Fax. 203.287.3244
E-mail. long@quinnipiac.edu

cc Ms. Barbara Burns

 **(1986-Current)**

**Star Tribune: Newspaper of the Twin Cities**

August 31, 1993

## Lesson learned: Always address a judge `Your Honor'

Author: David Peterson; Staff Writer

Section: NEWS
Page: 01A

*Index Terms:*
court

Estimated printed pages: 4

Article Text:

A dramatic flurry of behind-the-scenes events involving some of the state's most influential judges has left a mystery:

How did it happen that, at a moment of personal triumph, the highest-ranking trial **judge** in Minnesota signed a letter addressed last month to a female **judge** and adversary that began, "Dear Bitch"?

Hennepin County District **Judge Kevin Burke** maintains the letter was an innocent mistake. If so, he is the victim of an unfortunate coincidence: The letter went to Ann Montgomery, also a Hennepin County district **judge** and the most prominent, respected and outspoken woman among a group of dissident **judges** who have been warring with **Burke** and his allies for years.

**Burke** agrees that the situation is "just a disaster" for him, what with his sensitive position of leadership on a number of gender-related issues as chief **judge** of the state's largest judicial district and chairman of the Conference of Chief **Judges**, a key policymaking body for the judiciary.

**Burke** and his court reporter, Chris Frenzel, say that Frenzel made an unconscious slip - unrelated to Montgomery, Frenzel said - while attaching first names to a mailing of about 240 letters to the state's trial **judges**. **Burke** failed to notice the slip, he said, because he was rapidly flipping through the stack, seeing and signing only the last page of each four-page letter.

Montgomery said that she is left mostly feeling puzzled. "We have no ongoing disputes at the moment. An employee of his came to me and took the full brunt, and I am without evidence to say it's not true. I have received written apologies and have accepted them as final as far as I am concerned."

Montgomery's position complicates the situation for **Burke**. She is a leading member of a faction of **judges** who feel that **Burke** and his predecessor and ally, **Judge Roberta Levy**, have not been sufficiently demanding of **judges**. Last year she publicly criticized Levy's practice of teaching for pay while on paid leave, a practice that has since been ruled off-limits.

**Burke** said the letter went out as a result of his reelection in late June to the leadership of the Conference of Chief **Judges**. "I was real proud; it was the first time they'd reelected anyone. He decided to send a letter to all the **judges**, outlining his thoughts and plans, and to take the trouble to address them by their first names.

Frenzel obtained a computerized list of **judges**' names and addresses from the state court administrator's office. She had to

type each person's first name, she said, then merge them with the text of **Burke's** letter. The letters were signed and went out on Thursday, July 8.

The following day, **Burke** said, he learned for the first time from a friend, **Judge** John Stanoch, about the letter that Montgomery had received. **Burke** said he thought it must be a joke.

Stanoch said **Burke** seemed to react genuinely with shock and bewilderment. "He kept saying, `You're kidding.' I told him to talk to **Judge** Montgomery because she was very upset. I don't think he had any prior knowledge."

Frenzel said she was among the group at a Lake Minnetonka boating party on that Friday when Stanoch passed the word along. She went downtown to check her computer, she said, and was "blown away" to see the "Dear Bitch" reference there. She first tried calling Montgomery and then went to her house the following Sunday with a handwritten explanation and apology.

She said she doesn't know how it happened, but assumes she typed it in after getting a phone call from a frequent caller to **Burke's** office whom she considers a bitch. **Burke** said he has disciplined Frenzel.

On the subsequent Monday morning, two senior members of the bench who are friends of Montgomery's - former Chief **Judge** Patrick Fitzgerald and former U.S. Attorney Andrew Danielson - asked to see **Burke**.

"We were concerned and wanted an explanation," Danielson sad. "**Kevin** seemed distraught. Right off the bat he said, `I know why you're here.' He said, `What do you think I should do, resign?' "

Fitzgerald said: "**Judge Burke** indicated he thought it appropriate to resign [as chief **judge**]. Both **Judge** Danielson and I spoke immediately - I spoke first - against that. In my opinion, he has done an excellent job as chief **judge**. He is very innovative, extremely conscientious, and willing to listen to everybody." But Fitzgerald said he suggested a written apology, and that was done.

The Star Tribune learned of the letter from a source who said that a potentially serious matter has been hushed up because no one involved has a strong interest in disclosing it. Even **Burke's** critics would be loath to lose someone who is considered an effective lobbyist and spokesman on their behalf, with no one of equal agility standing by to take over.

**Judges** are required to be courteous in their official dealings, and to avoid gender bias. In 1984, the Minnesota Supreme Court publicly censured Ramsey County Municipal **Judge** John Kirby for using such terms as "lawyerette" and "attorney generalette" in referring to female lawyers. Voters ousted Kirby from office later that year.

Montgomery is the highest-rated **judge** of those whom the Hennepin County bar has evaluated to date, and the faction to which she belongs includes some of the stellar names on the bench, such as Robert Schiefelbein and Michael Davis. **Burke** also does very well on judicial surveys.

Montgomery's position as a **Burke** adversary suggests the possibility that at the very least, an inadvertent slip could have been caused by the sight of her name. But Montgomery said that her children play tennis with Frenzel's and she would have a hard time believing there was any anger from Frenzel's standpoint.

Some members of Montgomery's circle wonder whether the letter might have been a bit of interoffice horseplay that mistakenly got out. That, too, could be damaging to **Burke**, suggesting that he considers such a reference acceptable. **Burke** said that isn't so: While he uses the "f" word from time to time, he does not use the word "bitch" or anything like it.

One **judge** privately asked why **Burke** wouldn't have checked all the salutations: It was not the usual thing to address **judges** by their first names in a mass mailing, and a list from the court administrator's office would include some formal, seldom-used names that would sound odd to friends of **Burke's**.

"That's a good question," **Burke** said. "In fact, last week I did a mailing in which I did do that, and found a bunch that I did change, like John to Jack. But I just didn't the other time; I left it to Chris to make those judgments."

**Burke** said his best evidence is now vanished: the genuine shock he felt at the time, and that Stanoch and others saw.

, Asked whether he believes **Burke's** story, Fitzgerald said he is "reasonably satisfied that the court reporter did it and it was a situation over which he had no control."

Caption:
PHOTO

Copyright (c) 1993, 2001 Star Tribune: Newspaper of the Twin Cities
Record Number: 621875

Article Bookmark(OpenURL Compliant):Star Tribune: Newspaper of the Twin Cities : Lesson learned: Always address a judge ' Your Honor'
http://docs.newsbank.com/openurl?ctx_ver=z39.88-2004&rft_id=info:sid/iw.newsbank.com:STMB
&rft_val_format=info:ofi/fmt:kev:mtx:ctx&rft_dat=0EFD67726CBDB2BD&svc_dat=InfoWeb:current&req_dat=0EBB14EEF44F7896

Case 3:02-cv-00897-RNC    Document 128    Filed 12/14/2004    Page 13 of 29


**(1986-Current)**

| Edit Search | Help | Home |

Record **223** of **330**

| E-Mail | Text Only Display | List | Previous | Next |

**Star Tribune: Newspaper of the Twin Cities**

May 25, 1995

## Lange transferred; move assailed as retaliatory

Author: Randy Furst; Staff Writer

Section: NEWS
Page: 01B

*Index Terms:*
court

Estimated printed pages: 3

Article Text:

Hennepin District **Judge** LaJune Lange, who accused the district's chief **judge**, **Kevin Burke**, of abusive verbal behavior three weeks ago, was transferred out of juvenile court Wednesday by **Burke**, setting off charges by Lange's supporters that he was retaliating against her.

**Burke** said her removal was neither punitive nor retaliatory and was in the best interests of the court. He likened the transfer to Minnesota Twins coach Tom Kelly's switching Kirby Puckett from center to right field. But his actions are likely to intensify controversy over the dispute.

Lange declined to comment, but an individual close to her who spoke with her said Lange considered it retaliation by **Burke** because of her outspoken criticism of his treatment of her.

**Burke** is white and Lange is black. A group of ministers, most of them black, held a news conference last week supporting Lange and saying it wants the state Board on Judicial Standards to investigate Lange's accusations against **Burke**.

**Burke** said he signed an order Wednesday transferring Lange to criminal court and replacing her in juvenile court with Tanya Bransford, another black **judge** who had been a referee there and, briefly, a juvenile court **judge**.

**Burke** said Lange was to return to the criminal court at the end of 1995 and Bransford was to join the juvenile court in 1996 or 1997. He said that rather than have Lange's staff learn the computer system and then leave, continuity would be improved by transferring her now. One of **Burke's** previous criticisms of Lange was that she failed to update computer court records, a criticism she and some supporters deny.

"I did not do this [transfer her] as a criticism of **Judge** Lange," said **Burke**. "She, in fact, made improvements in the case management of her office. But it seemed to me that in the overall best interest of the team - meaning the bench as a whole - it seemed that changing the positions made sense. If Tom Kelly moved Kirby Puckett from center field to right field, it should not be interpreted as a criticism of Kirby Puckett. . . .

"I recognize that people could misinterpret this move as a disciplinary move," **Burke** said. "I am not going to make the decision on managing the court on the basis of press conferences."

Lange's transfer drew some sharp criticism. "They are retaliating and harassing her, and they have threatened respected

,members of the African-American community, and we are not going to stand by and take this on the cheek because they wear robes," said Jesse Overton, past president of the St. Paul NAACP.

"This action appears to be punitive and to not respect the integrity of a **judge**," said the Rev. Richard Coleman, Lange's minister, a pastor at St. Peter's AME Church and a leader of the coalition that asked the state Board of Judicial Standards to investigate Lange's accusations against **Burke**.

**Burke** said state Supreme Court Chief Justice A.M. (Sandy) Keith agreed with his decision. Asked to comment, Keith issued a statement supporting the transfer.

Some say criticism of Lange was behind the transfer. On May 1, **Burke**, joined by juvenile court presider **Judge** Charles Porter, met Lange in her chambers, where **Burke** told her he might transfer her, citing management issues.

Lange then wrote to the Supreme Court, assailing **Burke**, saying that he had blocked her door and yelled at her, which **Burke** denies.

Last Thursday, **Burke** met with Hennepin County **judges** who form the district's executive committee and said a transfer was one of his options, according to an individual familiar with the committee.

Porter told **Burke** on Friday that he wanted Lange removed, citing criticisms of her management style and deteriorating relations among juvenile court personnel, the individual said.

Lange learned Tuesday that she'd been invited to Wednesday's executive committee meeting. She wrote **Burke** that she and her attorney couldn't attend on such short notice.

"It is very troubling," she wrote, "that you would undertake such a matter in **Judge** Porter's absence and while an investigation of your conduct towards me is pending before the Board of Judicial Standards." She asked for a postponement until all parties could be present.

The person familiar with the committee's actions said the group voted to table the issue. "A majority felt they should not direct the chief **judge** what to do," the individual said.

Said **Burke**, who did not attend the discussion: "I know I have full support of the executive committee."

But another person familiar with the committee said some committee members felt Lange's transfer was not the way to solve the problems.

Lange's letter was brought to the committee Wednesday by Overton, who said **Burke** shouted at him and told him to get out. Overton said he'd never experienced such "mean-spirited conduct."

Asked for comment, **Burke** said, "I would not dignify his accusation with a response."

Caption:
PHOTO

Copyright (c) 1995, 2001 Star Tribune: Newspaper of the Twin Cities
Record Number: 714252

Article Bookmark(OpenURL Compliant):Star Tribune: Newspaper of the Twin Cities ; Lange transferred; move assailed as retaliatory
http://docs.newsbank.com/openurl?ctx_ver=z39.88-2004&rft_id=info:sid/iw.newsbank.com:STMB
&rft_val_format=info:ofi/fmt:kev:mtx:ctx&rft_dat=0EFD6622CC0ABEFC&svc_dat=InfoWeb:current&req_dat=0EBB14EEF44F7896

E-Mail    Text Only Display    List    Previous    Next

 **(1986-Current)**

**Star Tribune: Newspaper of the Twin Cities**

May 13, 1995

## Disorder in the court; judges are squabbling
**Hennepin jurists' accusations fly**

Author: Randy Furst; Staff Writer

Section: NEWS
Page: 01A

*Index Terms:*
court

Estimated printed pages: 4

Article Text:

**Kevin Burke**, chief **judge** of the Hennepin County District Court, has been accused of behaving in a verbally threatening manner toward **Judge** LaJune Lange, who has taken the unusual step of writing a letter to every state Supreme Court member to complain of his actions.

In an interview Friday, **Burke** denied Lange's accusations but said he told her that if she does not correct a number of problems in her office, he will transfer her out of the Juvenile Court.

The dispute has created some turmoil within the local and state court system as the allegations have multiplied. There have been accusations by Lange, who is black, and others that **Burke** and other white court personnel have acted improperly. There are both race and gender overtones to the dispute.

The controversy continued to escalate after several meetings in which Chief Justice A.M. (Sandy) Keith and several Supreme Court justices met with Lange, **Burke** and other **judges** to mediate the issue. **Burke** acknowledges that he is a close friend of Keith's, and a source familiar with the dispute said it is likely that using a mediator will be proposed.

Keith declined to be interviewed, but did issue a statement that appeared to defend **Burke**. Keith said that after talking to those involved, he found nothing "to substantiate her [Lange's] description of incivility or a hostile work environment" and that **Burke** "took appropriate action" to resolve a case-management problem.

Keith said that Lange had "problems acclimating herself and her staff" to the computer system and that while she said she wanted to resolve the problems, **Burke** had to run an efficient court and that "I fully support him."

Keith's statement drew a sharp response from Lange on Friday.

"It's nice to have your best friend as the chief justice," she said.

The dispute appears to have caused some disarray within county courts, as well.

Frances Moore, a public defender, said there was a "horrible tension" Friday in the Juvenile Court. "The murmuring is that something is happening and no one knows what it is," she said. In her experience with juvenile cases, she said, it was untrue

'that Lange's computer records were not up-to-date, as alleged by **Burke**.

At the heart of the commotion is a letter Lange wrote to Keith on May 3, with copies to the other justices, criticizing **Burke** and others. The Star Tribune obtained a copy Thursday.

**Burke** said Friday that Lange's letter "was a diversion from the issue that **Judge** Lange needs to perform her work in Juvenile Court."

"I categorically deny yelling at her," he said. "I admit I raised my voice, and I admit I was frustrated with her."

**Burke** also said he regrets that the news media found out about the internal court dispute. "This is an embarrassment to the institution," he said. "I will make sure that this institution will act effectively."

But the institution took more hits Friday. The Minnesota chapter of the National Conference of Black Lawyers demanded that the Supreme Court "take strong action against **Judge Burke** for his outrageous and assaultive behavior against a highly respected African-American jurist."

In an interview Friday, Lange said she and her staff members, who are also black, have encountered "a lot of hostility and lack of cooperation." She also said, "**Judge Burke** has had great difficulty over the years dealing with women **judges**."

Told of that remark, **Burke** replied, "That's totally false. That illustrates **Judge** Lange's attempt to divert attention from the fundamental issue, which is her failure to do the job." He also said he does not believe there is racial hostility within the court.

Another **judge** mentioned in Lange's letter also expressed dismay

that it had reached the news media. "I think this is detracting from our ability to do our jobs," said **Judge** Patricia Belois. "I am saddened by the discussion."

In her letter, Lange said that **Burke** and Charles Porter, presiding **judge** of Juvenile Court, came into her office unannounced and without invitation. "**Judge Burke** placed himself against the only exit door to my office and started yelling and shaking his finger at me," she wrote.

Lange called **Burke's** behavior "improper and discourteous."

In an interview, Porter said that they did not enter uninvited. He said that "there was one short period of time" when **Burke** "slightly raised his voice" but that Lange's contention that **Burke** yelled at her "was a gross exaggeration, and certainly we did not accost her in the office."

He said that the meeting was prompted by a growing frustration at Lange and her staff members for failing to update records, and that despite meetings with her, she is now nearly 200 cases behind.

Porter said, "My frustration got to the point that I told him [**Burke**] it would be her leaving or me leaving, that I couldn't run the court in the way he was asking me to do it - effectively or efficiently in a sense of shared purpose, without her cooperation and her interest."

Lange also said in her letter that she was aware that **Judge** Belois had been "yelling at law clerks and attorneys, some leaving her courtroom in tears." Lange also wrote that she saw Susan Bownes, the Juvenile Court manager, yelling at Porter and that Lange's staff members had been rudely treated and yelled at by Bownes.

"How can I protect my staff from a hostile workplace environment when I am subject to abuse from the chief **judge**?" she wrote.

**Burke**, Bownes, Porter and Belois issued emphatic denials. Of the allegation that Bownes yelled at Porter, Porter said, "That is absolutely false. I categorically deny that, and I would have been a witness." Said Belois: "I am completely unaware of any lawyer or law clerk who left my courtroom in tears. I believe I would have noticed that."

**Burke** said that Porter has a national reputation for efficient management of the court calendar and that several months ago Porter told him about problems concerning Lange's computer records.

**Burke** said he also questioned Lange about a note she left recently that implied she was attending a local meeting when she was at a conference in Tennessee, even though she had used up all her vacation leave and quasi-judicial time. He also raised concerns that she allowed three staff members to be gone the same week, which required outside personnel to enter her records in the computer.

Lange said Friday that only 30 current cases were not filed in the computer, which was similar to other **judges'** numbers, and that the meeting in Tennessee was an authorized court category and official judicial business. As for having three staff members gone the same week, she said, "That is a baldfaced lie."

Caption:
PHOTO

Copyright (c) 1995, 2001 Star Tribune: Newspaper of the Twin Cities
Record Number: 712587

Article Bookmark(OpenURL Compliant):Star Tribune: Newspaper of the Twin Cities : Disorder in the court; judges are squabbling
http://docs.newsbank.com/openurl?ctx_ver=z39.88-2004&rft_id=info:sid/iw.newsbank.com:STMB
&rft_val_format=info:ofi/fmt:kev:mtx:ctx&rft_dat=0EFD661E2FADE333&svc_dat=InfoWeb:current&req_dat=0EBB14EEF44F7896

E-Mail        Text Only Display        List        Previous        Next

 **(1986-Current)**

Edit Search    Help    Home

Record 1 of 200    E-Mail    Text Only Display    List    Next

**Star Tribune: Newspaper of the Twin Cities (Minneapolis, MN)**

November 23, 2004

## Tip put police on lawyers' case
## Prosecutor, wife on other side in court

Author: Pam Louwagie
Randy Furst
Staff Writers

Edition: METRO
Section: NEWS
Page: 1A

*Index Terms:*
investigation
drug

Estimated printed pages: 4

Article Text:

As veteran prosecutors, the Minneapolis couple worked each day elbow-to-elbow with police. She sat near officers in a precinct building, helping to get nuisance criminals off the streets. He worked with investigators to help abused children and sex-assault victims, bringing their attackers to justice.

What Julius and Laura Nolen apparently didn't know was that for the past few weeks, police were secretly eyeing them, sifting through their trash looking for evidence of drugs.

Monday, the two public servants stood as defendants in the Hennepin County court system they know so well, charged with possessing cocaine at home while children were there.

Laura Nolen, 41, an assistant Minneapolis city attorney, and her husband, Julius Nolen, 45, an assistant Hennepin County attorney, were released from jail Monday afternoon along with three others charged in the case, after they made their first court appearance. They are expected to appear in court next month.

Laura Nolen's attorney, Robert Paule, said it would be imprudent for him to comment while he doesn't have all the facts. Julius Nolen's attorney couldn't be reached after the hearing. Other defendants in the case didn't have attorneys representing them in court.

Julius Nolen, a county prosecutor for nearly 18 years, has been suspended from his job pending termination proceedings. Laura Nolen, an assistant city attorney for more than 10 years, was put on administrative leave. Before any possible disciplinary action, the city meets with the employee involved, a city spokeswoman said.

Law enforcement officers surprised the Nolens and their companions with search warrants Friday evening at the Nolens' home in south Minneapolis. They were arrested after investigators found drugs in the house.

When authorities arrived at the Nolens' house, the couple was sitting at a dining room table with two women, according to a

,charging document. Authorities asked about drugs, and Julius Nolen raised his arms and responded, ``OK, everything here is mine and I will show you." He walked to the master bedroom and pulled a glass plate from under the dresser that had two white lines of what appeared to be cocaine and a rolled-up $5 bill, court papers said.

After showing officers some marijuana and money that he pulled from a black suit jacket in a closet, Julius Nolen said he couldn't think of anything else to give them, adding ``I know my career is over with. I'm just trying to help out," a criminal complaint said.

Both Nolens were charged Monday with one count each of fifth-degree possession of a controlled substance, a felony, and a gross misdemeanor count of child endangerment. The same charges were filed against Amy S. McGrath, 40, of St. Louis Park, one of the women at the table. Authorities said she produced one small packet of what appeared to be cocaine from her pants and four others from her purse, along with $724 that she said she was saving to buy a car. The other woman, Pamela K. Lazor, 40, of Minneapolis, was charged with the drug count.

The Nolens' 1-year-old daughter was in the house along with Laura Nolen's 14-year-old daughter and a friend of the girl, also 14, the complaint said. McGrath's 3-year-old daughter was also there.

A fifth defendant, Michael A. Ruprecht, 44, of St. Louis Park, was also charged with the drug count. Police stopped him after he dropped off McGrath at the Nolens' house. Charging documents say police found he had 2.5 grams of cocaine concealed in his underwear.

Workers at the Hennepin County Government Center were abuzz Monday with talk of the Nolens' arrests. Many were shocked that the couple, whom they described as competent lawyers, could be involved in drugs. Laura Nolen was described as outgoing while Julius Nolen is considered more reserved.

``I thought she was very professional, very caring and very committed," Hennepin County District **Judge Kevin Burke** said of Laura Nolen.

**Burke** said he presided at several trials where her husband was the prosecutor.

``He was very professional very committed," **Burke** said. ``He did some very difficult cases [and was] very sensitive to victims."

It is unclear who tipped investigators. Court affidavits say a ``concerned citizen" told authorities that Laura Nolen had been seen buying cocaine from McGrath and Ruprecht, who live in St. Louis Park. A police informant who had gone to that house for a controlled drug buy in mid-October saw Laura Nolen there, an affidavit says. The informant told police that Laura Nolen, McGrath and Lazor were leaving for St. Cloud, where Laura Nolen was attending a legal convention.

This month, police found small bags with traces of marijuana in trash at the curb outside the Nolens' house. At the St. Louis Park house, authorities' trash finds included a bag with a trace of marijuana, some marijuana seeds and stems and a small bag with suspected methamphetamine.

Hennepin County Attorney Amy Klobuchar said that Minneapolis police told her about the investigation a month ago and that she handed it over to Scott County, because Julius Nolen is one of 160 county attorneys employed by Hennepin County. A **judge** who has no conflict is to be assigned to the case.

``The initial focus was on her [Laura Nolen]," Klobuchar said. ``We felt that it was in the interest of public safety that they be treated like any other suspects and at the time it was she" who was the suspect.

For a number of weeks, Klobuchar said, the only people in her office who knew about the police investigation were her and Pete Cahill, her deputy.

``Our main goal was that the criminal investigation would proceed so we couldn't tip him [Julius Nolen] off in any way," Klobuchar said. She added that he wasn't handling any drug cases.

Klobuchar said her office has no indication that any of Julius Nolen's cases have been compromised, but Klobuchar said a senior attorney in her office is reviewing the past five years' worth of his cases in the interest of caution.

Staff writers Margaret Zack and Terry Collins contributed to this report.

Pam Louwagie is at plouwagie@startribune.com.

Caption:
PHOTO

Copyright 2004 Star Tribune: Newspaper of the Twin Cities
Record Number: 041123NOLEN1123

Article Bookmark(OpenURL Compliant): Star Tribune: Newspaper of the Twin Cities (Minneapolis, MN) : Tip put police on lawyers' case Prosecutor, wife on other side in court
http://docs.newsbank.com/openurl?ctx_ver=z39.88-2004&rft_id=info:sid/iw.newsbank.com:STMB
&rft_val_format=info:ofi/fmt:kev:mtx:ctx&rft_dat=10692F5EBB54F210&svc_dat=InfoWeb:current&req_dat=0EBB14EEF44F7896

E-Mail    Text Only Display    List    Next

Page 2 of 10



163 N.W.2d 844
282 Minn. 197, 163 N.W.2d 844
**(Cite as: 282 Minn. 197, 163 N.W.2d 844)**

FOR EDUCATIONAL USE ONLY

Page 1

c

Supreme Court of Minnesota.

In re TRUST Created by George A. **HORMEL**,
etc., George Ryan, et al., Relators.
In re TRUST Created by Lillian B. **HORMEL**,
etc., George Ryan, et al., Relators.
In re TRUST Created by Jay C. **HORMEL**, etc.,
George Ryan, individually and as a
member of the **Hormel** Foundation, Relator.

Nos. 41557--41559, 41574.

Dec. 27, 1968.

Petition for writ of prohibition to enjoin enforcement of orders signed by two District Court judges who removed trustee of 22 **trusts**, appointed themselves as successor trustees pro tem., registered all of assets in their names as trustees pro tem., and placed assets in custody and under the control of clerk of district court. The Supreme Court, Otis, J., held that where no emergency existed and no violation or threatened violation of the trusts was claimed, court's removal of trustee on its own motion without notice and without opportunity for interested parties to be heard was a denial of due process.

Alternative writ of prohibition made absolute.

West Headnotes

**[1] Judges** ⬅51(2)
227k51(2) Most Cited Cases
Where order to show cause had been entered on court's own motion, returnable in week's time after service, failure to recognize affidavit of prejudice served four days prior to hearing was error where other judges were available and no interested party would suffer from the delay. Rules Civ.Proc., Dist.Ct., rules 6.01, 63.03, 27A M.S.A.

**[2] Judges** ⬅51(4)
227k51(4) Most Cited Cases
Where issue raised in order to show cause and issue disposed of in later order were identical,

affidavit of prejudice against judge should have been given continuing effect and was not rendered moot on basis that the earlier order was quashed by trial court on day of later order and that affidavit was not addressed to the second order. Rules Civ.Proc., Dist.Ct., rules 6.01, 63.03, 27A M.S.A.

**[3] Judges** ⬅51(4)
227k51(4) Most Cited Cases
Affidavit of prejudice directed at judge as to particular hearing is effective to disqualify that judge from executing subsequent order dealing with same subject matter. Rules Civ.Proc., Dist.Ct., rules 6.01, 63.03, 27A M.S.A.

**[4] Judges** ⬅56
227k56 Most Cited Cases
That judge against whom affidavit of prejudice has been filed was joined by second judge in executing subsequent order dealing with same subject matter did not preserve validity of order. Rules Civ.Proc., Dist.Ct., rules 6.01, 63.03, 27A M.S.A.

**[5] Judges** ⬅24
227k24 Most Cited Cases
It may be presumed that judge who executes order does so after appropriate deliberation and consultation with colleagues who join him and his signature indicates his approbation and can be expected to influence decision of his brethren.

**[6] Judges** ⬅51(4)
227k51(4) Most Cited Cases
Affidavit of prejudice on part of judge is intended to prevent participation in decision-making process as well as in formal execution of an order. Rules Civ.Proc., Dist.Ct., rules 6.01, 63.03, 27A M.S.A.

**[7] Judges** ⬅51(3)
227k51(3) Most Cited Cases
Law governing affidavits of prejudice on part of judge shall be given liberal construction to avoid sacrifice of that right on altar of technicality, particularly where there has been substantial compliance with rules and there is no showing that rights of any interested party will suffer. Rules Civ.Proc., Dist.Ct., rule 63.03, 27A M.S.A.

**[8] Judges** ⬅51(4)
227k51(4) Most Cited Cases
Where judge's impartiality is questioned, to avoid any suspicion of favoritism, all doubt concerning

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

163 N.W.2d 844
282 Minn. 197, 163 N.W.2d 844
(Cite as: 282 Minn. 197, 163 N.W.2d 844)

FOR EDUCATIONAL USE ONLY                                    Page 2

compliance with rules should be resolved in favor of his disqualification. Rules Civ.Proc., Dist.Ct., rule 63.03, 27A M.S.A.

**[9] Judges ☞56**
227k56 Most Cited Cases
Refusal of judge to honor trustee's affidavit of prejudice filed in substantial compliance with the rules was error which invalidated the order removing the trustee. Rules Civ.Proc., Dist.Ct., rule 63.03, 27A M.S.A.

**[10] Trusts ☞166(1)**
390k166(1) Most Cited Cases

**[10] Trusts ☞167**
390k167 Most Cited Cases
Right of trustee to hold and manage estate as long as it remains faithful to purposes of trust is a valuable one which cannot be confiscated except for abuse or violation of its duties, and then only on petition of interested party after due notice and opportunity to be heard. M.S.A. §§ 501.33, 501.43.

**[11] Trusts ☞167**
390k167 Most Cited Cases
(Formerly 390k67)
There may be infrequent and unusual instances where integrity of trust is in immediate jeopardy and court must peremptorily remove trustee on its own motion to protect the assets. M.S.A. §§ 501.41, 501.43, 501.44.

**[12] Trusts ☞177**
390k177 Most Cited Cases
Situations may arise where management of trust vests in court as a matter of law. M.S.A. §§ 501.41, 501.43, 501.44.

**[13] Trusts ☞169(1)**
390k169(1) Most Cited Cases
Under statute providing that, upon death of surviving trustee, trust shall vest in district court and shall be executed by "some person" appointed for that purpose and statute empowering district court to appoint new trustee in place of one deceased, resigned or removed and to cause trust to be executed by one of its officers, court's authority is limited to appointing new trustee to execute trust and the words "some person" or "one of its officers" do not include judge of the district court. M.S.A. §§ 317.16, 317.62, 501.12, subd. 3, 501.41, 501.43, 501.44.

**[14] Trusts ☞169(1)**
390k169(1) Most Cited Cases
District judges' appointing themselves as trustees of

22 trusts and ordering that trust assets be registered in their names and be held in custody of court clerk, thereby vesting in them control of one of state's largest industries, although provisions of 16 of trusts expressly named successor trustees, was an abuse of discretion. M.S.A. §§ 317.16, 317.62, 501.12, subd. 3, 501.41, 501.43, 501.44.

**[15] Constitutional Law ☞309(1)**
92k309(1) Most Cited Cases
Where no emergency existed and no violation or threatened violation of trust was claimed, court's removal of trustee on its own motion without notice and without opportunity for interested parties to be heard was a denial of due process. M.S.A. §§ 317.16, 317.62, 501.12, subd. 3, 501.41, 501.43, 501.44.

**[16] Trusts ☞167**
390k167 Most Cited Cases

**[16] Trusts ☞169(1)**
390k169(1) Most Cited Cases
Where no emergency existed and no violation or threatened violation of trust was claimed, court in removing trustee and appointing itself successor, although trustee was named by settlor and for 13 years had been qualified and functioning under court's supervision, abused its discretion. M.S.A. §§ 317.16, 317.62, 501.12, subd. 3, 501.41, 501.43, 501.44.

**[17] Trusts ☞159**
390k159 Most Cited Cases
Charitable foundation appointed to administer private family trusts has power to act as trustee if authorized by its articles and if it has interest in trust as a remainderman. M.S.A. § 501.33.
**\*\*845 Syllabus by the Court**

**\*197** 1. (a) Where an order to show cause is entered on the court's own motion, returnable in a week's time after service, it is error for the court not to recognize an affidavit of prejudice served on it 4 days prior to the hearing, if other judges are available to sit and no interested party will suffer from the delay.

(b) An affidavit of prejudice directed at a judge with respect to a particular hearing is effective to disqualify that judge **\*\*846** from executing a subsequent order dealing with the same subject matter.

(c) The fact that a judge against whom an affidavit

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

of prejudice has been filed is joined by a second judge in executing a subsequent order dealing with the same subject matter does not preserve the validity of the order.

2. Where no emergency exists and no violation or threatened violation of a trust is claimed, it is a denial of due process of law for the court on its own motion to remove a trustee without notice and without an opportunity for interested parties to be heard.

3. Under such circumstances, it is an abuse of discretion for the court to remove the trustee and appoint itself successor where the trustee was named by the settlor and for 13 years has been qualified and functioning under the court's supervision.

4. A charitable foundation appointed to administer private family trusts has the power to act as trustee if authorized by its articles and it has an interest in the trust as a remainderman.

**\*198** Dorsey, Marquart, Windhorst, West & Halladay, and Edward J. Schwartzbauer, Minneapolis, for appellants.

Douglas M. Head, Atty. Gen., Richard H. Kyle, Sol. Gen., David J. Byron, Spec. Asst. Atty. Gen., St. Paul, for respondent.

OPINION

OTIS, Justice.

These matters are before the court on petitions for writs of prohibition to enjoin the enforcement of orders signed by two judges of the District Court of Mower County who removed the trustee of 22 trusts, appointed themselves as successor trustees pro tem, registered all of the assets in their names as trustees pro tem, and placed the assets in the custody and under the control of the Mower County clerk of district court. Alternative writs of prohibition were issued by this court on July 30, 1968, and August 2, 1968. The matter was presented to the full bench on September 4, 1968, following which the writs were made absolute on September 24, 1968.

The **trusts** which are the subject of this litigation were created by George A. **Hormel** and members of his family. A substantial portion of the **trust** assets consists of stock in Geo. A. **Hormel** & Company, a meatpacking business with plants located in Austin, Minnesota, and elsewhere throughout the United States. In 1941, The **Hormel** Foundation was created under the laws of Minnesota for religious, charitable, scientific, literary, or educational purposes. Since that date, it has acted as **\*199** trustee for the **Hormel** family **trusts**. In 1955 it submitted to the jurisdiction of the district court and qualified the **trusts** under Minn.St. 501.33.

On April 5, 1968, the Foundation petitioned the district court for an order allowing its accounts in three **trusts** for the period subsequent to March 24, 1967. Following a hearing on May 3, at the request of Judge Warren F. Plunkett a copy of the Foundation's certificate of incorporation was furnished the court on May 11. On May 29, 1968, Judge Plunkett entered an order denying the trustee's request to purchase additional **Hormel** Company stock but reserved a ruling on the remainder of the petition pending receipt of 'a report from the Trustee designating that provision of the Certificate or Articles of Incorporation of the **Hormel** Foundation authorizing said **Hormel** Foundation to act as Trustee in the **trust** involved herein.' An amended account and various receipts requested by the court were filed on July 2, 1968, together with a letter from the trustee withdrawing from the court's consideration the petition of April 5.

On July 24, 1968, the following order was signed by Judge Plunkett and on Friday, **\*\*847** July 26, it was served on the trustee, returnable on Friday, August 2:

'ORDER TO SHOW CAUSE
'To: George Ryan, M. B. Thompson, Richard Arney, Raymond Ondov, James Huntting and James Hormel, individually, and as members of the Board of Directors of the Hormal Foundation.
'YOU ARE HEREBY ORDERED to show cause before the Court at 1:30 o'clock p.m. on Friday, August 2nd, 1968, in the Court Room in the Court House, City of Austin, County of Mower, State of Minnesota, as to why you have not complied with the Order of this Court dated May 29th, 1968, directing, 'a report from the Trustee

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

163 N.W.2d 844
282 Minn. 197, 163 N.W.2d 844
(Cite as: 282 Minn. 197, 163 N.W.2d 844)

FOR EDUCATIONAL USE ONLY                                                    Page 4

designating that provision of the Certificate or Articles of Incorporation of the Hormel Foundation authorizing said Hormel Foundation to act as Trustee in the trust involved herein.' Let a copy of this Order be served by mail on each of the above named.
'Dated this 24th day of July, 1968.
'S/ Warren F. Plunkett
District Judge.'
**200** On the day the order was served, counsel for the trustee requested and was denied a continuance of the August 2 hearing. On the following day, he executed an affidavit of prejudice addressed to Judge Plunkett, which was served on Monday, July 29. Judge Plunkett declined to honor the affidavit, asserting that it was untimely and intended only for purposes of delay. The next day, July 30, 1968, he signed an order quashing the order to show cause which was to be returnable on August 2. On the same date, Judge Plunkett and Judge Daniel F. Foley jointly executed the following order which is the subject of this litigation:
'WHEREAS, it having come to the court's attention that the certificate of incorporation of The Hormel Foundation which is attached hereto and marked Exhibit A and incorporated herein as a part hereof does not contain any power or authority to act as a trustee or fiduciary in the trust involved herein; and
'WHEREAS, all of its acts must be construed as ultra vires of its corporate powers;
'NOW, THEREFORE, the court, upon its own motion, hereby orders that said The Hormel Foundation is forthwith removed as trustee herein and
'IT IS FURTHER ORDERED that Daniel F. Foley and Warren F. Plunkett, Judges of the District Court, Third Judicial District, State of Minnesota, residing in Mower County, Minnesota, are hereby appointed to act as trustees pro tem until permanent trustees can be appointed by the court and qualify, and
'IT IS FURTHER ORDERED that all of the assets of the above referred to trust be forthwith registered in the name of Daniel F. Foley and Warren F. Plunkett as trustees pro tem of the above referred to trust, and said assets be placed under the custody and control of the Clerk of this Court pending the further order of this Court.
'Dated this 30th day of July, 1968.
's/ Warren F. Plunkett

's/ Daniel F. Foley
'Judges of the District Court, Third Judicial District'

**201** In an accompanying memorandum, the judges gave as their reason for executing the order the fact the certificate of incorporation contained no authority for the Foundation to act as trustee. The memorandum concluded with the following statement:
'The court will entertain suggestions and recommendations from the beneficiaries of the trust herein to appoint a minimum of three and a maximum of seven trustees to act as trustee in the above trust. The court will await the receipt from each of the beneficiaries of their suggestion referred to above before taking any action to replace said The Hormel Foundation as trustee herein.' **848** The order removing the trustee was signed ex parte, on the court's own motion, and without notice or an opportunity to be heard by the trustee or beneficiaries. On the same date, upon the petition of the trustee, we issued an alternative writ of prohibition enjoining the enforcement of the July 24 order to show cause.

On the following day, the articles of the Foundation were amended by a resolution expressly authorizing the corporation to act as trustee of the Hormel family trusts. A second alternative writ of prohibition directed at the July 30 order of Judge Plunkett and Judge Foley was executed by this court on August 2, 1968, upon the petition of the Foundation.

The issues here for decision are as follows:

(1) Was Judge Plunkett obliged to honor the affidavit of prejudice served on him on July 29? We hold that he was.

(2) Did the order of July 30 removing The Hormel Foundation as trustee deny the trustee and beneficiaries due process of law? We hold that it did.

(3) Was the removal of the Foundation and the appointment of the judges as trustees pro tem an abuse of discretion? We hold that it was.

(4) Does The Hormel Foundation have the power

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Page 6 of 10

163 N.W.2d 844
282 Minn. 197, 163 N.W.2d 844
(Cite as: 282 Minn. 197, 163 N.W.2d 844)

FOR EDUCATIONAL USE ONLY

Page 5

to act as trustee of the Hormel family trusts? We hold that it does.

[1] 1. (a) Under Rule 63.03, Rules of Civil Procedure, an affidavit of prejudice must be served 5 days prior to the special term, or day fixed by *202 notice of motion, at which the hearing is to be had.[FN1] Counsel for the trustee did not receive notice of the August 2 hearing, pursuant to the July 24 order to show cause, until Friday, July 26. After requesting and being denied a continuance on that date, counsel executed the affidavit of prejudice on July 27 and served it on Judge Plunkett the following Monday, July 29. [FN2] Judge Plunkett contends that the time within which to serve the affidavit expired at midnight on July 26. Whether or not, under Rule 6.01, the affidavit was served within the 5 days prescribed by Rule 63.03, it was illiberal and unwarranted for the court to ignore the affidavit. The hearing to which the affidavit was addressed was ordered ex parte by the very court which had 13 years earlier appointed and confirmed the trustee and had periodically supervised and allowed its accounts. The fact that for something less than 60 days the trustee had not responded to the court's inquiry with respect to its authority to act did not justify the court's refusal to recognize an affidavit of prejudice when the trustee itself had only a scant week's notice of the hearing. In a multiple-judge district, there was no reason to assume the hearing would not be assigned to another judge for a prompt and expeditious disposition. In any event, there is no claim that the trusts would have suffered from delay. *203 Indeed, on this **849 record, where none of the interested parties supported the action proposed by the trial court, the court would have been hard pressed to make a showing of prejudice. Quite the contrary, a number of beneficiaries have filed affidavits vigorously opposing the removal of the trustee.

> FN1. Rule 63.03, Rules of Civil Procedure, provides: 'Any party or his attorney may make and serve on the opposing party and file with the clerk an affidavit stating that, on account of prejudice or bias on the part of the judge who is to preside at the trial or at the hearing of any motion, he has good reason to believe and does believe that he cannot have a fair trial or hearing before

such judge. The affidavit shall be served and filed not less than 10 days prior to the first day of a general term, or 5 days prior to a special term or a day fixed by notice of motion, at which the trial or hearing is to be had, or, in any district having two or more judges, within one day after it is asscertained which judge is to preside at the trial or hearing. Upon the filing of such affidavit, with proof of service, the clerk shall forthwith assign the cause to another judge of the same district, and if there be no other judge of the district who is qualified, or if there be only one judge of the district, he shall forthwith notify the chief justice of the supreme court.'

> FN2. Judge Plunkett quotes counsel as saying the affidavit was filed only because the continuance was not granted. Counsel categorically denies having made that statement and asserts that he requested the clerk to make an immediate reassignment to another judge.

[2][3] (b) It is the contention of the district court that the failure of Judge Plunkett to honor the affidavit of prejudice is now moot because the July 24 order was quashed by the trial court on July 30 and the affidavit was not addressed to the second order of July 30 removing the trustee. In Locksted v. Locksted, 206 Minn. 525, 526, 289 N.W. 55, we held that an affidavit addressed to a motion before trial does not disqualify a district judge from presiding at the trial of the action, where the two hearings 'differ essentially in character.' Here, on the other hand, the issue raised in the July 24 order to show cause and the issue disposed of in the July 30 order were identical. Under such circumstances, the affidavit should have been given continuing effect.

[4][5][6] (c) Finally, the trial court asserts that the affidavit of prejudice did not affect the outcome since it was not addressed to Judge Foley, and his signature on the July 30 order was sufficient to make the order effective.[FN3] If Judge Plunkett took no part in the consideration or decision to remove the trustee, we are at a loss to understand why he signed the order. It may be presumed that a judge who executes an order does so after

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

appropriate deliberation and consultation with colleagues who join him. His signature indicates his approbation and can be expected to influence the decision of his brethren. An affidavit of prejudice is intended to prevent participation in the decision-making process as well as in the formal execution of an order.

> FN3. There is no explanation of why Judge Foley joined Judge Plunkett in removing The Hormel Foundation and naming himself trustee. The record does not disclose his prior participation in any of the proceedings.

[7][8][9] We have held that the law governing affidavits of prejudice shall be given liberal construction 'to avoid a sacrifice of that right on the alter of technicality.' This is particularly so where there has been substantial compliance with the rules, and there is no showing that the rights of any interested party will suffer. *204Wiedemann v. Wiedemann, 228 Minn. 174, 178, 36 N.W.2d 810, 813. We have said that because of rapid communication and transportation judges can ordinarily be reassigned without delay or inconvenience. Where a judge's impartiality is questioned, to avoid any suspicion of favoritism, all doubt concerning compliance with the rules should be resolved in favor of his disqualification. Jones v. Jones, 242 Minn. 251, 264, 64 N.W.2d 508, 516. We therefore hold that Judge Plunkett's refusal to honor the trustee's affidavit of prejudice was not rendered moot and that such refusal was error which invalidated the order removing the trustee.

2. The applicable statute governing the removal of a trustee is Minn.St. 501.43, which provides as follows:

'Upon the complaint of any person interested in the execution of an express trust, and under such regulations as shall be established by the court for that purpose, it may remove any trustee who has violated or threatened to violate his trust, or who is insolvent, or whose insolvency is apprehended, or who for any other cause is deemed an unsuitable person to execute the trust.'

The July 30 order removing The Hormel Foundation was issued sua sponte without a petition or complaint and without notice or an opportunity

to be heard by either the trustee or the beneficiaries. No emergency existed and no violation or threatened violation of the trust was claimed. The sole basis for removing the trustee was the judges' conclusion that the Foundation was without power because its articles did not expressly authorize it to act. Since the trustee had withdrawn its petition of April 5 at the time of the July 30 order, **850 there was nothing pending before the court, although it had ongoing jurisdiction over the trust.[FN4]

> FN4. Minn.St. 501.33 provides: 'Upon petition of any person appointed as trustee of an express trust by any will or other written instrument, or upon petition of any beneficiary of such trust, the district court of the county wherein such trustee resides or has his place of business, shall consider the application to confirm the appointment of the trustee and specify the manner in which he shall qualify. Thereafter such district court shall have jurisdiction of such trust as a proceeding in rem.'

[10] That such procedure denied the trustee and beneficiaries due process of law is clear. The beneficiaries have never been made parties to these *205 proceedings. The right of the trustee to hold and manage the estate as long as it remains faithful to the purposes of the trust has been characterized as a valuable one which cannot be confiscated except for an abuse or violation of its duties, and then only on the petition of an interested party 'after due notice and an opportunity to be heard.' Ex parte Kilgore, 120 Ind. 94, 98, 22 N.E. 104, 106. More recently, the Indiana court has held that removal of a trustee sua sponte without specific charges and without notice and an opportunity to be heard was a proceeding beyond the jurisdiction of the court. State ex rel. Anderson-Madison etc. v. Superior Court, 245 Ind. 371, 381, 199 N.E.2d 88, 93. The Illinois courts have dealt with similar problems in Wheeler v. Paddock, 293 Ill.App. 395, 12 N.E.2d 687, and in Chicago Title & Trust Co. v. Rogers Park Apartments Bldg. Corp., 375 Ill. 599, 32 N.E.2d 137. The Wheeler case held that before a trustee may be removed there must be entry of a rule of court against him or a petition and notice to the trustee and the beneficiaries. In the Chicago Title case an order which the court described as without precedent directed the trustee to assign the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

trust assets to the clerk of court, sua sponte. There was no complaint, charge of insecurity, misconduct, or wrongful dealing, and no notice to interested parties. The court held that the order was void for want of due process. [FN5] We reach the same conclusion here.

FN5. See, also, In re Meyer's Estate, 35 N.J. 160, 171 A.2d 305; 2 Scott, Trusts (3 ed.) s 107, note 20; Bogert, Trusts and Trustees (2 ed.) s 523, note 25.

3. At the time the July 30 order was entered, the articles of The Hormel Foundation did not expressly authorize it to act as trustee of the Hormel family trusts. That deficiency was corrected the following day by the resolution to which reference has been made. Nevertheless, at the time the Foundation was removed, the court had before it no facts which justified the precipitous action it took. Decisions cited in support of the right to remove a trustee uniformly involve active wrongdoing. Goncelier v. Foret, 4 Minn. 1 (13); Clark v. Stanton, 24 Minn. 232, 244; Doerr v. Warner, 247 Minn. 98, 109, 76 N.W.2d 505, 514. The settlors of the Hormel family trust had designated the Foundation as its trustee in the year 1941. The court will not ordinarily remove a trustee named by the *206 settlor upon a ground existing at the time of his appointment and known to the settlor and in spite of which the settlor appointed him, although the court would not have appointed him trustee.' Restatement, Trusts (2d) s 107, comment f. To the same effect is 2 Scott, Trusts (3 ed.) s 107.1. As we have pointed out, the court itself had confirmed the appointment and had qualified the trusts and for 13 years had supervised their administration under the same trustee it summarily removed on July 30.

[11] We decline to hold that the district court may not, under any circumstances, remove a trustee on its own motion. Bogert, Trusts and Trustees (2 ed.) s 522, note 15.5; 3 Scott, Trusts (3 ed.) s 200.4. Minn.St. 501.43 authorizes the court to act on the complaint of an interested person. Nevertheless, there may be infrequent and unusual instances where the integrity of a trust is in immediate jeopardy and the court must peremptorily remove **851 the trustee on its own motion to protect the assets. This was not such a case.

[12][13][14][15][16] A corollary to the rule governing the removal of trustees on the court's own motion is one which makes it equally improper for a judge to appoint himself successor trustee. Situations may arise where the management of the trust vests in the court as a matter of law. Sections 501.41 and 501.44 provide as follows:
'Upon the death of the surviving trustee of an express trust, the trust estate shall not descend to his heirs, nor pass to his personal representatives; but the trust, if then unexecuted, shall vest in the district court with all the powers and duties of the original trustees, And shall be executed by some person appointed for that purpose, under the direction of the court.' (Italics supplied.)
'The district court has full power to appoint a new trustee in place of one deceased, resigned, or removed; and when, in consequence of such death, resignation, removal, or other cause, there is no acting trustee, the court, in its discretion, may appoint a trustee, Or cause the trust to be executed by one of its officers under its direction; and when any person other than the trustee originally named, or appointed by a court of this state, has in good faith done any act in execution of the trust, the court may confirm such act.' (Italics supplied.)
*207 As we construe these statutes, the court's authority is limited to appointing a new trustee to execute the trust under the court's direction. We do not understand the words 'some person,' referred to in s 501.41, or 'one of its officers,' mentioned in s 501.44, to include a judge of the district court. [FN6] State ex rel. Flodin v. District Court, 222 Minn. 546, 559, 25 N.W.2d 692, 699. We have said (McLaughlin v. Minnesota Loan & Trust Co., 192 Minn. 203, 210, 255 N.W. 839, 842):

FN6. We do not suggest any impropriety in a district judge's acting as a trustee of a private trust in his individual capacity as distinguished from his judicial capacity where he does not appoint himself, more particularly if he has a personal interest in the trust and acts with the knowledge and consent of the beneficiaries.

'* * * It is but a statutory precaution that, upon a vacancy arising in a trusteeship, the trust estate may vest in the district court (2 Mason Minn.St. 1927, s 8103), which thereby may become a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

temporary repository of title, but in such qualified fashion and for such special and temporary purposes that there can be no valid suggestion that liability of the court or its judges would arise under the covenants of a lease which happened to be part of the trust property.'

It would be anomalous and unseemly for judges of the district court to pass judgment on their own administration, however brief the duration. It was particularly improvident in the case before us where the judges ordered that the trust assets be registered in their names and be held in the custody of the clerk of court. The effect of that order was to vest in the judges control of one of Minnesota's largest industries with all of the legal and economic implications which such control suggests.[FN7] The order gave no heed to the provisions of 16 of the trusts which expressly named successor trustees. For these reasons, we hold the order was an abuse of discretion.

FN7. There are 2,380,248 shares of Hormel Company common stock outstanding. Of this amount, the Foundation owns outright 239,258 shares and holds 875,110 shares as trustee for family trusts in which the Foundation has a vested remainder. In addition, the Foundation holds 245,906 shares where the Foundation has a contingent remainder, the inclusion of which gives it a controlling interest in the Hormel Company.

*208 [17] 4. The district court judges challenge in their brief the right of a charitable trust to act as trustee of private trusts, the income of which is payable to others. We **852 hold that where the articles authorize it to so act, a charitable corporation has such power.[FN8] Under s 317.16, a nonprofit corporation has broad authority and 'the capacity to act possessed by natural persons.'

FN8. Under s 317.62, if a nonprofit corporation exceeds or abuses its authority or powers, the attorney general may institute proceedings to terminate the corporate existence. However, he must give the corporation 30 days in which to take corrective measures before he files the petition.

Section 501.12, subd. 3, provides in part:

'* * * The attorney general shall represent the beneficiaries in all cases arising under this section and it shall be his duty to enforce such trusts by proper proceedings in the courts.'

'* * * (A) charitable corporation may hold property upon a private trust, as for example where property is transferred to it in trust to pay the income or a part of the income to the settlor or a third person for life and thereafter for charitable purposes.' 2 Scott, Trusts (3 ed.) s 96.3.

The rule thus announced is peculiarly applicable to the case at hand if, as the trustee alleges, it is a vested or contingent remainderman of the family trusts which it administers.[FN9] Under such circumstances, unless an actual conflict of interest arises between the Foundation as trustee and the Foundation as remainderman, we see no impropriety in the Foundation's managing the various trusts. In a similar situation a New York court held in Robb v. Washington & Jefferson College, 103 App.Div. 327, 352, 93 N.Y.S. 92, 106 (modified and affirmed on other grounds in 185 N.Y. 485, 78 N.E. 359):

FN9. The trial court asserts that five of the trusts do not contain such remainders.

'* * * It is a general rule that a charitable corporation cannot act as a trustee in a matter in which it has no interest, but where it has an interest, either in the principal or in the income, it may act as trustee for another or others having an interest in the whole or part of the income for life.'

The continuance of the Foundation as trustee is fortified, as we have indicated, *209 by the fact the various settlors of the Hormel family trusts selected it for that responsibility.

It is not our intention to foreclose all further inquiry into the propriety of the Foundation's continuing to act if circumstances arise, or are present and not disclosed by the record, making a change of trustees desirable. However, the wishes of the settlors and beneficiaries in reaching such a decision are entitled to great weight.

The order of July 30, signed by Judge Plunkett and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

163 N.W.2d 844
282 Minn. 197, 163 N.W.2d 844
**(Cite as: 282 Minn. 197, 163 N.W.2d 844)**

FOR EDUCATIONAL USE ONLY

Page 9

Judge Foley is accordingly vacated, and the alternative writ of prohibition signed by this court on August 2, 1968, is herewith made absolute.

282 Minn. 197, 163 N.W.2d 844

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.