STATE OF MINNESOTA

BOARD ON JUDICIAL STANDARDS

File No. 95-66

OFFICE OF
APPELLATE COURTS

NOV 27 1996

FILED

In Re:    **Complaint Concerning
The Honorable LaJune Lange**

DISMISSAL

       The Minnesota Board on Judicial Standards, having determined there was sufficient cause to believe a possible violation of the Minnesota Code of Judicial Conduct involving conduct of District Court Judge LaJune Lange, filed a Formal Complaint against the Judge with the Minnesota Supreme Court on February 28, 1996, requesting the appointment of a three judge hearing panel to make findings and recommendations.

       Acting Chief Justice of the Minnesota Supreme Court, M. Jeanne Coyne, on March 29, 1996, appointed Associate Justice Lawrence R. Yetka, Retired, Judge Doris Ohlsen Huspeni, Minnesota Court of Appeals, and Judge Stephen L. Maxwell, Retired, as panel members.

       The Panel received testimony and exhibits and heard arguments of counsel during nine days, August 5 through August 16, 1996.  On October 17, 1996, in a split decision, the panel majority found that Judge LaJune Lange had not violated the Minnesota Code on Judicial Conduct and recommended the charges be dismissed.

       The Board Members, having reviewed 1500 pages of transcript, the 65 exhibits received in the proceeding, together with the Panel's Findings and Recommendation, have concluded the proceedings against Judge LaJune Lange be dismissed.

1

The Board believes that its original concerns were well articulated by the dissenting member of the panel of judges, however, the majority of the panel concluded that the violations had not been proven by the strict clear and convincing standard of proof.    The Board voted unanimously to accept the panel's recommendation.

NOW THEREFORE, the Formal Complaint filed against District Court Judge LaJune Lange and the subsequent proceedings are dismissed.

Date: _11/26/96_

Robert W. Johnson, Chairperson
MINN. BOARD ON JUDICIAL STANDARDS
2025 Centre Pointe Blvd., Suite 420
Mendota Heights, MN  55120

2

LANGE
EXHIBIT NO. 7

# the court, judges are squabbling

## Hennepin jurists' accusations fly

By Randy Furst
Staff Writer

Kevin Burke, chief judge of the Hennepin County District Court, has been accused of behaving in a verbally threatening manner toward Judge LaJune Lange, who has taken the unusual step of writing a letter to every state Supreme Court member to complain of his actions.

In an interview Friday, Burke denied Lange's accusations but said he told her that if she does not correct a number of problems in her office, he will transfer her out of the Juvenile Court.

The dispute has created some turmoil within the local and state court system as the allegations have multiplied. There have been accusations by Lange, who is black, and others that Burke and other white court personnel have acted improperly. There are both race and gender overtones to the dispute.

The controversy continued to escalate after several meetings in which Chief Justice A.M. (Sandy) Keith and several Supreme Court justices met with Lange, Burke and other judges to mediate the issue. Burke acknowledges that he is a close friend of Keith's, and a source familiar with the dispute said it is likely that using a mediator will be proposed.

Keith declined to be interviewed, but did issue a statement that appeared to defend Burke. Keith said that after talking to those involved, he found nothing "to substantiate her [Lange's] description of incivility or a hostile work environment" and that Burke "took appropriate action" to resolve a case-management problem.

Keith said that Lange had "problems acclimating herself and her staff" to the computer system and that while she said she wanted to resolve the problems, Burke had to run an efficient court and that "I fully support him."

Keith's statement drew a sharp response from Lange on Friday.

Judge continued on page 8A

5/13/95

# TWIN CITIES
# Reader

MARCH 20-2...

LANGE
EXHIBIT NO. 25

## HUMOROUS PEE

Schimke high-fives
Spike's *Girl 6*
PAGE 19

# NO APOLOGY

**Hennepin County District Court Judge LaJune Lange is the target of unprecedented attacks by powerful enemies. Still defiant, Lange answers her accusers in detail. A *Reader* exclusive.**

**BY ROSE FARLEY**
**PAGE 9**

---

**Murder and the First Amendment**
Page 4

**Domestic-abuse lobby takes its own beating**
Page 8


Alanis Morissette

**Alanis & her illiterate ilk: improper faction**
Page 22

**One-woman slow: Jungle's *Eleanor* lacks pep**
Page 30

TWIN CITIES READER EXCLUSIVE

# THE WAR OF THE ROBES

### Hennepin County Judge LaJune Lange is the target of unprecedented attacks by powerful enemies. Still defiant, Lange calls the charges against her bogus, and answers her accusers in detail.

**BY ROSE FARLEY**

PHOTOS BY BRIAN PObuDA



After months of silence, Judge LaJune Lange speaks out against her attackers.

COPYRIGHT 1994 TWIN CITIES READER

When Hennepin County District Court Judge LaJune Lange moved into her Juvenile Justice Center chambers on January 1, 1986, she was determined to avoid the common practice of some of her colleagues, who render one decision after another like black-robed vending machines. Instead, Lange says, she viewed the new assignment as an opportunity to improve teenagers' experiences with the court system and prevent them from becoming regular visitors.

"I would attend community meetings, and young people would say, 'Why are the judges in juvenile court so angry? Why do they talk to us in such a disrespectful manner?' I wanted to restore their confidence in the juvenile court system, and I wanted to restore the accountability of serious juvenile offenders," Lange says.

Lange says her hopes of restoring public confidence in the court system were almost immediately shattered by colleagues who used their power and influence to cross the bounds of ethical, if not legal, conduct. This week Lange broke months of silence to answer her attackers. It was the latest salvo in an inter-judge war of unprecedented severity and duration.

Just two and a half weeks after Lange began her new assignment in juvenile court, she inherited the juvenile case of Malcolm Shabazz — a routine matter that later would become a focus of the federal murder-for-hire case against Qubilah Shabazz, the daughter of slain civil-rights leader Malcolm X. Although Lange's ruling in the case of Malcolm Shabazz withstood an appeal, it set off a yearlong battle that

(continued on next page)

*(continued from previous page)*

some Lange against formidable enemies: Hennepin County Chief Judge Kevin Burke, Hennepin County Judge Charles Porter, Supreme Court Chief Justice A.M. (Sandy) Keith and U.S. Attorney David Lillehaug.

While Lange has requested investigations into the conduct of the judges and Lillehaug, she has herself become the target of investigations carried out by the Minnesota Board on Judicial Standards (BJS) and the U.S. Department of Justice. In February, the Board on Judicial Standards quietly served a formal complaint against Lange, and now is attempting to have her publicly disciplined — an exceedingly uncommon punishment that has been exercised fewer than 30 times since 1971.

After its seven-month investigation, the board concluded on February 27 that Lange violated the Minnesota Code of Judicial Conduct because she had publicly criticized Keith, Burke and Porter, and had formally requested U.S. Attorney General Janet Reno to investigate Lillehaug for possible misconduct in his failed prosecution of Qubilah Shabazz.

The seven-page Board on Judicial Standards complaint states that Lange violated board rules by "using the judicial office — the bench, a public courtroom and official court stationery — to make her Public Statement of May 30, 1995, containing unsupported allegations against the Minnesota Judiciary and the United States Attorney for Minnesota. This conduct denigrates the integrity, independence and impartiality of the judiciary."

In a series of interviews with the *Twin Cities Reader* earlier this month, Lange detailed the events of the last year that led to the complaints against her. She said that Department of Justice investigators neglected to interview numerous members of her staff and other relevant witnesses before concluding that her request for an investigation into Lillehaug was without merit. Although the Justice Department's September 11, 1995, report remains confidential, Lange says, the Board on Judicial Standards is using it as a tool to further discredit her.

Other information obtained by the *Reader* supports Lange's assertion that the federal investigation was a "whitewash," intended to cover up Lillehaug's malfeasance. The information also supports Lange's view that Keith, Burke and Porter have used lies, threats and intimidation in their retaliatory assault on Lange.

Documents obtained by the *Reader* and interviews with court personnel indicate black marks aplenty against Lange's accusers, including:

✔ Lillehaug had access to improperly obtained police records;

✔ Lillehaug personally contacted Lange and demanded access to confidential juvenile records;

✔ An FBI agent, key in Lillehaug's case against Shabazz, was himself charged with first-degree vehicular homicide;

✔ Keith inaccurately claimed that Burke's decision to transfer Lange out of juvenile court was endorsed by the Hennepin County Executive Committee; and

✔ Keith, Burke and Porter repeatedly distorted allegations that Lange was behind on her case load.

Judge Burke, contacted by phone, said he was unaware that there was a complaint against Lange, and offered no comment. Lillehaug referred the *Reader* to the public portion of the Justice Department's report, which he said "disposes of these allegations completely and conclusively."

When the Board on Judicial Standards seeks public discipline, the Minnesota Supreme Court decides what, if any, discipline

to dole out. Lange already has asked the Supreme Court to assign the case to the Minnesota Court of Appeals. The Supreme Court has yet to decide who will hear the matter. In the meantime, Lange says, her defense against the recent charges will center on two key elements: a judge's obligation to uphold her oath and freedom of speech.

"A lot of times people see a judge as an individual who can only look at what's in front of them and can't look beyond that, but a judge has that duty," Lange says, adding that she will not be bullied into apologizing for her actions. "Judges have an obligation to be more than pallbearers who preside over miscarriages of justice."

## THE COVETED FILE OF 10-YEAR-OLD MALCOLM SHABAZZ

On the morning of January 11, 1995, U.S. Attorney David Lillehaug stunned the nation when he indicted Qubilah Shabazz, charging her with one count of interstate travel and eight counts of making interstate phone calls in a plot to assassinate Nation of Islam leader Louis Farrakhan. Within hours of the announcement, reporters from *The New York Times*, the *Washington Post* and major national wire services set out for the Twin Cities to cover the story. The following day, the story spilled onto front pages of newspapers across the country. Lillehaug was basking in the national spotlight, while Farrakhan and Dr. Betty Shabazz, Qubilah's mother, jointly denounced the indictment.

The press corps began an intense, competitive search for sources to help flesh out the life and character of Qubilah Shabazz. One week later, Shabazz pleaded not guilty before U.S. Magistrate Franklin Noel in a St. Paul courtroom packed with reporters. Meanwhile, on the third floor of the Hennepin County Juvenile Justice Center in Minneapolis, Judge LaJune Lange briefly presided over a juvenile hearing regarding issues of possible parental neglect of Malcolm Shabazz, Qubilah's 10-year-old son, and scheduled a second hearing for January 26, 1995.

Days later, allegations that Qubilah Shabazz abused her son were leaked to the *Star Tribune* and *The New York Times*. On January 22, 1995, both papers published lengthy, page-one articles about Qubilah and Malcolm Shabazz. While *The Times* reported that the information came from a "person familiar" with the situation, the *Star Tribune* went into



*Judge Lange's ruling in the juvenile case of Malcolm Shabazz set off a yearlong battle.*

> ## "Judges have an obligation to be more than pallbearers who preside over miscarriages of justice."
> — JUDGE LAJUNE LANGE

more detail, stating that it confirmed the information "not with the FBI, but after obtaining local police and child-protection reports."

Upon reading the articles, Lange says, she realized that Malcolm's legal right to privacy was in danger and she immediately made arrangements to secure the Juvenile Justice Center for the January 26 hearing. "No one except the parties involved in the case is supposed to know who is the entire case goes to be closed, but one of Lange's court administrators spilled the beans electronically. On January 23, juvenile court manager Susan Bowen sent an e-mail message to all juvenile court employees announcing that the building would be closed that Thursday from 8 to 8:30 a.m. for a "case involving Ms. Shabazz."

Early on Thursday, January 26, reporters and photographers lined up outside the Juvenile Justice Center as the Shabazz family was driven to the building and brought in via the "Sally Port" garage door.

Lange says she made the transportation arrangements to protect a vulnerable child from reporters who had already made allegations, obtained information. "I was concerned because juvenile court proceedings are confidential. The court has a duty to protect information concerning a child. That is the highest calling in terms of confidentiality, this kind of case," says Lange, who on the following Monday took the rare step to "seal" the Malcolm Shabazz file. Although all juvenile hearings and documents are confidential, a seal acts as an additional reminder to court personnel that the file is not to be disclosed to anyone except the parties involved.

In the weeks following Lange's sealing order, Lillehaug's office began a zealous pursuit of Malcolm Shabazz's juvenile files. On February 14, 1995, Lillehaug's office subpoenaed the Hennepin County Welfare Office requesting access to Section 8 public assistance documents and Malcolm's juvenile court file. The federal subpoena was stalled because issues arose over state data-privacy laws, which protect juvenile records.

## SHABAZZ CASE HEADS SOUTH, LILLEHAUG GOES FISHING

While the attorneys squabbled, Lillehaug's federal case against Qubilah Shabazz slowly began to unravel, perhaps shedding light on why it became so convinced that he needed the information about Qubilah's son.

By then, numerous news reports detailed the insidious history of FBI snitch Michael Fitzpatrick. Farrakhan's supposed hit man and Lillehaug's star witness. In 1991, under the pseudonym Michael Kevin Summers, Fitzpatrick was charged in Hennepin County District Court with fifth-degree possession of crack cocaine. Court documents show that, after numerous delays, Fitzpatrick's case finally has been set for a hearing on March 1996, before Hennepin County District Judge Robert Lynn.

Fitzpatrick's closetful of skeletons, including several arrests and misdemeanor convictions, is now public knowledge. What has been reported locally are facts extremely damaging to the reputation of Dan Scott, Fitzpatrick's FBI "handler." Scott, who has publicly vouched for Fitzpatrick's credibility, would have testified had the Shabazz case gone to trial. On August 4, 1994, Scott was charged with first-degree vehicular homicide, leaving the scene of an accident and obstructing a police officer, according to an article the same day in the *Atlanta Journal and Constitution*.

Scott, who had an earlier drunk-driving conviction, was driving an FBI-issued Pontiac which was equipped with a car phone

police radio, when he struck a pedestrian in Marietta, Georgia. He then drove to his nearby house, called 911 and said he had "possibly hit something or somebody." When police arrived at Scott's home to arrest him, a struggle reportedly ensued. The hit-and-run victim, 27-year-old Bruce Watson, was pronounced dead on arrival at the hospital. The trial for the former FBI agent began this week.

Though it is unknown when, or if, Lillehaug received information about Scott, the Shabazz defense team began to investigate the accident shortly after Shabazz was indicted, says Larry Leventhal, a Shabazz attorney. "I had it as a tip from a member of the press in another city. When we chased it down, we were able to confirm it," Leventhal says, adding that the defense team planned to use the information in trial to question Scott's credibility. "Not only was Fitzpatrick unreliable, but the individual that was directing him in the FBI — to the extent that *anyone* directed him — was also unreliable."

Instead of gambling on Fitzpatrick's ability to charm a jury, Lillehaug went fishing for information that could further discredit Qubilah Shabazz. His first task was to reel in her son.

On April 10, 1995, Lillehaug's office bypassed its own stalled attempt to obtain Malcolm Shabazz's juvenile records at the county level and filed a federal "motion to compel" release of the documents with U.S. Magistrate Franklin Noel. In a memo supporting the motion, Lillehaug argued that he needed the information because it was "critical" to assessing Qubilah Shabazz's ability to formulate a murder-for-hire scheme. Besides, he argued, "much of the information that the United States seeks has already been the subject of a January 22, 1995, article in the *Star Tribune*. Defendant thus has little expectation of privacy for information which has already been published by the press."

Lange says Lillehaug's office didn't inform her of its federal motion, and that she only became aware of it on April 10, 1995, when she received a letter from Federal Public Defender Dan Scott (no relation to the former FBI agent). Shabazz's "right to privacy has been lessened because someone in the court system, or the police department, released child protection records without permission," wrote Scott, adding that Lillehaug's attempt to use the newspaper reports as a basis for obtaining confidential records was "repugnant."

## A PERSONAL PHONE CALL

Lillehaug didn't wait for U.S. Magistrate Noel to rule before he tried to get his hands on the confidential documents. On April 12, a day before the federal motion was to be argued, Lillehaug called the Hennepin County Attorney's Office "seeking location" of the sealed juvenile files, according to the Board on Judicial Standard's complaint against Lange. When that failed, Lillehaug called Lange that same day.

The board's complaint states that Lillehaug called to ask about the location of the sealing orders, but Lange says she saw it very differently. "He said he wanted the file. I regarded it as a demand: that he *wanted* the file. I told him the file is sealed and I issued orders to that effect. Then there was silence on the phone and then he said he wanted to see the orders. I said, 'I'll have to get back to you,'" says Lange, who notes that it's extremely unusual for the U.S. attorney to make calls that clerks would normally make "He's like the CEO of a major corporation." Lange says "You don't step in and start making ministerial calls because your staff is busy."

Later that day, one of Lange's clerks left a voice-mail message with Lillehaug's office explaining that he would have to file a motion with notice to all interested parties. "Lillehaug has absolutely no right to access those files — even if they weren't sealed," Lange says. "He can't see the [sealing] orders, either. All proceedings — even the orders — are confidential."

Lange felt so strongly about the need to protect Malcolm Shabazz from the prying U.S. attorney that the next day she amended her initial sealing order and had the physical documents placed in a locked vault.

The source of the leak may never be known, but two sources contacted by the *Reader* confirmed that Lillehaug at some point had read improperly obtained police reports about Malcolm Shabazz — *before* he made his motion to obtain the reports legally. The reports, which are included in Shabazz's juvenile court file, made their way into the *Star Tribune* and *The New York Times* and formed the basis of Lillehaug's motion to compel Shabazz's juvenile court records.

Sources say that, on April 13, during an informal hearing on Lillehaug's motion in Noel's chambers, Lillehaug said that he already had read the police records and intimated that he had possession of them. "At the time, Lillehaug argued [the motion] himself and he certainly spoke about what he expected to find in the juvenile records, which led me to believe that someone informed him what was in the file or he had seen them," one source says.

U.S. Magistrate Noel later ruled that Lillehaug could not have access to the juvenile records. On April 27, Lillehaug appealed Noel's ruling to U.S. District Court Judge James Rosenbaum. Before Rosenbaum could issue a ruling, the point became moot: On April 30, Lillehaug dropped his case against Shabazz, who signed a confession and agreed to undergo chemical-dependency treatment.

## PAYBACK TIME

Like a headhunter armed with a butter knife, Lillehaug turned his attention to his next victim, Dr. John Najarian, and news about the Shabazz case faded. Judge Lange's adversaries on the bench, however, began circling like sharks. The day after the Shabazz case was settled, Hennepin County Chief Judge Kevin Burke and Juvenile Court Presiding Judge Charles Porter visited Lange's chambers. At the time, Lange says, she didn't understand the nature of the confrontation. It was a private argument soon to be played out before the entire Twin Cities.

"I really wasn't sure what his [Burke's] real agenda was. His conduct was so out of character." says Lange, who adds that Burke did most of the talking.

Lange says Burke's May 1 visit was almost as unusual as Lillehaug's decision to telephone. "We basically all work independently, so contact was limited. That's why when he came down to my chambers it was such an exceptional situation."

Seated at a conference table inside a Minneapolis law firm, Lange rises and demonstrates how she was walking out of her chambers when she met Burke and Porter at the door. The duo backed her into her chambers, and then Burke closed the door behind him, Lange says. Burke began to shout and point his finger at Lange while blocking the door.

Burke said nothing about the Shabazz case. Lange says, as he lambasted her for taking a trip to Tennessee for a peer mediation conference, which Burke had previously approved. (Peer mediation is an essential tool used to prevent juvenile violence and the act of attending a conference about it constitutes official court

(continued on next page)

Mentha Piperita

The Original Celebrated
CURIOUSLY STRONG
PEPPERMINT
**ALTOIDS**
MADE IN GREAT BRITAIN

Assa Kickerata

THE CURIOUSLY STRONG MINTS

*(continued from previous business.)*

"a asked him to lower his voice," Lange says, adding that Burke startled the law clerk sitting outside her chambers. Burke briefly lowered his voice, Lange says, but his voice rose as he criticized her for computer-entry problems. He concluded by warning Lange that, "If I hear any more complaints about you, I will have you transferred."

In the Board on Judicial Standard's complaint, which summarizes various events beginning with the Shabazz indictment, this confrontation is neutrally described as a "meeting." Lange replies that she received no advance notice that Burke or Porter wanted to meet, nor any information that there was a problem with her staff.

On May 3, Lange described the meeting and complained about Burke and Porter's behavior in a letter she sent to each member of the Minnesota Supreme Court. In the two-page letter, Lange asked the justices for help in "establishing civility standards" and said that she hadn't encountered anything so outrageous since Burke sent his 1993 "Dear Bitch" letter to Hennepin County Judge Ann Montgomery. (In an August 1993 *Star Tribune* article, Burke said the letter had been "an innocent mistake.")

Two days later, Lange says, she met with the justices, at which time Chief Justice Keith stated that he would handle the matter. A meeting with Lange, Burke, Porter, Judge John Stanoch and Bownes was set for May 8 in the Juvenile Justice Center. Lange says she requested the meeting to discuss Burke's behavior but that it turned into an attack on her and her staff for making computer-entry errors and lagging behind in data entry.

Three days after the meeting, a copy of Lange's letter to the Supreme Court was leaked to *Star Tribune* reporter Randy Furst, whose story the following Saturday detailed the infighting on the bench. In the article, Burke confirmed that he raised his voice in Lange's chambers, but he denied yelling or pointing his fingers and denied that he had entered the chambers uninvited.

In the article, which portrayed the conflict in terms of race and gender, Burke accused Lange of appealing to the Supreme Court as a means to divert attention from her staff being behind by "nearly 200 cases." Keith backed up Burke, saying he acted appropriately and adding that Lange had "problems acclimating herself and her staff" to the computer system. Porter piled on, saying he was frustrated by Lange and her staff's failure to update records.

Computer records provided by Porter to the *Reader* last summer show that on May 10, 1995, Lange had 197 "pending" cases. By the following week, however, that number had been reduced to 54, according to computer documents recently provided by Lange, who adds that the word "pending" means only that information about the case hasn't been entered into the computer. In other words, Lange's staff was behind on data entry, but no actual court hearings or proceedings had been affected.

"The staff and I were just completely astonished at any accusation that we weren't doing what we were supposed to be doing. They just used the case counts to help themselves, but never explained what the case count meant," Lange says.

In fact, documents obtained by the *Reader* show that computer-entry errors and delays were of concern, though apparently not serious, with the entire juvenile court staff months before Lange was singled out in the *Star Tribune*.

In a February 17, 1995, e-mail, Susan Bownes told all juvenile court staff not to schedule hearings for the week of April 10. Bownes didn't say why hearings shouldn't be

your bathing suit, start your trips to the tanning booth and shine-up your bowling ball."

In June, Bownes told the *Reader* that the juvenile court staff discussed computer-related and other staff-development issues during the week. On Tuesday of that week, the staff met at the Minneapolis Athletic Club, which is equipped with a swimming pool and a bowling alley.

Lange's staff did not attend. Instead, it continued to address the computer errors — a process it had begun weeks earlier. In a March 27 letter from Lange to Deb Kempf, manager of the juvenile court file room, Lange politely responded to concerns about files and requested additional training materials: "I am aware that your staff has been trained by the TCIS [software] conversion, computer breakdowns and case backlogs," Lange wrote. "The Court will be closed for one week to address pre-existing problems. I'm sure that we can work together to improve communication and training for clerks if we use positive leadership."

The Board on Judicial Standards investigated the allegations that Lange was behind on her juvenile case load, according to a June 20, 1996, letter to Lange from BJS executive secretary DePaul Willette. By then, however, Lange's staff had compiled ample documentation to defend themselves. The board's formal complaint against Lange contains no charges related to case loads nor complaints about Lange's job performance as a judge.

## THE WALLS HAVE EARS

Three days after Keith, Burke and Porter stood together against Lange in the May 13, 1995, *Star Tribune*, Lange says their true motivations suddenly crystallized in her mind. On May 16, Lange was inside her chambers when she overheard a telephone conversation between Porter, whose chambers share a wall with Lange's, and a person she believed to be Burke.

During the conversation, Porter was trying to assure Burke that "they could separate the Shabazz case from the decision," Lange wrote in a June 23, 1995, letter to the Department of Justice. Porter then went on to say, "I know you; the boys in St. Paul are running the show."

When Porter hung up the phone, Lange says, he came and stood in her doorway and said, "I want to recap your conversation about the Shabazz case." Lange replied that she did not recall such a conversation and added that she was too busy to talk. She then left work, upset and confused.

"I didn't even go home. I went to my mom's house," says Lange, who grew up in south Minneapolis and now resides in Kenwood. "I told my mom, I said this sounded like a mad dog being pulled back into the gates of hell. I was stunned at the breadth of the 'boys in St. Paul.' I kept saying to myself, 'Who are the boys in St. Paul?' I concluded later that they were the Board on Judicial Standards." Lange now says that, when Porter said "decision," he was referring to her impending transfer.

Two days after she overheard the conversation, Porter formally requested that Lange be transferred out of juvenile court, according to a 16-page, May 18 memo, which he sent to the executive committee of the Hennepin County Bench. Porter attacked Lange's attitude and character, while falsely maintaining that she was still 197 cases behind. He complained that Lange and her staff did not participate in a weeklong staff-development exercise, in which everyone else "had donuts one morning, pizza one lunch time, ice cream one afternoon and flowers for our desks." He also accused Lange of publicly attacking her colleagues.

"Judge Lange's treatment of colleges [sic]

MAY 29-JUNE 4, 1996

---

**The Board's formal complaint against Lange contains no charges related to case loads nor complaints about Lange's job performance as a judge.**

---

directly and by involving the guiltless in press campaign cannot be tolerated T press campaign against Judge Burke threatens our management, and has totally unfounded allegations impugning my actions and motives have destroyed my ability to run the Division," Porter wrote.

Porter didn't mention that he recently had been investigated by the Board on Judicial Standards and reportedly was ordered to undergo anger counseling after his former law clerk, Susan Schempf, accused him of verbal assaulting her. Last June, the *Reader* published an exclusive interview with Schempf, who detailed how she'd been a victim of Porter's temper since she had been assigned to him in 1995.

The board has never confirmed that it ordered Porter to seek counseling in response to Schempf's complaint. In 1992, however, Porter became one of only 18 Minnesota judges since 1971 to be publicly disciplined by the board, which reprimanded Porter for statements he had made on WCCO-TV about a first-degree murder defendant.

In the *Reader* article, Burke shrugged off Porter's tantrums. "I know Porter has a problem improving his own interpersonal relationships with people who appear before him and his staff," Burke said at the time, adding that while Porter's attitude had improved, Lange's had not.

On the day that Porter wrote his 16-page memo, the only time Lange had made any public comments about her colleagues was in the May 13 *Star Tribune* article, in which she defended herself and stated that Burke had a history of problems in dealing with women (Lange says she cited Burke's "Dear Bitch" letter as an example, but that information didn't make it into the article.)

In recent weeks, Burke has publicly accused Lange of inserting races as an issue in the dispute. In fact, it was Porter who first played the race card in his memo to the executive committee.

"My discussions with Judge Burke also included a suggestion that in order to prevent even the suggestion that my actions could be motivated by matters of race, he would be well advised to enlist the help of African American elders," wrote Porter, who concluded the memo by asking for Lange's transfer and a replacement. "I strongly urge that the new judge be a representative of the communities of color."

At 3:44 p.m. on May 23, 1996, Burke faxed Lange a letter, requesting her presence at the executive committee meeting the following morning, at which time her transfer would be considered. Lange, who did not have enough time to meet with her attorney and prepare a defense before the 7 a.m. meeting, replied to Burke in writing that she would not attend. In her absence, the executive committee voted to table the issue and discuss it at a subsequent meeting, according to a copy of the minutes of the meeting.

Burke, however, ignored his colleagues and moved ahead on his own. After the meeting, Burke sent Lange a letter in which he transferred her out of juvenile court to adult criminal court, effective immediately, and replaced her with Tanya Bransford, who is African American. Later that day, Keith issued a statement supporting Burke's decision. In an interview with the *Star Tribune* that day, Burke equated his move to Minnesota Twins coach Tom Kelly transferring Kirby Puckett from center field to right field. In response to the story, Burke convinced 11 of his 53 colleagues to sign a "petition" dated May 24 supporting the transfer.

"Basically, he was saying he was the manager and I was the property to be transferred at

(continued on page 14)



U.S. Attorney
David Lillehaug



Supreme Court
Chief Justice A.M.
(Sandy) Keith

(continued from page 12)

will," Lange says, adding that Burke and Keith continue to contact members of the African-American community in an attempt to win support. They're "trying to make me a pariah in my own community so when I make my move I wonder where my supporters are," Lange says. They're "running around poisoning all the wells, telling them how awful I am. What kind of management is that? It seems disingenuous."

Two days after her transfer, the issue of Shabazz resurfaced when Lange received a memo signed by private investigators Russell Krueger and Wayne Brademan. In the memo, the investigators reported that they had heard through numerous contacts that David Lillehaug had contacted Keith, Burke and Porter in his attempt to gain access to Malcolm Shabazz's juvenile files.

"We have heard that because of Judge LaJune Lange [sic] correct stand of not releasing the file on the juvenile case, thus showing egg on the faces of those that tried to violate the rights of this juvenile, that this is a conspiracy of the judicial system to retaliate against Judge Lange," they wrote, adding that the information was based on rumors and overheard conversations that couldn't be proven unless the parties involved were interviewed.

When he was later interviewed by the Department of Justice, Krueger, a former Minneapolis police officer who now works out of the Hennepin County Public Defender's office, says the bias of his questioners was glaring. Rather than quit him about what he'd heard, the two Justice Department investigators kept insinuating that Lange had hired Krueger to conduct an investigation into the matter.

"They kept on saying, 'Your memo has ruined his [Lillehaug's] reputation.' They were hostile. They were screaming. They were not objective, absolutely not," says Krueger, who was reached last week. "The government kept on saying, 'Why did you write this?' I wrote it because I was asked to write down on paper what he had heard. And that's exactly what we put down."

When he brought the information to her attention, Krueger says Lange simply asked him to write down what he knew. Krueger says he did not conduct an investigation and has always maintained that the information couldn't be proven unless all relevant parties were interviewed.

After reading the memo and in the wake of her transfer, Lange says she asked U.S. Attorney General Janet Reno to investigate Lillehaug. After contacting Reno's office, Lange prepared for her May 30 press conference, in which she also criticized Keith, Burke and Porter. Seated at her bench and wearing her robe, Lange solemnly told reporters a "cancer" was growing on the Minnesota judiciary.

"The two most dreaded evils, the abuse of power and cronyism, have invaded the halls of justice. The institution that the citizens of Minnesota hold in high respect has been rendered impotent by the actions of Justice Keith, Kevin Burke and Charles Porter to further a personal agenda through abuse of power, defamation and cronyism," Lange said. "As a judge who was elected by the people to protect and uphold the rights of all people under the Constitution, I have a responsibility to call for an investigation involving the attempted use of a sealed juvenile court file by U.S. Attorney David Lillehaug in the matter of United States vs. Qubilah Shabazz. I welcome a thorough investigation."

The statement — and Lange's decision to make it while dressed in her robe and seated at her bench — is the crux of the Board on Judicial Standards complaint. In essence, the

board is seeking to publicly discipline Lange for making "unsupported public charges, made in reckless disregard of the truth."

The board's complaint seems absurd — especially in light of the two-page public statement Keith issued shortly after Lange's press conference.

"After exhausting other alternatives for resolving the personnel problem with Judge LaJune Lange, the situation has been addressed by transferring Judge Lange to adult criminal court — a move made by the chief judge of the district and endorsed by the executive committee of the Hennepin County Bench," Keith wrote.

In fact, the executive committee has never officially endorsed Burke's decision to transfer Lange. Rather, for weeks after he had transferred Lange, Burke sought supporters by circulating a petition, which was signed by judges, according to two copies of the same petition. One copy, provided by Lange, shows that 11 of 19 judges who attended the May 24 meeting signed the petition on May 26 — a day after they had taken the issue. Another copy of the same petition, which Burke and Porter made public in June, has 14 signatures but it is still dated May 26.

And while Lange has never called Keith, Burke or Porter racists, Keith went out of his way in his statement to address that subject.

"I feel compelled to correct the misconception about the motivation for moving Judge Lange. The decision was not based on either race or gender but upon the fact that she has damaged her working relationships with others in Juvenile Court," wrote Keith, who then praised Burke as "one of the most aggressive judges in Minnesota in his leadership efforts to eradicate racism in the court system."

## HERE COME THE FEDS

Last June, in response to Lange's request for an investigation, two investigators from the Department of Justice's Office of Professional Responsibility arrived in Minneapolis. The Board on Judicial Standards, meanwhile, began its own investigation.

In a June 29, 1995, letter to Lange, executive secretary Willette wrote that the board determined an investigation was appropriate based on several newspaper articles. Willette then asked Lange to provide information about Burke's and Porter's conduct on May 1 and whether Lange's staff had problems making computer entries. Willette asked for facts about her "alleged statement" that Burke and Porter contacted Lange about the Shabazz juvenile files "prior to your press conference on May 30, 1995."

At the time Willette wrote his letter, however, Lange had never publicly accused Burke and Porter of contacting her about the Shabazz case. "I wasn't saying I think there's something up with Kevin and Lillehaug. Uh uh," Lange says, shaking her head. "I was concerned about Lillehaug's handling of the case. This man went forward with the integrity of the United States of America."

On July 17, Lange responded to Willette's letter and included a copy of the June 23 letter she had sent to the Justice Department detailing, for the first time, the conversation she overheard between Porter and Burke. Any chance that the board would take any actions against Burke or Porter, however, evaporated.

A month later, Willette informed the Rev. Richard Coleman, Lange's minister at St. Peter's A.M.E. Church (who had filed a complaint against Burke), that the board had exonerated Burke for the May 1 confrontation in Lange's chambers. "The Board has determined the conduct of Chief Judge Kevin Burke did not violate the Code of Judicial Standards

We are closing our file on the matter but thank you for your inquiry," Willette wrote. The board didn't close its file, though. It simply turned its attention to Lange.

In a September 11, 1995, letter to Lange, the Department of Justice's Office of Professional Responsibility (OPR) informed Lange that its investigation of Lillehaug revealed no "factual support for her allegations regarding Mr. Lillehaug." This fact was quoted by the Board on Judicial Standards in its complaint, in part to justify its proceedings against Lange.

"The OPR conducted a thorough investigation. It reviewed the relevant pleadings and documents and interviewed a substantial number of involved persons including members of the judiciary, court staff, and staff from the Hennepin County Public Defender's Office, the Hennepin County Attorney's office, and the U.S. Attorney's office," the complaint states.

## BURKE VS. TERM LIMITS

After the board exonerated Burke, he enlisted the powerful support of Supreme Court Chief Justice Sandy Keith to further his personal agenda.

In early January 1996, Keith visited state Sen. Carol Flynn and asked her to carry a bill that would allow Burke, and Burke alone, to seek a third consecutive term as chief judge. "Sandy Keith was here, he was in our office talking about it," says Flynn, who initially agreed to author the bill, which was drafted on January 12.

Although Burke has claimed his fellow Hennepin County judges fully supported the bill, Burke and Keith were lobbying legislators two weeks before the executive committee of the Hennepin County Bench debated and voted on the issue.

Although 30 percent of the bench reportedly opposed Burke and Keith's bill, Burke blamed his eventual decision not to seek a third term on Lange, according to a February 2 letter he sent to his fellow judges.

"The fact that some people who disagree with my candidacy have sought to characterize me as a racist is wrong. The fact that those individuals were prompted by a member of this bench is simply not an environment in which I wish to participate any longer," Burke wrote, referring to Hamline Law Professor Robin Magee, who lobbied against the bill, arguing that it seemed inappropriate after Burke's questionable "race-based" decision to transfer Lange.

In his memo, Burke went on to say that he had lost enthusiasm to be chief judge, a "privilege" for which he thanked his colleagues. On February 21, Lynn says she withdrew the bill "based on concerns raised by others and the fact it would have applied throughout the state without any input from other chief judges."

Burke's attempts to maintain his position on the bench gradually failed. Meanwhile, Lange says, the yearlong ordeal has been a huge strain, especially on her family and friends. Over the last months, though, Lange says she has been fortunate to have the support of an extensive network of friends, particularly the members of St. Peter's A.M.E. church.

"My minister told me to keep my head up, to stand erect and to keep fighting," says Lange, who adds that she has often sought advice from her mother. "I said to my mom, 'Mom, tell me where the snakes are so I don't just jump in the pond for a swim.'"

Like her minister, Lange says her mother encouraged her to stand up for what she believes in. Lange takes a sip of her Constant Comment tea and adds that the idea of remaining silent on this issue is unthinkable. "That's not how my mother raised me and that's not how I want to raise my daughter." ◆



**Hennepin County Chief Judge Kevin Burke**



**Hennepin County Judge Charles Porter**

"We have heard that because of Judge LaJune Lange's correct stand of not releasing the file on the juvenile case, thus showing egg on the faces of those that tried to violate the rights of this juvenile, that this is a conspiracy of the judicial system to retaliate against Judge Lange."

—PRIVATE INVESTIGATORS RUSSELL KRUEGER AND WAYNE BRADEMAN

# Minneapolis Sp

## Minnesota's first choice for African A

# Religious leaders express concern over treatment of Judge Lange

## Dispute allegedly tied to Shabazz case

By Gayle Anderson

Calling the recent controversial dispute between Hennepin County Judge LaJune Lange and Chief Judge Kevin Burke a symptom of possible abuses of juvenile defendants in the courts, a group of Minneapolis church leaders vowed to investigate at a press conference on Tuesday. "Judge Lange and other judges need to feel safe and secure in their work environment where she can render clear and just decisions," said Reverend Richard Coleman, pastor of St. Peter's AME Church where the press conference was held. "If this is the manner in which such a high ranking member of the judiciary is treated, we shudder to think how our children are being treated in the courtrooms."

Coleman was joined by: Rev. Dr. Gary Rierson, Minneapolis Council of Churches, Rev. Alphonse Reff, pastor Wayman AME; Rev. Ian Bethel, pastor New Beginnings Church; Rev. Noah Smith, St. James AME, Minneapolis; and Matt Little, past president Mpls. NAACP. About 15 other community and business leaders also attended in support of the ministers. Rev. Bethel stressed that the community must stand



with Judge Lange.

Reliable Spokesman/Recorder sources say the staff and office problems are a smoke screen to mask the real problem Judge Burke and Judge Porter have with Judge Lange. Race and gender issues permeate the controversy, but the real problem stems from Lange's failure to cooperate in the Qubillah Shabazz case.

When U.S. Attorney David Lillehaug reached agreement with attorneys for Shabazz, his office requested the files on the child custody case involving Shabazz' young son. These were going to be leaked to the press, according to the source, to further discredit Shabazz in the face-saving agreement reached in the case. Guess who handled the child custody case? Judge Lajune Lange, who refused to hand them over.

Burke and Porter went to Lange to intercede and were still turned down, which caused the furor over the reported issues. While Lange has not detailed all the issues surrounding the dispute, sources say she also refused to let her staff off when Porter closed the court down and took about 80 employees bowling at taxpayer expense. That may explain his accusation in the Tribune article that she was not cooperative. Information was received too late before press time to get responses from the judges.

The dispute between Judge Lange and Chief Judge Burke exploded in the daily papers last week. In a letter to all the state Supreme Court Justices, Judge Lange complained that she was "accosted by Chief Judge



Judge LaJune Lange

Kevin Burke and Juvenile Presiding Judge Charles Porter" shortly after the noon recess on May 1, 1995. She claimed the two blocked the only exit door and that Burke "started yelling and shaking his finger at me."

She said in the article he was agitated over a report she had given on Peer Mediation. She went on to cite other instances where behavior in the offices of the courthouse have been less than respectful asking, "How can I protect my staff from a hostile workplace environment when I am subject to abuse from the Chief Judge?"

Judge Lange voluntarily assigned herself to the juvenile courts recently. Judge Burke was quoted in a front page Minneapolis Star Tribune article on May 15th denying the charges and accusing Lange of having a number of problems in her office. Meetings with several Supreme Court Justices and Chief Justice A. M. (Sandy) Keith resulted in Keith, who is admittedly a close friend of Burke's, saying he found no substance to Judge Lange's accusations and said in a statement that Lange had "problems acclimating her staff to the computer system." He reportedly told the only Black Supreme Court Justice, Alan Page, he did not need to attend the meetings.

The dispute is headed for mediation. It is interesting that the dispute comes at a time when the number one cause of death for Minneapolis youth age 15 to 24 is murder. And the crime rate among juveniles has tripled in the last few years. It is an opportune time for the ministers to observe what's happening to Black youth in the juvenile court system where there is only one African American - Judge LaJune Thomas Lange.

*Rev. Ian Bethel (left), pastor New Beginnings Church; Reverend Richard Coleman (right), pastor of St. Peter's AME Church at press conference.*

*Photo by Gayle Anderson*

5/18-24/95

STATE OF MINNESOTA
FOURTH JUDICIAL DISTRICT COURT

LAJUNE THOMAS LANGE
JUDGE
HENNEPIN COUNTY GOVERNMENT CENTER
MINNEAPOLIS, MINNESOTA 5546
(612) 348-6474
FAX (612) 348-2131

May 3, 1995



LANGE
EXHIBIT NO. 4

Justice Sandra S. Gardebring
Supreme Court
421 Minnesota Judicial Center
25 Constitution Avenue
St. Paul, Minnesota 55101

Dear Justice Gardebring:

It is with great reluctance that I write to you today. However, the problem is so serious I feel compelled to communicate my concern.

On Monday, May 1, 1995 shortly after the noon hour recess, I was accosted by Chief Judge Kevin Burke and Juvenile Presiding Judge Charles Porter. They came into my office unannounced and without invitation and Judge Burke placed himself against the only exit door to my office and started yelling and shaking his finger at me. Judge Burke was agitated apparently about a presentation I gave on Peer Mediation. When I responded to his allegations, he continued to grow more agitated and continued to raise his voice. I requested that he stop yelling and he briefly lowered his voice. His attention then transferred to my staff and a complaint he received on Monday regarding a three-minute request I made of an administrative staff because my law clerk was away taking a final exam.

Judge Burke as the Chief Judge of the largest district in the state should be an example of positive leadership and not demonstrate improper and discourteous behavior. Judge Burke's conduct was extremely upsetting to my staff and myself. We already have difficulty with Judge Patty Belois yelling at law clerks and attorneys, some leaving her courtroom in tears.

I have observed Judge Porter being yelled at by Susan Bownes, the Juvenile Court Administrator. My staff has been rudely treated and yelled at by Susan Bownes and her staff when asking for a file or other routine inquiries.

How can I protect my staff from a hostile workplace environment when I am subject to abuse from the Chief Judge?

I have two employees in a job share that speak fluent English. However, English is their second language. The training my staff has received for the new TCIS is deficient in several respects and my staff, along with Judge Stanoch's clerks and other new staff must redo a number of computer entries. I have been told by Judge Porter and Judge Burke that my staff will no longer have the

LaJune Thomas Lange
May 3, 1995
Page 2

technical resources available to assist in the TCIS area that the other judges continue to have
available.

I would like to perform my duties as a judge in the Juvenile Court without hostility created by the
Chief Judge. I have not encountered anything so outrageous since the "Dear Bitch" letter Judge
Burke sent to Judge Montgomery.

If he demonstrates the same level of candor about this conduct toward me, you should have cause
for concern.

Your assistance in establishing civility standards and conflict resolution mechanisms would be
truly appreciated.

Sincerely,

LaJune Thomas Lange

LTL:gm