That prior ruling by a Minnesota court of competent jurisdiction as to the validity and legal effect of Exhibit 37 is binding upon this court, sitting in diversity. <u>Its practical effect is that this court cannot construe the Burke memorandum as the law.</u>

Since Judge Bertolson ruled on July 22, 2004, the Minnesota appellate court has determined that the Burke memorandum is void for want of due process and that Appellant cannot be bound by it. On February 14, 2005, on Appellant's pro se motion that any balance-of-harm test—weighing the collective interest of public access to the January 16, 2004 Burke memorandum against Appellant's personal privacy and other rights, favored Appellant—Exhibit 37, consisting of the January 16, 2004 "order" and memorandum of Kevin S. Burke and the April 2, 1997 memorandum of Daniel Mabley, was sealed by Judge Jack Nordby of the Fourth Judicial District, Minneapolis, MN.

For texture, Appellant is again constrained to note, with emphasis, that, in July 2005, Christopher Renz—a Minnesota attorney adverse to Appellant, who had appeared before Judge Norby and who had attempted to unethically trade [24] on the Burke/Mabley memorandum in a manner almost identical to the litigation tactics of Connecticut attorneys Nouri and Conway—was formally censured by the Minnesota Lawyers' Board of Professional

---

[24] As noted *supra*, Appellant was adverse to Renz in a proceeding initiated by Renz in late 2004. Appellant promptly moved to dismiss. Renz, like Karalus, Nouri, and Conway before him, utilized inflammatory rhetoric and *ad homoniem* attack in an attempt to discredit Appellant, specifically stating in open court that Appellant was a frivolous and abusive litigant for no other reason than that Burke said so. The Minnesota court <u>rejected</u> that argument, and granted Appellant's motion to dismiss, a resolution in Appellant's favor. Some 90 days later, the Minnesota Lawyers' Board of Professional Responsibility issued a formal admonition to Renz, citing him for unethical litigation conduct.

27

Evidencing the same litigation tactics and unethical strategy of *ad hominiem* attack evidenced by the Appellee and defense counsel Conway and Nouri, Renz ultimately attempted to introduce the Burke memorandum and attachments that Appellee has designated as Exhibit 37. The parties ended up before Judge Nordby. On Appellant's motion that the Burke memorandum and attachments were substantially false, misleading, and unfairly prejudicial, the court sealed the record and also sealed the letter communicated written by Renz, wherein Renz argued that the court should disregard Appellant's Motion to Dismiss.

The court granted Appellant's Motion to Dismiss on March 1, 2005. With Judge Nordby's knowledge, Appellant filed a complaint of ethical misconduct against Renz. The Director of the Minnesota Lawyers' Board of Professional Responsibility investigated. In July, 2005, the Board issued an admonition to Renz.

Here—after losing three motions for dismissal off the merits and/or for summary judgment—Appellee and his attorneys resorted, in desperation, to *ad hominiem* attack upon the Appellant. On December 6, 2004, in clear violation of the December 2002 scheduling order of this court that Appellee has repeatedly attempted to enforce against the pro se Appellant, Appellee effected an eleventh-hour filing of the January 16, 2004 purported "order" by a validly disqualified Minnesota trial judge, Burke, that Appellee knew, or should have known [16], was invalid on its face and without authority under Minnesota law, which controls.

---

[16] Among the legal authorities cited by Appellee Exhibit 37 is the Minnesota Court of Appeals' opinion upholding Appellant's disqualification of Burke, as well as the case law, *McClelland v. Pierce*, and *Citizens' State Bank v. Wallace*, that sets forth the Minnesota disqualification rule and upon which the Minnesota appellate court relied.

Furthermore, to Appellee's <u>actual knowledge</u>, the January 16, 2004 "order" had been discredited by a Minnesota court in July 2004, six months *before* the Appellee filed it in this court. Subsequently, as noted *supra*, it was declared void for want of due process by the Minnesota appellate court, which had earlier upheld Appellant's disqualification of Burke and the judicial disqualification rule, MRCP 63.03. Ultimately, it was sealed, on motion of Appellant, by Judge Jack Nordby of the Fourth Judicial District of Minnesota.

As the trial transcripts confirm, the trial court was well aware at the time that it admitted Exhibit 37 that MRCP 63.03, the preemptory disqualification rule observed by Minnesota courts, of which Appellant requested the trial court to take mandatory judicial notice, is <u>self-executing</u> and *had **already been upheld** by a Minnesota appellate court, on petition of Barbara Burns, against the **same** trial judge, Kevin Burke, who authored the January 16, 2004 memorandum designated by Appellee as Exhibit 37.* Consequently and as discussed more specifically, *infra*, Appellee cannot possibly establish prejudice from Appellant's instant motion to strike and seal Appellee's Exhibit 37.

Nor, as Appellant stated at trial and as Judge Bertolson found, can Burke's unauthorized statements be found to be relevant to any litigation in which Appellant is a participation, including the issue of Appellant's reputation or entitlement to damages that underlie this litigation. To the contrary, as Appellant argued on motion in limine and as Judge Bertolson, in striking the Burke memorandum when it was

introduced by Brian Karalus [17], inclusion of the Burke memorandum and other irrelevant materials can only confuse and distract the appellate court from the central issue: Appellant's constitutional entitlement to a jury trial regarding what the trial judge has determined are factual issues concerning Appellant's attainment of "good standing status" and entitlement to compensatory, special, consequential, and punitive damages on compensable contract, defamation, and other tort claims that are clearly evident on the face of Appellant's Complaint.

In consideration of the foregoing facts and as set forth *infra*, Appellant, as provided and authorized under FRAP 10(e) (1)(2)(B), properly moves to strike and seal the superseded January 16, 2004 Burke "order" and memorandum, inclusive of attachments, proffered by Appellee and of record as Appellee's Exhibit 37 to facilitate and enhance the interests of justice and judicial economy, including, but not limited to, a clear understanding of pertinent legal issues raised on appeal by the appellate court; and to achieve harmony with the rulings of the St. Paul, MN court which struck the Burke memorandum as unauthorized, irrelevant, and not binding upon the Appellant or the court; and the Minneapolis, Minnesota court which sealed this record on February 14, 2005 on motion of Appellant, asserting that the memorandum was substantially false, misleading, and unfairly prejudicial.

---

[17] Appellant sued Brian Karalus on a contract claim. Karalus, like King attempted to evade the merits by filing the Burke memorandum. After admonishing Karalus, an attorney, to "act like a lawyer", Judge Bertolson struck it, and granted judgment, including court costs and fees, to Appellant on July 22, 2004.

**ARGUMENT**

I.    APPELLANT'S MOTION TO SUPPLEMENT THE RECORD ON APPEAL
      WITH A DOCUMENT REFERENCING A COLLATERAL PROCEEDING
      DEEMED RELEVANT BY THE TRIAL COURT IS CLEARLY BOTH
      AUTHORIZED AND PROPER UNDER BOTH THE LETTER AND THE
      SPIRIT OF FRAP 10.

       The case at bar arises from a publication by the Defendant/Appellee, David

S. King, to the Dean of the University of Minnesota Law School, E. Thomas

Sullivan that was originally published and republished on, respectively, May

24, 2000 and January 18, 2005. As this trial court record confirms, Appellant

contemporaneously maintained a defamation action against the Appellee and,

at the same time, instituted and maintained an administrative data challenge

under the Minnesota Government Data Practices Act, Minn. Stat. 13.04(04),

which includes the University of Minnesota.

       It must be, and is, duly noted that Defendant/Appellee's admitted

obstruction of Appellant's federally-mandated entitlement to records [18] access

for more than two years delayed the administrative data challenge process

considerably. Thus, it is not Appellant's fault and Appellant should not be

---

[18] Appellant strenuously objects to King's boastful statements and those of his lawyers, that King did not
violate the federal FERPA statute. King did violate the spirit as well as the letter of the statute. Specifically,
King testified in his deposition that he was aware of Appellant's written data request in mid-2000; that he
knew that Appellant was in Florence, Italy, some 3,000 miles from the Quinnipiac campus, on the date of
the request and for 45 days thereafter; that Appellant was entitled to a mailed copy of the requested records;
and that King and persons under his control withheld the records. It is duly noted that, to justify a ruling for
King, which defense counsel has touted as a victory on the merits and as irrebuttable proof that King did
not violate the FERPA statute, which, by his own admission, he did, the FERPA office in Washington,
D.C. was compelled to create a legal fiction regarding Appellant's domicile, declared by this court to be
Minnesota, i.e., the FERPA office contended that Appellant lived in New Jersey at the time the FERPA
request was made in 2000 and 2001, and was therefore within "commuting distance" of the Hamden, CT
campus. As the trial court found and as King was and is well aware, this was **not true** and, in fact,
Appellant returned to her home in Minnesota, 1800 miles from Hamden, when the Georgetown summer
program in Florence, Italy ended on July 1, 2000. Furthermore, even if it was true that Appellant was a
New Jersey resident, which it is not, New Jersey is still beyond the 50-mile commuting distance defined by
FERPA in its published and website materials.

19

penalized for the fact that the administrative challenge did not conclude until after trial and appeal.

As noted herein, the administrative challenge that Appellant filed with the University of Minnesota was adjudicated in accordance with the Minnesota Government Data Practices Act (MGDPA), Minn. Stat. §13.04, et seq. by Susan G. McKinney, the MGDPA "responsible authority." As noted, *supra* and *infra*, McKinney is but the latest fact-finder in a **long line of persons**, including the Quinnipiac Dean, the Quinnipiac Bursar, and this court, all of whom found King's statements that Appellant was not "in good standing" substantially false and misleading, as well as damaging.

Before and during trial in this court, the pending McKinney adjudication and certification was discussed on several occasions by, between, and among the parties, defense counsel, and the court. This court, which ordered King to issue a correcting statement [19] referenced as relevant the pending University of Minnesota administrative hearings, stating, specifically, that the proceedings would be obviated if King set the record straight. Transcript, January 14, 2005 Proceedings in 02-CV-897 (RNC). As noted, King had repeatedly refused to do so, stating that he would clarify his May, 2000 statement to Sullivan "only if the University of Minnesota contacts me." See

---

[19] In these circumstances, which are well known to King, Appellant objects strongly to defense counsel's self-serving attempt to falsely represent that the correction was King's idea, or that King even voluntarily agreed to issue it. In fact, and as King is well aware, King repeatedly refused to issue a correcting statement, despite numerous requests by Appellant over a period of many months, stating that the University of Minnesota would have to contact King; and King only issued the statement, which he distorted to further defame Appellant, as Mc Kinney found, because the trial court compelled him to issue it. Had the court not made its expectation clear, King would never have issued any statement and the transcript produced by defense counsel himself documents that King attempted to evade this obligation, as he had with Appellant, by stating that he would issue a statement "if the University of Minnesota calls me" or words of that substance and meaning.

20

FN 19. On January 14, 2005, the trial court made it clear that it expected King to proactively correct the false impression that King created.

Although the trial court's directive, which King confirmed that he understood perfectly, could not have been more unequivocal, the record, including Appellant's Motion for New Trial and supporting materials filed by Appellant on or about January 18, 2005 **prior** to taking of appeal on February 12, 2005, is equally unequivocal that King did not do this. Rather, in a clear showing of malice, King did <u>not</u> comply with the spirit or the letter of the trial court's order. Rather, he seized upon the opportunity to damage Appellant further by republishing substantively the same statement [20] that gave rise to Appellant's original defamation claim to Alex M. Johnson, Dean, University of Minnesota Law School.

In disseminating King's unauthorized and damaging communication with Johnson, both King and his attorney, Conway, clearly evidenced a deliberate, intentional, and reckless disregard of Appellant's privacy and other rights. Furthermore, both King and his attorney took these maliciously-actuated actions, calculated to harm Appellant, with great glee, secure in the stated belief that—as was the case with Appellant's FERPA claim, which attorney Conway represented to this court on January 14, 2005 that King, who by his

---

[20] King and his attorneys, who have demonstrated a propensity to misstate and misrepresent facts, attempted to state that King wrote to Johnson because Appellant asked him to. Like so many statements that emanate from King, Conway, and Nouri, **nothing could be further from the truth**. In fact, Appellant wrote to Conway on January 14, 2005, stating that any statement by King should be issued to **Appellant for transmittal to the University of Minnesota;** and further stating that Appellant did <u>not</u> authorize King to communicate with third parties regarding Appellant because Appellant did not trust King. Appellant also <u>never</u> stated that she would forego damages or an injunction against King if King issued a statement, as defense counsel Nouri falsely implies, or that money damages and/or injunctive relief was not important to Appellant.

own admission violated a federal statute, "won"—they could violate Appellant's rights with impunity.

In the end, as set forth by Appellant's Motion to Supplement, the "joke" was on King when Susan McKinney, as Data Practices Officer, made a formal finding that both the May 24, 2000 and the January 18, 2005 communications were "inaccurate" and "incomplete", and, further, were sufficiently damaging to Appellant to warrant the extreme remedy of excision from Appellant's Law School file, with third-party notification that the University deemed King's statements false and damaging. Predictably, King and his attorneys have sought to discredit McKinney by attacking McKinney's competence and credibility, as well as her authority, which is defined by a Minnesota legislative statute. Equally predictably, King and/or his attorneys offer <u>no legal</u> <u>argument sufficient to defeat Appellant's assertion that the McKinney</u> <u>certification would aid and facilitate appellate review and the interests of</u> <u>justice, which is the only showing that Appellant is required to make to</u> <u>prevail on a motion to supplement the district court record on appeal.</u>

Specifically and as a plethora of case law, wherein a number of federal circuit courts, interpreting FRAP 10 over time, confirms, a trial or appellate court has broad discretion to grant a motion to supplement a record on appeal *for no other reason than to promote the interests of justice and to afford the appellate court a better understanding of relevant facts and events.* Furthermore, even assuming, *arguendo*, that the issue of King's January 18, 2005 defamatory publication and McKinney's adjudication were <u>not</u> placed

22

before the trial court before appeal was taken, which, in fact, they were, the 8th Circuit, which includes Minnesota, has determined that FRAP 10 does <u>not</u> prevent the trial court from considering collateral  post-trial proceedings, ***provided that they are relevant***, which, by the trial court's determination, the University of Minnesota proceedings clearly were and are.

Specifically, Susan McKinney considered the **same** claims and the **same** evidence—including the testimony of Valerie Carbone, that was considered by the trial court, but withheld from the jury—from the perspective of a member of the representative Minnesota academic community. Her findings are therefore clearly relevant and must also be deemed more credible than those of the trial judge, a male New Englander, who, so far as Appellant is aware, has never lived or worked or been educated in Minnesota and has no knowledge or appreciation of the reference community.

Equally clearly, McKinney's determination enhances the ability of the appellate court to evaluate Appellant's reputation in the context of the representative Minnesota academic community. This evaluation, now the task of the the appellate court, goes directly to the issue of Appellant's damages, including punitive damages, and the issue of amount-in-controversy jurisdiction that Appellant has raised for appellate review.

Defense counsel's (predictable) attempts to "sweep under the rug" McKinney's findings[21], which conclusively discredit the Appellee's

---

[21] Defense counsel, in an attempt to discredit McKinney, whose findings do not favor King, attempts to engage the Appellant and the court in a semantical debate regarding McKinney's authority, which is statutory; and her certification, which is also statutory, and to which this court must accord full faith and credit.

23

"substantial truth" defense, are without merit, as well as blatantly self-serving. Notably, in opposing Appellant's Motion to Supplement the Record on Appeal, Defense counsel characteristically resorts to Appellee's time-honored litigation strategy of inflammatory rhetoric and *ad hominiem* attack in an attempt to divert the court's attention from the indisputable fact that—as the trial court itself found when it ordered King to issue a retraction—McKinney correctly found King's mischaracterizations of Appellant's good-standing status to be substantially false and misleading.

Defense counsel accomplishes this by variously arguing that Appellant has misrepresented Mc Kinney's certification, a business record that speaks for itself and/or that Appellant has vested McKinney with authority that McKinney does not possess. Both assertions are without merit.

In fact, in presenting McKinney's June 10, 2005 certification, which is binding upon this court, and by identifying McKinney as no more—**and no less**—than "the responsible authority" specified by the Minnesota Government Data Practices Act, Appellant has neither "grossly mischaracterized" the contents of the letter, which, in fact speaks for itself; nor has Appellant placed McKinney on an "absurd" pedestal. Indeed, it is defense counsel's desperate attempts to persist in claiming that King's obviously defamatory statements did not damage Appellant that are absurd and totally belied by the facts.

24

II.    THE COURT SHOULD STRIKE AND SEAL APPELLEE'S EXHIBIT 37 ON THE BASIS THAT IT IS SUBSTANTIALLY FALSE AND MISLEADING, AS WELL AS DEVOID OF LEGAL AUTHORITY, THEREBY UNFAIRLY PREJUDICING APPELLANT IN THE INTERESTS OF JUSTICE AND TO HARMONIZE PERTINENT RULINGS OF THIS COURT WITH JUDICIAL AND QUASI-JUDICIAL DECISIONS OF COMPETENT MINNESOTA COURTS AND ADMINISTRATIVE LAW OFFICIALS

This is a diversity action wherein this court has made a determination that the relationship of the parties is properly construed as being governed by Minnesota law. When, as in this case, a federal district court sits in diversity, it must apply the substantive law of a state, in this case, Minnesota, *as it has been consistently interpreted by that state's highest courts.* In so doing, a federal district court may <u>not</u> reject the law as it is given by the subject state appellate and circuit courts, *even if it disagrees with it.*

Here, Appellant presented credible non-hearsay evidence at trial, including a Westlaw case summary of CX 95 141 (Minn. App) 1995, a case involving Appellant and Kevin S. Burke, the author of the document designated as Appellee Exhibit 37. The Westlaw summary, of which the Appellant requested the trial court to take mandatory judicial notice, established that Appellant validly disqualified Kevin S. Burke, a Minnesota trial court judge and the author of Exhibit 37, under a peremptory [22] disqualification that, by the determination of the Minnesota appellate court, was filed by Appellant, pro se, in substantial conformity with Minn. R. of Civ. 63.03, which includes the chief judge of a Minnesota judicial district; and that Appellant's

_____

[22] Although the Minnesota appellate court upheld Appellant's disqualification of Burke on peremptory grounds, Appellant established and Minnesota Judge Isobel Gomez found, ample grounds to disqualify Burke for cause, i.e., judicial bias.

disqualification of Burke was upheld by the Minnesota appellate court. Under the Minnesota preemptory disqualification rule, MRCP 63.03, as it has been consistently interpreted by that state's highest courts, any exercise of judicial power by Burke subsequent to the filing of a Notice of Removal by Appellant in substantial conformity with MRCP 63.03 is "without authority." *McClelland v. Pierce*, 376 N.W. 2d 217 (Minn) 1985; see also, *Citizens' State Bank v. Wallace*, 477 N.W. 2d 741 (Minn. App) 1991.

By the determination of the Minnesota Supreme Court in *IN RE: Hormel's Trusts*, 163 N.W. 2d 844, Minn. 1968, when a trial judge or a chief judge acts with malice, due process is violated. Consequently, a validly disqualified trial judge or chief judge may not be seconded [23] and a chief judge may not utilize collegial channels to continue to exercise influence over a case in which he has been validly disqualified. Id, stating, in pertinent part, that "the fact that (disqualified) judge was seconded by another judge or judges did **not** preserve the validity of the order." (Emphasis added).

As Appellant clearly stated before, during and after trial and before taking appeal, the unauthorized January 16, 2004 Burke memorandum was reviewed and formally declared "without authority" by Judge Michael Bertolson of the Second Judicial District, St. Paul, MN on July 22, 2004, some six months *before* Appellee introduced it as Exhibit 37 on or about January 11, 2005.

---

[23] Exhibit 37, authored by Burke, creates the impression that Burke was seconded by Daniel Mabley upon entry by Mabley of a "copycat" order in the same case on April 2, 1997. Under the supreme court interpretation of the disqualification rule in *Hormel*, this is impossible. The point is a moot one because Mabley conceded Appellant's disqualification of Mabley for cause on the record in a transcripted proceeding taken by Court Reporter Donald Klabunde on April 2, 1997. In that same proceeding, Mabley further conceded that his authority over Appellant was limited to the ministerial acts exception, i.e., a chief judge's inherent authority to uphold the Minnesota Rules of Court, articulated by the Minnesota Supreme Court and did <u>not</u> extend to substantive findings of fact and conclusions of law.