UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Barbara R. Burns,

    Plaintiff                    Docket No. 02-CV-897(RNC)

v.

David S. King,

    Defendant

---

### PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO VACATE JANUARY 18, 2005 JUDGMENT

As provided and authorized by Federal Rule of Civil Procedure 60(b) [1] and as otherwise provided by the Federal Rules of Civil Procedure, Plaintiff Barbara R. Burns hereby moves for an order vacating the January 18, 2005 judgment of the Connecticut District Court on ground of newly discovered evidence and fraud and on the basis that it is no longer equitable that the judgment have prospective application. Plaintiff so moves in the interests of justice and in reliance upon this court's express representations that its rulings are faithful to the law and based upon the truth.

Plaintiff further moves for injunctive relief, as set forth with specificity, *infra*. Plaintiff duly notes that Plaintiff's timely-filed Petition for Re-Hearing is presently pending before the United States Court of Appeals for the Second Circuit. The appellate court has not issued its mandate and presumptively retains jurisdiction under 28 U.S.C. §§1291, 1292, et seq. and the All-Writs Act, 28 U.S.C. § 1657, et seq.

---

[1] Stating that on motion of a party, or it own motion, a court may relieve a party from a judgment or set aside a judgment for fraud upon the court.

1

## CHOICE OF LAW

This is a diversity action wherein Plaintiff, determined by the court to be a resident of Minnesota, sued Defendant, a resident of Connecticut. Plaintiff asserted, *inter alia*, claims of multi-state defamation, breach of contract, and tortuous interference with prospective economic advantage. By order dated September 29, 2004, the court construed the relationship of the parties to be governed by the substantive law of the state of Minnesota and the 8th Federal Circuit.

## BACKGROUND

Prior to filing this action, Plaintiff, pro se, obtained expert review of her claims by an experienced Connecticut attorney, Earle Giovaniello. Attorney Giovaniello, who represented Plaintiff in a collateral action involving Quinnipiac University, filed the *Burns-King* action at bar on Plaintiff's behalf in the United States District Court, New Haven Division, on May 25, 2002. Plaintiff obtained a default judgment against the Defendant on August 7, 2002. The court vacated the default judgment on August 27, 2002 on Defendant's motion that Defendant could and would defend the action on the elements.

Between the dates of August 27, 2002 and September 29, 2004, the Defendant filed and the court denied not fewer than three motions wherein Defendant sought to dismiss the action off the merits on jurisdictional grounds. The court also denied numerous motions filed by the Defendant that requested sanctions against the pro se Plaintiff. All the while, the Defendant actively sought to obstruct and delay discovery and the court's evaluation of the merits of the Plaintiff's claims and the Defendant's claimed affirmative defense.

In early 2004, in support of her contract and defamation claims, Plaintiff duly prepared and filed a detailed damage analysis, quantifying compensatory, special, consequential, and punitive damages payable by the Defendant to the Plaintiff under legal theories of breach of contract, defamation, intentional and tortuous interference with prospective economic advantage. Plaintiff at this time duly noted that punitive damages are expressly authorized under Minn. Stat. §549.20 in cases where a claim or defense is asserted in bad faith for purposes of harassment and/or delay and is demonstrated as wholly unsupported by the facts and the law of the case.

By order filed September 29, 2004, the trial court accepted the Plaintiff's good-faith damage analysis and denied the Defendant's motion for summary judgment. The trial court expressly found that Plaintiff's claims were made in good faith and that Plaintiff's good-faith estimate of damages controlled.

In a scheduling order dated September 30, 2004, the trial court set the case for trial and defined two factual issues: (1) whether "good standing" status at Quinnipiac University could be conditioned upon financial factors, as Defendant claimed; and (2) whether Plaintiff, who had remitted $6,000 and assigned awarded Title IV financial aid to Quinnipiac University, owed money to Quinnipiac University at any time during the historical period between November 16, 1999 and July 1, 2000. The trial court defined the two afore-stated factual issues as jury questions.

On December 6 and December 9, 2004, the trial judge convened two pre-trial conferences. At the second pre-trial conference on December 9, 2004, the trial judge instructed the pro se Plaintiff to henceforth communicate directly with him and to bypass court personnel. In response to Plaintiff's objections that the proposed communications

were ex parte and otherwise improper, as well as unfairly discriminatory, the trial judge assured the Plaintiff that such direct communication was proper and that, further, this arrangement afforded Plaintiff the distinct advantage of direct communication with the court. The trial judge could not or would not cite any valid reason for this requirement, the effect of which was actually to deprive Plaintiff of informal communications channels available to the Defendant and to make communication with the court by the Plaintiff more difficult. The December 9, 2004 telephonic pre-trial conference took place on the record in the presence of the trial judge, the Plaintiff, and defense counsel Conway.

Following a number of attempts by the Defendant to indefinitely delay trial, all of which were rejected by the court, the case proceeded to trial on January 11, 2005. At trial, the Defendant testified that the Plaintiff was a competent law student who met all academic and conduct factors required for good standing status.[2] In the process of authenticating three good-standing letters issued by the Quinnipiac Dean, Neil Cogan, between the dates of December 22, 1999 and July 1, 2000, the Defendant further testified that the Defendant was not and had never been the Quinnipiac dean; that the Defendant, in fact, worked for the Quinnipiac Dean; and that the Quinnipiac Dean, Neil Cogan, had overruled the Defendant on at least three occasions when the Defendant attempted to impose a "financial good standing" requirement upon the Plaintiff. The first jury question

---

[2] In response to an attempt by defense counsel to attack Plaintiff's competency, which the Defendant himself conceded at trial, Plaintiff offers as Exhibit A a Harvard transcript issued to Harry Andrew Blackmun, later United States Supreme Court Justice Blackmun, who apparently earned an Evidence grade that was considerably lower than his class average. Justice Blackmun's biographer hypothesized that Blackmun, a gifted corporate attorney who later served with distinction as an 8th Circuit judge and an associate Supreme Court justice, had financial obligations that limited the amount of time Blackmun could devote to his law studies; and that Blackmun, who did not aspire to a career as a litigator and who once described as the ten years he worked as in-house counsel for the Mayo Clinic as the happiest time of his life, did not deem the study of Evidence as relevant to his chosen transactional law career path. As Blackmun's biographer further noted, an isolated mediocre Evidence grade, which obviously did not prevent Justice Blackmun from achieving his professional goals, was clearly not a reliable indicator of a law student's aptitude for and fitness to practice the law, as defense counsel appeared to argue at trial.

posed by the trial judge, the issue of good standing, was thus resolved by the Defendant's own testimony in favor of the Plaintiff.

On cross-examination of the Plaintiff, defense counsel, in what was clearly a diversionary tactic, attempted to question the Plaintiff regarding a wholly unrelated ongoing legal matter, a property dispute, involving the Plaintiff and two other parties, who had designated the Plaintiff their de facto attorney and the Chubb Group of Insurance Companies, which insures Quinnipiac University and which engaged the firm of Conway and Stoughton to represent David King in the *Burns-King* case at bar. Plaintiff refused to testify regarding this ongoing litigation and thereby prejudice the legal interests of these parties for whom the Plaintiff had assumed a fiduciary responsibility. [3]

The trial court, which earlier had refused to consider and rule upon a timely-filed and authorized Motion in Limine that would have effected an orderly and legal resolution of this and other issues, including, but not limited to, Defendant's eleventh-hour invocation of a defense not previously disclosed to the Plaintiff in violation of Rule 26 and the court's December 22, 2002 scheduling, ordered the pro se Plaintiff in the presence of the jury to testify regarding the unrelated and ongoing property dispute under penalty of forfeiture of her emotional distress claims. Plaintiff again refused to do so and the trial court disallowed the emotional distress claim. [4]

---

[3] As the trial transcript and other court records confirm, Plaintiff acted as attorney of record in a property matter involving the Plaintiff and two other parties. In that capacity, Plaintiff noticed appearance, researched, wrote, and filed the parties' motions and briefs. Plaintiff also represented the parties at oral argument before the federal circuit court of jurisdiction in December 2004—and won. The case in question was remanded on Plaintiff's brief and oral argument by the appellate court of jurisdiction, which summarily vacated the trial court order from which appeal was taken, on December 14, 2004.

[4] Plaintiff notes that, while not legal duress in the classic sense, the trial court nevertheless presented Plaintiff with a "choice", i.e., to keep her emotional distress claim by "selling out" Plaintiff's own legal interest and that of two other persons, that was, in fact, no choice. Given these facts, Plaintiff denies that any waiver of any claim, express or implied, was voluntary, as both the trial court and defense counsel have attempted to claim.

5

Defense counsel, still on cross, then attempted to introduce hearsay writings, consisting of uncertified memoranda of demonstrated questionable validity, authored by a validly-disqualified Minnesota state court judge, Kevin S. Burke, and improperly seconded by a second member of that same court, as the sole determinant of Plaintiff's reputation in the Minnesota legal and academic communities. Plaintiff duly objected on the basis that, in addition to being uncertified, the seminal memorandum dated December 19, 1994, was formally overruled and adjudged "unauthorized" by the Minnesota appellate court, which reversed on October 17, 1995 1995; that the same memoranda had been considered and rejected as hearsay and as not binding upon the Plaintiff or the court by a judge of the Ramsey County District Court, St. Paul, MN, on July 16, 2004, less than six months prior to trial in the *Burns-King* litigation at bar, that the same Ramsey County Court granted judgment to Plaintiff on July 22, 2004; and, that, given these facts of which the Connecticut District Court was required to take mandatory judicial notice, the uncertified memoranda was untrustworthy within the meaning of FRE 803 and, consequently, hearsay not within any exception.

On January 14, 2005, following a brief exchange with the trial judge on the record, the Plaintiff introduced a Westlaw citation and head note of the opinion of the Minnesota appellate court. The appellate opinion, of which the Connecticut District Court was required to take mandatory judicial notice, corroborated the Plaintiff's testimony that the Minnesota trial judge, Burke, who authored the hearsay memorandum, was validly disqualified by Plaintiff under MRCP 63.03 on December 14, 1994 [5]; that the

---

[5] On December 12, 1994, Burke issued a show-cause order, directing Plaintiff to appear and argue why Burke should not restrict Plaintiff's filings in the Hennepin County District Court. The timing of the Burke show-cause order was quite curious, i.e., it issued approximately six weeks after the filing of an October 20, 1994 order by Hennepin County District Court Judge Peter Lindberg, who certified as "not frivolous" a

disqualification, which was of right, was upheld by the Minnesota appellate court; and that, by the determination of the Minnesota supreme court, interpreting MRCP 63.03, a disqualified trial court judge could not be seconded by another judge or judges. *IN RE:*

---

proposed action by Plaintiff, as federal plaintiff, against the County of Hennepin and the Fourth Judicial District of Minnesota, which employed Burke. Plaintiff responded to the show-cause order by filing a timely notice of removal of Burke on preemptory grounds on December 14, 1994. On December 19, 1994, Plaintiff appeared and argued on the record that each and every one of the actions filed to date by Plaintiff, who applied for and was granted fee waiver, in the Hennepin County District Court were formally certified by a Hennepin County judge, prior to filing, as "not frivolous" under Minn. Stat. 563.01, et seq. and that, as a matter of fact or law, Burke could not find, as a matter of fact or law, that any of these judicially pre-approved actions was frivolous. Plaintiff also introduced two hearing exhibits proving that two of the waivers, certifying Plaintiff's litigation position in two different cases as "not frivolous", were signed by Burke himself. In the face of these facts, Burke conceded on the record that he could not conclude as a matter of fact or law that the Plaintiff was a frivolous litigant and could not legally enjoin Plaintiff's filings. Transcript, December 14, 1994 Proceedings by Christine Frenzal, RCR. Having been thwarted in this attempt to discredit Plaintiff as a frivolous, vexatious litigation and apparently determined to have his injunction, whether legally justified or not, Burke then issued an order, dated January 5, 1995, stating that the Plaintiff's filing status remained unaffected, a resolution in the Plaintiff's favor, but that Plaintiff was enjoined from contact with the court for one year. The stated basis for the January 5, 1995 order was Burke's allegation that Plaintiff was rude to court personnel. The January 5, 1995 order, which imposed an undue burden upon the Plaintiff that Burke could not legally justify, was clearly an "end run" around Burke's demonstrated inability to restrict Plaintiff's filings and discredit Plaintiff, an authorized federal plaintiff in a lawsuit involving Burke's judicial district. Plaintiff appealed, stating that the December 14, 1994 disqualification of Burke was of right under MRCP 63.03 and operated to divest Burke of substantive judicial power *vis a vis* the Plaintiff. Plaintiff also argued on appeal that Burke's allegations that Plaintiff's conduct was improper were unsubstantiated and a convenient fabrication. In its October 17, 1995 opinion, the Minnesota court of appeals found that there was no credible evidence that Burke's allegations as to Plaintiff's conduct were true and upheld Plaintiff's disqualification of Burke. On November 16, 1995, Burke appealed to the Minnesota Supreme Court, then headed by Burke's mentor, Alexander M. Keith, who resigned from the court in 1996. The Minnesota Supreme Court, headed by Keith, granted cert to Burke, but did not hear the petition before the order became void of its own terms on January 5, 1996, thereby depriving the state supreme court of jurisdiction to hear the petition. On January 19, 1996, the Minnesota Supreme Court issued an advisory opinion, upholding the disqualification rule, MRCP 63.03 as "a necessity" in all justiciable controversies, adding that the chief judge of a district retained inherent administrative authority to enforce the Rules of Court. This narrowly-drawn exception is consistent with the "ministerial acts" rule observed by a number of jurisdictions and permits a presiding judge to impose procedural rules, consistent with the Rules of Court, upon parties and counsel in the interests of efficient court administration. As Plaintiff has noted elsewhere in this record, the ministerial acts exception, which in any case does not permit a disqualified judge to make findings in cases, does not apply to Burke, who is not a presiding judge. For texture, Plaintiff notes that Burke himself offered his own resignation in 1993 in the face of a public outcry in response to publication of what has been widely-known in Minnesota as "the dear bitch letter" signed by Burke and addressed to Judge Anne Montgomery. Following an equally well-publicized and acrimonious bench debate, wherein members of the Hennepin County bench criticized his handling of the La June Lange matter in 1996, Burke was not permitted to stand for election as chief judge and did not hold the office of chief judge at any legally relevant time during the historical period of the *Burns-King* litigation at bar. The defendant's representation to this court that Burke was the Chief Judge of the Fourth Judicial District at the time that the Defendant filed the Burke memorandum in late 2004 are simply untrue. Similarly, defense counsel's representations to this court that there are extant restrictions upon Plaintiff's communications and filings with any Minnesota court are also untrue and the Burke-Mabley memoranda introduced by and relied upon by defense counsel was in fact sealed on Plaintiff's pro se motion by a judge of the Fourth Judicial District of Minnesota on February 14, 2005.

number of women colleagues, two of whom, Anne Montgomery and La June Lange, were judges.

As Plaintiff duly recounted on motion in limine and at trial, Burke, among other incautious and unseemly actions, signed a letter bearing the salutation, "Dear Bitch" and addressed to United States District Court Judge Ann Day Montgomery. As a number of Minnesota newspapers, quoting, among other credible sources, Burke, Montgomery, and United States District Court Judge Andrew Danielson, reported and as Montgomery herself acknowledged, she and Burke had a number of philosophical differences and, over a period of years, Montgomery was outspoken in her criticism of Burke.

In a deposition transcript filed in the Office of the Appellate Courts, St. Paul, MN, Burke himself admitted that he blocked Judge Lange's doorway and shook his finger in her face. This admission by Burke corroborated statements contained in a letter that Lange wrote to Minnesota Supreme Court Justice Sandra Gardebring that is publicly filed in the Office of the Appellate Courts, St. Paul, MN. In her letter to Justice Gardenbring, a writing contemporaneous with the events that it described, Lange stated that, based upon her dealings with Burke and his associate, Charles Porter, she had concerns about "judicial temperament" and a "hostile environment" within the Fourth Judicial District of Minnesota and that she construed Burke's actions in blocking her doorway and shaking his finger in her face as an assault [7]. This credible non-hearsay evidence of inappropriate

---

[7] For texture, Plaintiff further notes that a <u>third</u> professional woman, a Hennepin County social worker named Theresa Graham, stated—in the presence of Plaintiff, the parents of Judge La June Lange, and the pastor of the Pilgrim Baptist Church, in attendance as the Lange family spiritual advisor at the supreme court trial that was convened to discredit Lange in 1996, that Burke, then assistant chief judge of the Fourth Judicial District of Minnesota, had dispatched a county workman to, in Graham's words, "break her door." Certification of Barbara Burns. Plaintiff, following consultation with a Minnesota attorney, duly reported these statements by Graham, a licensed Hennepin County Social Worker and officer of the state of Minnesota, to Appellate Judge Doris Ohlsen Huspeni, who led the panel hearing the Lange inquiry, noting that Graham, an officer of the state of Minnesota, was presumptively credible and that her statements had

and abusive conduct on the part of Burke, duly proffered by Plaintiff at trial, goes directly to Burke's credibility and gender bias, and further conclusively establishes that the "evidence" offered by the Defendant to discredit the Plaintiff was and is unreliable and untrustworthy within the meaning of FRE 803.

As the trial judge himself noted in his September 29, 2004 order, denying Defendant's motion for summary judgment, Plaintiff's reputation is properly judged by a juror in the context of standards applicable to practicing attorneys and judiciary within reference *Minnesota* legal community. As Plaintiff––who, in any case, demonstrated that she was well liked and highly regarded by a number of Minnesota attorneys and law professors–– demonstrated at trial, these standards are quite low.

More specifically, records maintained by the Minnesota Board on Judicial Standards and other public records confirm that a number of Hennepin County Court judges, including Burke himself, have severe anger management and gender bias issues, and have perpetrated actions against court personnel and members of the public that constitute not only the rude and uncivil behavior that Burke attributed to the Plaintiff, but which, as Lange stated to Justice Gardebring, rise to the level of assault and battery. [8]

---

been witnessed by four persons, one of whom was a clergyman. Two months later, in November 1996, the case against Judge Lange was dismissed, a resolution in Judge Lange's favor. The dismissal order, filed by Plaintiff in support of Plaintiff's Motion in Limine, confirms that two appellate judges, one of which was Judge Huspeni, voted to dismiss and that retired Justice Lawrence Yetka, known to be friendly to Burke and his mentor, then-Chief Justice Alexander M. Keith, dissented.

[8] As noted *supra*, Burke publicly admitted after being questioned by Judge Andrew Danielson that he signed what has become widely known in Minnesota as "the dear bitch letter" that was addressed to Montgomery. Although he attempted to place the blame upon his court reporter, stating that she had mishandled a "mail merge", most persons, including Judge Danielson, who publicly expressed skepticism, did not find this explanation credible, given that Frenzal is an experienced court reporter with more than 25 years tenure and that her children were friendly with Montgomery's daughters. As also noted supra, Lange wrote to Justice Gardebring and later testified that Burke blocked her doorway and shook his finger in her face. It must be, and is, expressly noted that, while Burke publicly accused Lange of being "incompetent" and "disruptive", no person, including Burke, has called Lange a liar. It is similarly a matter of public record that Burke's colleague, Hennepin County Judge Charles Porter, was publicly censured by the Minnesota Board on Judicial Standards in 1996 after he admitted that he threw a sheaf of files at the head

10

Furthermore and in contrast to the unsupported and unproven allegations of uncivil and allegedly "abusive" behavior attributed to Plaintiff by Burke, the judges in question all admitted their guilt or were found guilty by a legal tribunal of competent jurisdiction. Id. At the same time, their legal careers in the Minnesota community for the most part have been unaffected.[9].

By the standard of conduct tolerated by this reference community, the conduct attributed to Plaintiff by Burke, even if accurately stated and proven to be true, which the Minnesota appellate court expressly found was **not** the case, should not and would not preclude Plaintiff from practicing law in Minnesota or, arguably, even holding office as a Minnesota state court judge or justice. This compels a conclusion that the "evidence" proffered by the Defendant was and is insufficient to overcome the presumption that Plaintiff enjoyed a good reputation in the Minnesota legal community, as a number of Minnesota attorneys and law professors in fact certified that Plaintiff did.

---

of his judicial clerk, Susan Schempf, who applied for, and was granted a transfer, out of Porter's courtroom. At approximately this same time, Judge Sean Rice was removed from office by the Board on Judicial Standards following complaints of abusive treatment by his staff. In 2004, Hennepin County Court Judge Harvey Ginsberg was, similarly, removed from the bench after pleading guilty to assaulting a member of the public at his son's soccer game. After being placed on probation, Ginsberg violated him probation when he "keyed" the car of another member of the public and later stood trial for felony assault. Equal tolerance of even criminal conduct is accorded to members of the Minnesota Bar. As just one illustration, county prosecuting attorney Laura Nolan and her lawyer husband Julius, both friends of Burke, who gave a statement in their support to the *Minneapolis Star Tribune* in late 2004, were found by police to be dealing cocaine in their St. Louis Park, MN living room while their four-year-old daughter slept upstairs. The Nolans were arrested in a "sting" operation and charged. Burke, in clear violation of the Minnesota Judicial Canons, which prohibit judicial comment on ongoing cases, attempted to influence the prosecution in the Nolans' favor by making a number of statements to the *Minneapolis Star Tribune*, the most widely-circulated newspaper in Minnesota. This strategy was successful in the short term: Ramsey County District Court Judge Edward Cleary suppressed the police search and Julius Nolan's confession. Cleary's ruling was overruled in 2005 by the Minnesota Court of Appeals, which upheld the search and reinstated the criminal case against the Nolans. By the account of the *Star Tribune* in late 2005, Laura Nolan is still practicing law in the county attorney's office and neither of the Nolans has been disbarred or even suspended from the practice of law in Minnesota.

[9] As the January 14, 2006 edition of *The New York Times* confirms, former Minnesota appellate judge Roland C. Amundson, who is presently serving a seven-year sentence in a Minnesota prison for felony swindle, has been disbarred. Judges Sean Rice and Harvey Ginsberg were forced to leave the bench, but retained their law licenses. Judge Charles Porter, who was censured by the Minnesota Board on Judicial Standards for throwing a file at the head of his judicial clerk, Susan Schempf, who requested and obtained a transfer, is still on the bench.

11

On January 14, 2005, on cross-examination, the Quinnipiac Bursar, Valerie F. Carbone testified that the Quinnipiac University "good standing" policy at issue in this litigation was defined by the University website and was **limited to conduct and academic factors only.** Carbone expressly stated, as did Quinnipiac Dean Neil Cogan before her, that Quinnipiac good standing status was not conditioned upon financial factors. Carbone's testimony, confirming that no "financial good standing policy" existed at Quinnipiac University and that Defendant's assertion of a "financial good standing policy" was not even partially true, supported by Carbone's and Plaintiff's proffer of the Quinnipiac website materials, therefore conclusively discredited, or should have conclusively discredited, the Defendant's "substantial truth" defense.

Carbone further testified on cross-examination that the "late billing" of 1999 summer tuition—which both the Defendant and Anne Traverso had earlier testified caused Plaintiff's Quinnipiac account to become delinquent in late 1999—"could not have happened". By Carbone's expert testimony, the University computer system would not accept a late billing. From this testimony, it is reasonable to infer that, to achieve a late billing that the University computer system would not accept or spontaneously generate, some manual manipulation of University records, possibly by Anne Traverso or the Defendant himself, must have occurred.

Finally, Carbone testified that two Title IV financial aid checks in the amount of $6,700, more than double the alleged arrearage, were assigned to and received by Quinnipiac University in early November 1999; that the checks were payable to Plaintiff and the Quinnipiac Bursar and not Anne Traverso; and that the checks were improperly intercepted by Traverso. Traverso herself admitted under oath at trial that Traverso

appropriated the checks and prevented them from being applied to Plaintiff's account. Since Traverso had no claim of right to the checks, her reasons for doing so are not relevant.

As noted *supra*, Carbone's testimony, which corroborated Plaintiff's account of relevant events, unequivocally discredited King's "financial good standing" policy and "substantial truth" defense, thereby resolving the good standing issue in Plaintiff's favor. Carbone's testimony and Traverso's admissions that she received and did not apply $6,700 in financial aid funds to Plaintiff's student account also mooted, or should have mooted, the account delinquency issue, or, alternatively, created a genuine factual issue as to whether payment was tendered by Plaintiff and rejected by Quinnipiac that, by the trial judge's determination, was properly submitted to and decided by a jury.

<u>The above-stated facts, verifiable by the record, compel a conclusion that King asserted a non-meritorious, even frivolous, "substantial truth" defense in bad faith for three years, that his purpose was solely to harass the Plaintiff and indefinitely delay adjudication of the merits of the Plaintiff's contract and other claims; and that, consequently, Plaintiff has demonstrated a clear entitlement to punitive damages. Under the plain language of Minn. Stat. §549.20, punitive damages are open-ended and subject to the sole discretion of the civil jury. In common with Rule 11, the statutory sanction is mandatory if the Minnesota Frivolous Claims statute, Minn. Stat. §549.20, is violated.</u>

As noted elsewhere in this record, the trial judge had previously determined and had repeatedly ruled that the parties' respective claims would be adjudicated **on the merits**. Consistent with this posture, the trial judge denied at least three defendant motions to dismiss off the merits, as well as the defendant's motion for summary judgment. Only

13

when, at the conclusion of Carbone's testimony, when it was, or should have been, clear that King could not win on the elements did the trial judge inexplicably abandon this heretofore consistent position that the parties' respective claims would be litigated on the merits and on no other basis.

Instead of granting judgment to Plaintiff—who had carried her burden in accordance with the "ground rules" underlying the law of the case by disproving that King's contrived "financial good standing" argument and, through credible in-court testimony, creating a genuine factual issue as to Plaintiff's financial status with Quinnipiac University—the trial court dismissed the case <u>off</u> the merits, stating that— notwithstanding three earlier rulings which upheld Plaintiff's good faith damage claim— the amount-in-controversy was not satisfied. The trial judge also inexplicably "flip flopped" as to who had the burden of proof as to causation of the Plaintiff's damages[10]. In so doing, the trial court clearly usurped the jury's fact-finding function after erroneously concluding that "no reasonable juror could possibly find for the Plaintiff." Transcript, January 14, 2005 Proceedings in 02-CV-897 (RNC).

Notably, the trial judge, at the same time <u>disclaiming</u> his ability to exercise judicial power with regard to these parties and their legal dispute, granted to Plaintiff the equitable remedy of specific performance. These two actions are directly contradictory.

---

[10] In permitting the defendant to delve into the private lives not only of the Plaintiff, but two other non-parties to the action, at trial in 2005 the trial judge seemed to take the position that it was the Defendant's burden to prove that the Plaintiff's damages were caused by something other than the Defendant's actions, a position that was clearly at odds with the trial judge's own findings in September 2004 that King caused Plaintiff's applications to become suspended and thereby caused Plaintiff's special and consequential damages. In his final judgment, however, the trial judge seemed to place the burden upon the Plaintiff, i.e., he seemed to require Plaintiff to prove that she had a good reputation, which Plaintiff, by a preponderance of non-hearsay evidence, did establish, and not that it was the Defendant's burden to prove that the Plaintiff had a bad reputation, which, given the single hearsay writing he produced in support of this assertion, he did not prove.

14

Specifically, the trial judge ordered King on the record to publish a retraction of the defamatory statement upon which the Plaintiff sued, to the University of Minnesota, implicitly concurring with Plaintiff's claim that King's statements were defamatory and damaged Plaintiff in the eyes of the Minnesota legal and academic communities. This action by the trial court in sua sponte granting the equitable remedy of specific performance to the Plaintiff compels a legal conclusion that (1) this trial judge **did** have jurisdiction of these parties; and (2) by the determination of the trial court, which previously found that the Plaintiff proceeded in good faith, the Plaintiff's "hands were clean", i.e., the Plaintiff did not participate in any fraudulent representation as to Plaintiff's status with Quinnipiac University, thereby entitling Plaintiff to equitable relief.

Plaintiff duly notes that King, who argued with the trial judge at the time the order was given, subsequently colluded with defense counsel Conway, and opportunistically used the court order to publish a retraction as an excuse to issue a second defamatory communication on January 18, 2005.

As noted elsewhere in this record, the January 18, 2005 communication, together with the substantially similar May 24, 2000 communication that was litigated, were reviewed by the University of Minnesota in the context of a data challenge by the Plaintiff. On June 10, 2005, the University found for the Plaintiff, ruling that the King statements were inaccurate and incomplete and would be stricken from Plaintiff's academic record and destroyed and that third parties would be notified of the determination.

The judgment of the district court, dismissing the action off the merits, was filed on January 18, 2005. On January 25, 2005, within the ten-day window specified by FRCP 58, the pro se Plaintiff duly submitted a letter request for a new trial to the trial judge. In

accordance with the trial judge's explicit instructions that Plaintiff communicate directly with "the judge", Plaintiff submitted the letter request directly to the judge's chambers, utilizing the email address that Plaintiff was given by the judge's clerk, Linda Kunufsky. <u>Plaintiff duly notes that transmission and receipt times of email are monitored and documented by Internet Service Providers (ISPs). In this case, the date and time of the Plaintiff's email transmission, together with a copy of the email itself, was archived electronically by Plaintiff's computer as well as the court's computer. Given these facts, there can be no question that the Plaintiff transmitted the email request for a new trial within the requisite 10-day time frame and that the trial judge, who ordered Plaintiff to communicate directly with him, received it.</u>

Linda Kunofsky rejected and returned the email request to the Plaintiff, stating that email correspondence directly to the trial judge was improper as to form and would not be accepted by the court. Plaintiff re-filed the letter request, requesting retroactive filing on the basis that Plaintiff submitted the request in accordance with a court order. The filing was not retroactively docketed, leading the Second Circuit to erroneously conclude that the request for new trial was not timely. In fact, it was timely and was submitted to the court in substantial, if not perfect, conformity with the explicit instructions of the trial judge.

On February 12, 2005, in accordance with the instructions of the trial judge's office, Plaintiff appealed. In its summary opinion dated December 23, 2005, the Second Circuit raised the issue of jurisdiction, stating that the filing of a request for new trial by Plaintiff within 10 days of entry of the January 18, 2005 judgment would deprive the appellate court of jurisdiction pending adjudication of the motion. On December 28, 2005, the trial

court, which had held Plaintiff's motion for a new trial for more than one year, denied all pending motions, including the timely-filed Motion for New Trial, as moot.

In other proceedings, the hearsay Burke-Mabley memoranda upon which the Defendant relies at bar was sealed on Plaintiff's pro se motion by a judge of the Fourth Judicial District of Minnesota on February 14, 2005. The seal order followed an attempt by a Minnesota attorney, Christopher Renz to misrepresent it for purposes of harassment and to discredit the Plaintiff in a manner substantially similar, if not identical, to the "scorched earth" litigation tactics utilized by defense counsel Conway and Nouri.

Plaintiff duly notes that Minnesota court records are subject to the provisions of Rule 9, "Records of the Judicial Branch", an addendum to the Minnesota Government Data Practices Act, Minn. Stat. 13.04, et seq. Under Rule 9, the ability of a district court to expunge, destroy, or grant and deny public access to its own records is plenary. Once sealed, a court file is deemed by the Minnesota Judicial Office to have ceased to exist, i.e., by the account of the Office of the State Court Administrator, a court clerk, in response to an inquiry regarding a sealed record, is required to state to the inquiring party that no such record exists.

On March 1, 2005, following grant of the seal order and with the knowledge of the Minnesota court, Plaintiff filed a complaint of lawyer misconduct against Renz, which was duly docketed and investigated by the Minnesota Lawyers' Board of Professional Responsibility in St. Paul, MN. On July 25, 2005, the Judge Kenneth Jorgenson, Director, Minnesota Lawyers' Board of Professional Responsibility, issued an admonition and censure of Renz. Opinion of Judge Kenneth Jorgenson, Director, Minnesota Lawyers

Board of Professional Responsibility, *IN RE: The Matter of Christopher Paul Renz,* (2005).

Several weeks earlier, on June 10, 2005, Susan McKinney, Data Practices Officer, University of Minnesota, had upheld Plaintiff's challenge of the May 25, 2000 and January 18, 2005 statements authored by David King under § 13.04 (4) of the Minnesota Government Data Practices Act (MGDPA). Upon a finding that the King representations as to Plaintiff's good standing status were "inaccurate and incomplete" and harmful to the Plaintiff within the meaning of Minn. Stat. §13.04(4), McKinney granted the most drastic remedy, excision and destruction, with third-party notification, permitted by the MGDPA.

Under the terms of the MGDPA, which includes the University of Minnesota, Minnesota courts, and derivatively, a Connecticut federal court, sitting in diversity, are required to defer to the findings of fact and conclusions of law by an MGDPA "responsible authority", in this case, Susan McKinney. The McKinney certification thus directly contradicts the trial court's conclusion that "no reasonable juror" could find for Plaintiff and is, or should be binding upon this court.

In still other proceedings, Plaintiff sued the Fourth Judicial District Court of Minnesota on November 10, 2004, asserting claims under Title 42, Section 1983 of the United States Code and common-law defamation and invasion of privacy claims. The judicial district moved unsuccessfully to dismiss. By order dated April 12, 2005, the Plaintiff's claims were upheld. This determination by a sister federal court of competent jurisdiction, viewed in the context of the totality of circumstances, further directly contradicts the trial court's conclusion that "no reasonable juror would possibly find for the plaintiff."

On January 5, 2006, Plaintiff filed a timely Petition for Re-Hearing by the full court en banc in the United States Court of Appeals for the Second Circuit. That Petition for Re-Hearing is presently pending and, to date, the appellate court has not issued its mandate, relinquishing jurisdiction of the case. Plaintiff files the instant Motion to Vacate the January 18, 2005 Judgment and for other relief at this time to effect compliance with the one-year time requirement specified by FRCP 60, which expires on January 18, 2006.

## ARGUMENT

I. **THE PLAINTIFF HAS ESTABLISHED CLEAR ENTITLEMENT TO AN ORDER VACATING THE JANUARY 18, 2005 JUDGMENT UNDER FRCP 60 ON GROUNDS OF FUNDAMENTAL ERROR, ON THE BASIS THAT A PRIOR JUDGMENT UPON WHICH THE JANUARY 18 JUDGMENT IS BASED HAS BEEN REVERSED OR OTHERWISE VACATED; AND ON THE BASIS THAT THE TOTALITY OF THE ACTIONS BY THE DEFENDANT AND HIS ATTORNEYS IS TANTAMOUNT TO A FRAUD UPON THE COURT**

A motion to vacate an order of judgment of a federal district court is expressly authorized by FRCP 60. On motion and on such terms as are just, a court may relieve a party or the party's legal representative of a final judgment, order, or proceeding, and may order a new trial or grant such other relief as may be just for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence, which be due diligence could not have been discovered in time to move for new trial; (3) fraud (whether heretofore demonstrated as intrinsic or extrinsic), misrepresentation, or misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been released, satisfied, or discharged of a prior judgment upon which it has been based has been reversed or otherwise vacated, or it is no longer equitable that the judgment have prospective application; and (5) any other reason justifying relief from the operation of the judgment.