UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Barbara R. Burns,                            Docket No. 02-897 (RNC)

    Plaintiff

v.

David S. King,

    Defendant

## CERTIFICATION OF BARBARA R. BURNS

Barbara R. Burns, upon oath, deposes and says:

1. That I am the Plaintiff in the above-entitled matter; that I make this Certification in support of Plaintiff's Motion to Vacate January 18, 2005 Judgment; and that this Certification is based upon my personal knowledge.

2. That, in accordance with the pre-trial order of this court at conference on December 9, 2005, I submitted a letter-motion setting forth specific objections and requesting a new trial in the above-entitled matter to the trial judge and that the same was duly transmitted to and received by Linda_Kunofsky@ctd.uscourts.gov on January 22, 2005, with contemporaneous mail service upon the Clerk of the United States District Court, and that this successful email transmission is verifiable by my Internet Service Provider (ISP) and the acknowledgment letter, with file stamp, that I received from the Clerk of the Court.

1

3. That in support of the statements contained in the Facts section of Plaintiff's Motion to Vacate January 18, 2005 Judgment, to which this Certification is appended, I hereby certify the following:

   1. On or about August 9, 1996, I attended public hearings in The Matter of LaJune Lange; that I sat in the gallery and became acquainted with, among other persons, Judge Lange's parents, the pastor of the Pilgrim Baptist Church, Minneapolis, MN, and a Hennepin County social worker named Theresa Graham; that, at the invitation of Judge Lange's father, Ms. Graham and I joined his group for lunch at the state capital; that, in the course of conversation, in the context of a discussion of the testimony in the Lange case, including, but not limited to, the letter that Judge Lange wrote to Justice Gardebring, Graham volunteered the information that she worked in the Hennepin County Government Center, and that, on one occasion, Kevin S. Burke "broke (her) door", which I interpreted to mean that he dispatched a workman to disable the lock or otherwise remove or disable the functionality of the door; that, following consultation with a Minnesota attorney, I prepared and submitted an affidavit, detailing Graham's statements and stating that they were witnessed by four persons, including myself and a clergyman, to Judge Doris Ohlsen Huspeni, who led the panel; and that, several weeks later, just before Thanksgiving 1996, I read a newspaper article in the *Star Tribune*, stating that the three-judge appellate panel hearing the Lange case had dismissed the charges against Judge

Lange, that Judge Huspeni was one of two appellate judges who voted to dismiss; and that Kevin Burke could not be reached for comment.

2. That on July 16, 2004, I was present in the Ramsey County Government Center at 15 Kellogg Boulevard, St. Paul, MN, at which time Judge Michael Bertolson of the Second Judicial District of Minnesota heard argument in a contract dispute in which I represented the Plaintiff; that opposing counsel brandished the same Burke-Mabley memoranda relied upon by defense counsel at bar, waving the same in the face of Judge Bertolson, and demanding that the case be summarily dismissed off the merits on the basis of the allegations contained in the memoranda; that I argued in opposing that Burke had been validly removed under MRCP 63.03 and, pursuant to the three appellate decisions cited in Plaintiff's Motion to Vacate January 18, 2005 Judgment, could not make substantive rulings or be seconded; that, in the presence of approximately one dozen persons, including myself, opposing counsel, and parties and counsel seated in the gallery and after reprimanding opposing counsel to "act like a lawyer", Judge Bertolson ruled on the record that the court would accord no validity or legal effect to the Burke-Mabley memoranda; and that on July 22, 2004, the Ramsey County Court granted judgment to the plaintiff for the full amount of the claim, in addition to court fees and costs.

3. That on January 27, 2005, I became aware of an ex parte communication effected by a Minnesota attorney named Christopher Renz consisting of a cover letter to which the Burke-Mabley memoranda was appended; that, in

3

response to this letter communication, I moved the Hennepin County District Court for seal of the Burke-Mabley memoranda, stating that it was being misrepresented as authoritative and binding when it was not for the purpose of discrediting me and my litigation position; and that the court heard and granted my motion to seal on February 14, 2005.

4. That, with the knowledge of the Hennepin County District Court, I filed a complaint of lawyer misconduct against Christopher Renz on or about March 1, 2005; that the same was duly docketed by the Lawyers' Board of Professional Responsibility, which commissioned a District Ethics Committee to investigate; and that, on July 25, 2005, Judge Kenneth Jorgenson of the First Judicial District of Minnesota, in his capacity of Director, Minnesota Lawyers' Board of Professional Responsibility, issued an admonition and censure of Renz.

5. That the statements of fact contained herein, which are verifiable by court and other official and business records, are true to the best of my knowledge and belief; and, as for statements of opinion, I believe that they are true.

DATED: January 14, 2006         BY: /s/ Barbara R. Burns

                                                         Barbara R. Burns

12 · BECOMING JUSTICE BLACKMUN



Blackmun's Harvard Law School transcript. His class rank was 120 out of 451.

them." A professor he consulted explained that the law school's grading scale was a harsh one, with few A's or B's awarded, and that "considering everything, I did mighty well to get my sixty-six." He followed this account with his own rueful comment: "Maybe."

One bright spot was his membership on the student team that won the Ames Competition, a high-profile moot court contest built around briefing and arguing appellate cases. The pressure eased when Blackmun realized that he had saved enough money, from his various jobs, to give them up and get through his third year with a manageable amount of borrowing. His final class rank was 120 out of 451, respectably near the top quarter of the class but a comedown for a student who three years earlier had been one of only twenty-four Harvard seniors chosen for Phi Beta Kappa and had graduated summa cum laude in mathematics. His memories of law school would remain raw for decades. For his seventieth birthday, in 1978, his oldest daughter, Nancy, sent him a copy

MINNESOTA BEGINNINGS · 13

of *One L*, a best-selling book about the rigors of the first year at Harvard Law School. The author, a young Harvard Law School graduate named Scott Turow, had autographed the copy at Nancy's request, and Blackmun wrote him a note of thanks.

"You certainly captured and poignantly described life at the Law School, with its worry and concern, its tension, its competitiveness, and its deep-seated discomfort," Blackmun told Turow. "Surely there is a way to teach law, strict and demanding though it may be, with some glimpse of its humaneness and its basic good—the art of getting along together—as well as its demands for perfection. You so properly point out that there is room for flexibility and different answers, and that not all is black or white. If I ever learned anything on the bench, it is that."

Blackmun graduated from Harvard Law School in 1932 and returned home to St. Paul without a job. He studied for the Minnesota bar examination over one weekend and passed it. He applied for a clerkship with a newly appointed federal court of appeals judge, John B. Sanborn, who kept his chambers in St. Paul. This was the same Judge Sanborn who, as a state court judge eight years earlier, had awarded first prize to Harry Blackmun's high school oration on the Constitution. But now, in the midst of the Great Depression, everything was uncertain, including whether emergency restrictions on the judiciary's budget would even permit Judge Sanborn to hire a law clerk. But on August 1 the clerkship came through, at $2,400 a year instead of the usual $2,400, although Blackmun did not mind the reduced salary. "How much that looks to me now! It may mean a way out of things," he wrote.

Judge Sanborn was one of seven judges on the United States Court of Appeals for the Eighth Circuit, then as now one of the most diverse of the federal appeals courts. The seven states of the Eighth Circuit ranged from the Dakotas and Minnesota, in the north, to Arkansas, then officially segregated and anchored to the Deep South. Its official seat was in St. Louis, to which the judges traveled on a regular basis from the courthouses in their home states where they kept their chambers.

